UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| - v. - | ) |
| | ) 20 Cr. 497 (GHW) |
| IVO BECHTIGER, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DANIEL WÄLCHLI'S MOTION TO DISMISS THE INDICTMENT AND FOR OTHER PRETRIAL RELIEF

Dated: September 30, 2022
      New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.
Jeremy H. Temkin
Richard F. Albert
Daniel P. Gordon
Katherine J. Drooyan
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant Daniel Wälchli*

## <u>TABLE OF CONTENTS</u>

<u>PRELIMINARY STATEMENT</u> ..................................................................................1

<u>STATEMENT OF FACTS</u> .....................................................................................2

I.     Background of the Investigation.........................................................................2

II.    The Indictment ..................................................................................................3

<u>ARGUMENT</u> ........................................................................................................5

I.     The Indictment is Barred by the Statute of Limitations....................................5

      A.     The Relevant Facts...................................................................................5

      B.     The Limitations Period .............................................................................8

      C.     The Legal Framework for Tolling the Statute of Limitations by Sealing an Indictment ..............................................................................9

      D.     The Government Cannot Justify Its Failure to Timely Unseal the Indictment ...........................................................................................10

            1.     Defense Counsel's October 15, 2020 Conversation with the Prosecutor Triggered the Governments Obligation to Unseal the Indictment ...............................................................12

            2.     At a Minimum, Mr. Lampert's February 1, 2022 Arrest Triggered the Government's Obligation to Unseal the Indictment .....................15

II.    The Indictment Must Be Dismissed Because it Relies Upon the Invalid Extraterritorial Application of the *Klein* Doctrine .......................................17

      A.     Background – The Problematic *Klein* Doctrine.............................................18

      B.     The *Klein* Conspiracy Charge Does Not Apply Extraterritorially to the Foreign Conduct Alleged in the Indictment................................................20

      C.     The Government Cannot Rely on the Clients to Establish Conduct Within the United States .............................................................................26

III.    If the Court Does Not Dismiss the Indictment, It Should Order the Government to Produce a Bill of Particulars, a Witness List, an Exhibit List, and Jencks Act and Impeachment Material on a Timely Basis ...........................................................27

    A.    The Court Should Order the Government to Produce a Bill of Particulars Naming All Unindicted Co-Conspirators ........................................................28

    B.    The Court Should Direct the Government to Produce Its Witness List, Exhibit List, and Jencks Act and Impeachment Materials at Least Sixty Days in Advance of Mr. Wälchli's Deadline to Move in Limine With Respect To Such Materials .............................................................................31

CONCLUSION.........................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Cleveland v. United States*,
   531 U.S. 12 (2000) .......................................................................................... 19

*EEOC v. Arabian American Oil Co.*,
   499 U.S. 244 (1991) ........................................................................................ 20

*Evans v. United States*,
   504 U.S. 255 (1992) ........................................................................................ 19

*Fiswick v. United States*,
   329 U.S. 211 (1946) .......................................................................................... 8

*Hammerschmidt v. United States*,
   265 U.S. 182 (1924) ................................................................................... 18, 24

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) .................................................................................... 19

*Marinello v. United States*,
   138 S. Ct. 1101 (2018) .................................................................................... 19

*McDonnell v. United States*,
   579 U.S. 550 (2016) ........................................................................................ 19

*McNally v. United States*,
   483 U.S. 350 (1987) ................................................................................... 17, 19

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) ........................................................................................ 20

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ........................................................................................ 20

*RJR Nabisco, Inc. v. European Community*,
   579 U.S. 325 (2016) ................................................................... 20, 21, 22, 26

*Skilling v. United States*,
   561 U.S. 358 (2010) ........................................................................................ 19

*Stogner v. California*,
    539 U.S. 607 (2003) ........................................................................................... 8

*Toussie v. United States*,
    397 U.S. 112 (1970) ........................................................................................... 8

*United States v. Akhavan*,
    20-cr-188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ........................... 30

*United States v. Al-Imam*,
    373 F. Supp. 3d 247 (D.D.C. 2019) ................................................................... 21

*United States v. Ballistrea*,
    101 F.3d 827 (2d Cir. 1996) .............................................................................. 23

*United States v. Barrett*,
    153 F. Supp. 3d 552 (E.D.N.Y. 2015) ............................................................... 30

*United States v. Bellomo*,
    176 F.3d 580 (2d Cir. 1999) ................................................................................ 8

*United States v. Bennett*,
    96-cr-126 (JFK), 2007 WL 2388897 (S.D.N.Y. Aug. 21, 2007) ........................... 10

*United States v. Bonventre*,
    2013 WL 2303726 (S.D.N.Y. May 28, 2013) ..................................................... 32

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987) .............................................................................. 28

*United States v. Bowman*,
    260 U.S. 94 (1922) ........................................................................................... 21

*United States v. Buck*,
    13-cr-282 (VM), 2017 WL 4174931 (S.D.N.Y. Aug. 28, 2017) ........................... 26

*United States v. Caldwell*,
    989 F.2d 1056 (9th Cir. 1993) .......................................................................... 23

*United States v. Cherico*,
    769 F. Supp. 2d 560 (S.D.N.Y. 2011) ............................................................... 10

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012) ................................................................ 17, 18, 20, 22

*United States v. Davidoff*,
  845 F.2d 1151 (2d Cir. 1988) ....................................................................................... 29

*United States v. Deglomini*,
  111 F. Supp. 2d 198 (E.D.N.Y. 2000) ..................................................................... 10, 16

*United States v. Ferguson*,
  478 F. Supp. 2d 220 (D. Conn. 2007) .......................................................................... 32

*United States v. Gigante*,
  436 F. Supp. 2d 647 (S.D.N.Y. 2006) ....................................................................Passim

*United States v. Halkbank*,
  15-cr-867, 2020 WL 5849512 (S.D.N.Y. Oct. 1, 2020) ............................................... 26

*United States v. Hoskins*,
  902 F.3d 69 (2d Cir. 2018) .......................................................................................... 22

*United States v. Ingredient Tech. Corp.*,
  698 F.2d 88 (2d Cir. 1983) ............................................................................................ 8

*United States v. Kahale*,
  789 F. Supp. 2d 359 (E.D.N.Y. 2009) .......................................................................... 30

*United States v. Klein*,
  247 F.2d 908 (2d Cir. 1957) .............................................................................. 17, 18, 23

*United States v. Lanier*,
  520 U.S. 259 (1997) .............................................................................................. 17, 22

*United States v. Levine*,
  249 F. Supp. 3d 732 (S.D.N.Y. 2017) ............................................................................ 8

*United States v. Mahaffy*,
  446 F. Supp. 2d 115 (E.D.N.Y. 2006) .......................................................................... 29

*United States v. Marion*,
  404 U.S. 307 (1971) ....................................................................................................... 8

*United States v. Maroun*,
  699 F. Supp. 5 (D. Mass. 1988) .................................................................................... 11

*United States v. McDonald,*
    2002 WL 2022215 (E.D.N.Y. Aug. 6, 2002) ......................................... 32

*United States v. Meregildo,*
    2012 WL 4378047 (S.D.N.Y. Sept. 24, 2012) ....................................... 32

*United States v. Muse,*
    633 F.2d 1041 (2d Cir. 1980).  ............................................... 9, 13, 15

*United States v. Nachamie,*
    91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................ 29, 30

*United States v. Napout,*
    963 F.3d 163 (2d Cir. 2020) ............................................................. 26

*United States v. Perez,*
    962 F.3d 420 (9th Cir. 2020) ............................................................ 21

*United States v. Rosengarten,*
    857 F.2d 76 (2d Cir. 1988) ............................................................... 23

*United States v. Savin,*
    2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ...................................... 30

*United States v. Srulowitz,*
    819 F.2d 37 (2d Cir. 1987) ....................................................... 9, 10, 11

*United States v. Turkish,*
    458 F. Supp. 874 (S.D.N.Y. 1978) .................................................. 32

*United States v. Turkish,*
    623 F.2d 769 (2d Cir. 1980) ............................................................. 32

*United States v. Vasquez,*
    899 F.3d 363 (5th Cir. 2018) ............................................................ 21

*United States v. Vilar,*
    530 F. Supp. 2d 616 (S.D.N.Y. 2008) ............................................. 32

*United States v. Watson,*
    599 F.2d 1149 (2d Cir. 1979) ................................................... 9, 10, 11

*United States v. Wiltberger,*
    18 U.S. 76 (1820) ............................................................................. 17

*United States v. Zarrab*,
   15-cr-867, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ........................................................ 26

*Walker v. Armco Steel Corp.*,
   446 U.S. 740 (1980) ............................................................................................................... 8

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018) .......................................................................................................... 21

Statutes

18 U.S.C. § 371 .................................................................................................................... Passim
18 U.S.C. § 3292 ............................................................................................................................ 9
18 U.S.C. § 3500 ................................................................................................................ 2, 28, 31
26 U.S.C. § 6531 ............................................................................................................................ 8
26 U.S.C. § 7201 .......................................................................................................................... 27
26 U.S.C. § 7206 .......................................................................................................................... 27
31 U.S.C. §§ 5314 and 5322(a) .................................................................................................... 27

Rules

Fed. R. Crim. P. 26.2 .......................................................................................................... 2, 28, 31

Regulations

31 C.F.R. §§ 1010.350, 1010.306(c) and (d), and 1010.840(b) .................................................... 27

## PRELIMINARY STATEMENT

Defendant Daniel Wälchli is a Swiss citizen and resident with no ties to the United States. During the period covered by the indictment (the "Indictment"), he worked as an executive at IHAG Holding AG ("IHAG Holding"), a Swiss holding company that owns a diversified group of subsidiaries including Privatbank IHAG Zurich AG ("PB IHAG") and Helvetic Investments Pte Ltd ("Helvetic"). The government has charged Mr. Wälchli and six other defendants—none of whom had any relevant connection to the United States—with a single count of conspiracy to defraud the United States through conduct that occurred entirely outside this country. The charged conspiracy relates to the alleged concealment by three U.S. taxpayers of accounts that they maintained at PB IHAG.

The prosecution suffers from two fatal flaws. *First*, even under the government's telling, the charged conspiracy concluded almost *seven years* before the charges against Mr. Wälchli were unsealed. The eleventh-hour sealed Indictment did not render this prosecution timely because the government unreasonably delayed unsealing the charges against Mr. Wälchli until after the limitations period had otherwise expired. As a result, the Indictment should be dismissed as barred by the statute of limitations.

*Second*, the charges rely on a judicially created theory of liability that is based on a misreading of the applicable statute. Absent a clear, affirmative indication in the text of 18 U.S.C. § 371 demonstrating that Congress intended that it apply extraterritorially, there is no valid basis to expand the reach of the statute to the foreign conduct alleged in the Indictment. Accordingly, this Court should dismiss the charges against Mr. Wälchli for failing to allege a cognizable conspiracy.

Further, if the Court declines to dismiss the Indictment, Mr. Wälchli respectfully asks the Court to order the government to provide, no later than sixty days in advance of Mr. Wälchli's deadline to move *in limine* with respect to such materials, (a) a Bill of Particulars identifying all known, unindicted co-conspirators, (b) a list of witnesses it intends to call in its case in chief, (c) any statements of such witnesses as defined in 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2, (d) any impeachment material relating to such witnesses, and (e) an exhibit list and copies of the exhibits it intends to offer in its case-in-chief.

## STATEMENT OF FACTS

### I.    Background of the Investigation

On August 29, 2013, the United States Department of Justice (the "DOJ") and the Swiss Federal Department of Finance jointly announced the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Swiss Bank Program"), which gave qualifying Swiss banks the opportunity to avoid prosecution for having allowed their U.S. clients to hold undisclosed accounts by coming forward and disclosing information regarding their cross-border activities and clients.  *See Joint Statement Between the U.S. Department of Justice and the Swiss Federal Department of Finance* (Aug. 29, 2013), https://www.justice.gov/iso/opa/resources/7532013829164644664074.pdf.

On December 23, 2013, PB IHAG indicated its intent to participate in the Swiss Bank Program, and it entered into a non-prosecution agreement with the DOJ on November 24, 2015. *See Privatbank IHAG Zurich AG DOJ Swiss Bank AG Program—Category 2 Non-Prosecution Agreement* (Nov. 24, 2015), https://www.justice.gov/opa/file/795676/download ("PB IHAG NPA").  In connection with the bank's participation in that program, attorneys representing PB

IHAG held at least six meetings with the DOJ, during which the bank's lawyers gave their DOJ counterparts a detailed description of the conduct at issue in this case. *See* Temkin Decl. ¶ 17.[1]  As a result, the facts underlying the Indictment are described in the publicly accessible PB IHAG NPA. *See* PB IHAG NPA, Statement of Facts ¶¶ 23–25.

## II.   **The Indictment**

On September 15, 2020, a grand jury returned a one-count Indictment charging Mr. Wälchli and six other defendants—Ivo Bechtiger, Bernhard Lampert, Peter Rüegg, Roderic Sage, Rolf Schnellmann, and Allied Finance Trust AG—with participating in a conspiracy to defraud the United States in violation of 18 U.S.C. § 371. *See* Dkt. No. 2 (Indictment).  The charges arise out of the conduct disclosed by PB IHAG's counsel over six years earlier and described in the PB IHAG NPA.  Specifically, the Indictment alleges that the defendants—none of whom are U.S. citizens or residents, or are even alleged to have traveled to the United States during the period covered by the Indictment—designed and implemented a scheme known as the "Singapore Solution" to conceal the bank accounts of three PB IHAG clients who are alleged to have been U.S. taxpayers (the "Clients"). *Id.* ¶¶ 1, 9.

According to the Indictment, the Singapore Solution was designed in 2008 and 2009 to allow PB IHAG clients to conceal the beneficial ownership of their accounts. *Id.* ¶¶ 10, 13(a).  As part of the Singapore Solution, PB IHAG accounts of participating clients were closed and the funds in those accounts were transferred to accounts in Hong Kong in the names of nominee

---

[1] "Temkin Decl." refers to the Declaration of Jeremy H. Temkin in Support of Defendant Daniel Wälchli's Motion to Dismiss the Indictment and for Other Pretrial Relief; all citations to "Dkt. No." refer to documents entered on the docket in *United States v. Bechtiger*, *et al.*, 20-cr-497 (S.D.N.Y.).

corporations formed by a Hong Kong company co-owned by IHAG Holding, an Allied Finance affiliate, and another offshore entity. *Id*. ¶¶ 2(d), 10, 13(c)–(d). The funds were subsequently returned to PB IHAG in newly opened accounts held by Helvetic, a Singapore asset manager. *Id*. ¶ 10.

The Indictment alleges that three U.S. taxpayers participated in the Singapore Solution. *Id*. ¶ 7. In 2009, Client-1, a U.S. citizen who managed his family's account at PB IHAG, met with Mr. Rüegg, his PB IHAG relationship manager, and others in both Zurich and Hong Kong, *id*. ¶¶ 14, 16–18, and between September and December 2009, Client-1's funds were routed from PB IHAG through several accounts at a Hong Kong bank before returning to PB IHAG in a bank account in the name of Helvetic. *Id*. ¶¶ 20(a)–(d). Similarly, between June and December 2009, funds from the account of Client-2, another U.S. citizen, flowed from PB IHAG through several accounts at a Hong Kong bank before returning to PB IHAG in a bank account in Helvetic's name. *Id*. ¶¶ 34, 36(a)–(c). Finally, in May 2010, funds belonging to Client-3, a U.S. citizen who resided in California and Vietnam, were transferred first from his account at PB IHAG to a bank account in Liechtenstein in the name of a corporate entity controlled by Mr. Schnellman, then to a Helvetic bank account at a Hong Kong bank, and ultimately to accounts at PB IHAG in the name of Helvetic. *Id*. ¶¶ 46, 49–50.

Significantly, none of the Clients is alleged in the Indictment to have been a co-conspirator, and all twenty-four overt acts identified in the Indictment are alleged to have occurred outside the United States. Indeed, the only overt acts identified in the Indictment as having touched the United States were the incidental use of correspondent bank accounts in New York in connection with two of seven transfers of Client-3's funds from Hong Kong to Switzerland in 2010 and 2011 and four

of six transfers of Client-3's funds from Switzerland to Singapore in 2011 and 2012.  *Id.* ¶¶ 60(q) and (u).

**ARGUMENT**

**I.      The Indictment is Barred by the Statute of Limitations**

**A.      The Relevant Facts**

As noted above, the grand jury returned the Indictment on September 15, 2020. Notwithstanding the public disclosure of the underlying facts in the PB IHAG NPA and its intervening contacts with attorneys representing PB IHAG, various witnesses, and at least one of the defendants, *see* Temkin Decl. ¶ 18, the government moved to file the Indictment under seal. Although the government failed to provide a reason for sealing the Indictment, Magistrate Judge Paul Davidson granted the government's application on the record.  *See* Temkin Decl. Ex. A (transcript of Sept. 15, 2020 proceeding returning the Indictment).

On October 14, 2020, Mr. Wälchli's counsel—having come to believe that the government's investigation had reached a critical juncture, and that there was a substantial likelihood that an indictment was forthcoming—reached out to the lead prosecutor with the DOJ's Tax Division (the "Prosecutor") on Mr. Wälchli's behalf.  *See* Temkin Decl. ¶¶ 6, 8.[2]  During a telephone call the next day, defense counsel inquired as to the status of the government's investigation, informed the Prosecutor that Mr. Wälchli was prepared to come to the United States to face any charges that may be brought against him, and requested that, "in the event charges are filed, [the government] give Mr. Wälchli the opportunity to come to the United States voluntarily,

---

[2] The government has known the identity of Mr. Wälchli's counsel in connection with this matter since June 11, 2014.  *See* Temkin Decl. ¶ 5.

as opposed to devoting the time and resources to lodging a warrant for his arrest with Interpol." *Id*. ¶ 8, Ex. B.[3]

Although the Indictment had been filed under seal one month earlier, the Prosecutor did not indicate that charges were pending against Mr. Wälchli or otherwise respond to defense counsel's request for information regarding the status of the government's investigation. *See id*. ¶ 8. Nor did the government take Mr. Wälchli up on his offer to come to the United States. Indeed, the government did not follow up on the October 15, 2020 conversation in any way until October 5, 2021, nearly a year later. *See id*. Ex. C (Oct. 5, 2021 email from DOJ to defense counsel). Instead, notwithstanding Mr. Wälchli's offer, the government kept the Indictment under seal and filed or maintained an Interpol Red Notice with respect to Mr. Wälchli. *See id*. Ex. D (Mar. 17, 2022 letter from DOJ to defense counsel); *see also* Dkt. No. 26 (transcript of arraignment held on Mar. 16, 2022) at 9, Temkin Decl. Ex. E (July 17, 2022 letter from DOJ to defense counsel).

During the year the Indictment remained under seal, two of Mr. Wälchli's co-defendants— Mr. Lampert and Mr. Rüegg—were arrested on Red Notices. *See* Temkin Decl. Ex. E. *First*, on or about February 1, 2021, Mr. Lampert was arrested and detained by ███████████████ ████████, a country with which the United States does not have an extradition treaty. *See id*. Nineteen days later, on February 20, 2021, the government obtained a limited unsealing order permitting it to give Mr. Lampert and his defense team a copy of the Indictment, subject to their agreement not to disclose its existence to others without prior court authorization. *See id*. Exs. E, F

---

[3] Defense counsel memorialized this conversation in a letter to the Prosecutor dated October 20, 2020, a copy of which is attached to the Temkin Declaration as Exhibit B.

(Feb. 20, 2021 Order).  Mr. Lampert was released by the ███ authorities on or about March 15, 2021 and returned to Switzerland on or about April 1, 2021.  *See id*. Ex. E.

Second, on or before August 16, 2021, Mr. Rüegg was arrested in Mallorca, Spain.  *See id*. Ex. E; *see also*, *e.g.*, Katharina Bart, *Swiss Bank Executive Arrested in Mallorca* (Aug. 19, 2021), https://www.finews.com/news/english-news/47532-ihag-peter-rueegg-arrest-tax-us; *Schweizer Banker am Flughafen Mallorca festgenommen* ("Swiss Banker Arrested at Mallorca Airport") (Aug. 17, 2021), https://www.mallorcazeitung.es/panorama/2021/08/17/schweizer-finanzunternehmer-auf-mallorca-festgenommen-56299606.html. ████████████████

████████████████████████████████████████████████████

████████████████████████████  *See* Temkin Decl. Ex. E.[4] On September 22, 2021, however, the government learned that Mr. Rüegg had absconded to Switzerland, ████████████████████████████.  *See id.*; *see also*, *e.g.*, Katharina Bart, *Swiss Banker Escapes Back To Switzerland* (Sept. 27, 2021), https://www.finews.com/news/english-news/48066-peter-rueegg-ihag-switzerland-doj-tax.

On September 28, 2021, the government finally filed a request to unseal the Indictment, noting that Mr. Rüegg's arrest had "received substantial news coverage in Switzerland."  Dkt. No. 3 (Sept. 28, 2021 Unsealing Order).  That same day, Magistrate Judge Gabriel Gorenstein issued an order granting the government's application and unsealing the Indictment.  *See id*.  One week later, on October 5, 2021—355 days after defense counsel had communicated Mr. Wälchli's willingness to come to the United States to the DOJ—the government accepted Mr. Wälchli's

---

[4] While the government has represented that the Rüegg extradition package included a copy of the Indictment, it declined to provide defense counsel with the extradition package submitted to the Spanish authorities, nor did it provide a copy of any unsealing order.  *See* Temkin Decl. Ex. E.

offer.  *See* Temkin Decl. Ex. C.  Accordingly, Mr. Wälchli traveled to the United States and was

arraigned before Magistrate Judge Robert W. Lehrburger on March 16, 2022.  *See* Dkt. No. 22.

**B.**    **The Limitations Period**

Statutes of limitations are "the primary guarantee against bringing overly stale criminal

charges," "provid[ing] predictability," *United States v. Marion*, 404 U.S. 307, 322 (1971)

(quotation marks omitted), "peace of mind," *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751

(1980), and "protection [for] those who may during the limitation have lost their means of

defence," *Marion*, 404 U.S. at 322 (quotation marks and alterations omitted).  They also encourage

law enforcement officials to investigate criminal cases promptly, *see Toussie v. United States*, 397

U.S. 112, 115 (1970), and "reflect[] a legislative judgment that, after a certain time, no quantum of

evidence is sufficient to convict," *Stogner v. California*, 539 U.S. 607, 615 (2003).  Thus, the

Supreme Court has directed that "criminal statutes of limitation are to be liberally interpreted in

favor of repose."  *Marion*, 404 U.S. at 322 n.14.

Insofar as is relevant here, the applicable statute of limitations for a conspiracy to defraud

the United States in violation of 18 U.S.C. § 371 is six years.  *See* 26 U.S.C. § 6531; *see also*, *e.g.*,

*United States v. Bellomo*, 176 F.3d 580, 598 (2d Cir. 1999); *United States v. Ingredient Tech.*

*Corp.*, 698 F.2d 88, 99 (2d Cir. 1983).  Because Section 371 requires an overt act in furtherance of

the conspiracy, "[t]he statute of limitations . . . runs from the last overt act during the existence of

the conspiracy." *Fiswick v. United States*, 329 U.S. 211, 216 (1946).

On a "pre-trial motion to dismiss a . . . conspiracy charge as time-barred[,] . . . the Court

must accept the Government's factual allegations as true[,] . . . including the allegation of an overt

act being in furtherance of a conspiracy."  *United States v. Levine*, 249 F. Supp. 3d 732, 736

(S.D.N.Y. 2017) (quotation marks omitted).  The last overt act charged in the Indictment—a cash withdrawal by Client-3—occurred on October 16, 2014.  *See* Dkt. No. 2 ¶ 60(x).  Thus, on the face of the Indictment, the limitations period expired on October 16, 2020.

In this case, however, the government requested legal assistance from foreign governments and, in connection with some of those requests, obtained orders tolling the statute of limitations under 18 U.S.C. § 3292.  Pursuant to 18 U.S.C. § 3292(c), "[t]he total of all periods of suspension under this section with respect to an offense . . . shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before" the limitations period would otherwise have expired.  Here, the relevant foreign jurisdictions took final action on the government's requests prior to October 16, 2020.  *See* Temkin Decl. ¶ 19. Accordingly, the government's tolling applications extended the limitations period by a maximum of six months, through April 16, 2021—213 days after the government filed the Indictment under seal.

C.    **The Legal Framework for Tolling the Statute of Limitations By Sealing an Indictment**

"The law [is] clear that the filing of a sealed indictment within the statutory period serves to toll the statute of limitations even if the indictment is not unsealed until after the period has expired."  *United States v. Watson*, 599 F.2d 1149, 1154 (2d Cir. 1979), *opinion amended on reh'g*, 690 F.2d 15 (2d Cir. 1979), *and modified on reh'g sub nom. United States v. Muse*, 633 F.2d 1041 (2d Cir. 1980).  "There [are] limits, however, on the Government's privilege to toll the statute of limitations by a sealed indictment," *id.*, and a criminal defendant has a "right to challenge the propriety of the sealing . . . after the indictment is opened to public inspection," *United States v. Srulowitz*, 819 F.2d 37, 41 (2d Cir. 1987) (emphasis omitted).

When a defendant challenges the propriety of the sealing of an indictment, the government bears the burden of establishing that "the decision to keep an indictment secret [was] informed by the exercise of sound discretion in the public interest." *Id*. at 40; *see also*, *e.g.*, *United States v. Cherico*, 769 F. Supp. 2d 560, 567 (S.D.N.Y. 2011). "If the Government is unable to justify the sealing of the indictment, the expiration of the limitations period prior to unsealing would result in dismissal of the indictment, as it would in any case in which an indictment were untimely." *United States v. Gigante*, 436 F. Supp. 2d 647, 654–55 (S.D.N.Y. 2006); *see also*, *e.g.*, *United States v. Bennett*, 96-cr-126 (JFK), 2007 WL 2388897, at *2 (S.D.N.Y. Aug. 21, 2007).

"Even if the Government has a legitimate prosecutorial purpose for sealing an indictment, the time period in which the indictment may remain sealed is not boundless." *Gigante*, 436 F. Supp. 2d at 655. Rather, "the policy of repose underlying the statute demands that the Government unseal the indictment *as soon as its legitimate need for delay has been satisfied*." *Watson*, 599 F.2d at 1154 (emphasis added); *see also*, *e.g.*, *Cherico*, 769 F. Supp. 2d at 569. "This policy furthers the public's interest in prompt investigation of cases, as well as the interest in avoiding the inevitable prejudice to the defendant occasioned by the delay." *Gigante*, 436 F. Supp. 2d at 655 (quotation marks omitted).[5]

### D.    The Government Cannot Justify Its Failure to Timely Unseal the Indictment

The Second Circuit has explained that "there are various legitimate prosecutorial objectives" that, if pursued in good faith, "will justify the sealing of an indictment." *Srulowitz*, 819

---

[5] Notably, a defendant "need not show prejudice" "[w]here the government has no legitimate purpose served by keeping the indictment sealed beyond the expiration of the limitations period, . . . even if the indictment was properly sealed initially." *United States v. Deglomini*, 111 F. Supp. 2d 198, 200 (E.D.N.Y. 2000).

F.2d at 40.  Here, the government did not provide Magistrate Judge Davidson with any rationale for sealing the Indictment.  *See* Temkin Decl. Ex. A.  Although the government was not required to do so, *see Srulowitz*, 819 F.2d at 41, the Honorable Denny Chin has described as "troubling" the government's practice of not "explain[ing] its request for the sealing of an indictment, and for the magistrate judges to routinely grant these requests without asking for an explanation." *Gigante*, 436 F. Supp. 2d at 660.  Faced with the widespread practice of sealing indictments without a stated reason, some courts have held that, "[w]hen a request for sealing is made without explanation, it is more than mere silence.  It is an implicit representation that the request is being made for the ordinary purpose of preventing the flight of the defendant before he can be apprehended." *Id*. at 659 (quoting *United States v. Maroun*, 699 F. Supp. 5, 7 (D. Mass. 1988)) (alterations omitted).

Given that the government's sealing request pre-dated Mr. Wälchli's offer to surrender, we do not challenge the initial sealing of the Indictment.[6]  Nevertheless, after filing the Indictment under seal, the government was obligated to unseal the Indictment "as soon as its legitimate need for delay [was] satisfied." *Watson*, 599 F.2d at 1154; *see also id.* at 1155 (analyzing the impact of delay in unsealing an indictment separately as to each defendant).  Because it failed to do so as to Mr. Wälchli, the government cannot rely on the sealed Indictment to toll the limitations period through September 28, 2021—when it finally moved to unseal the Indictment.

---

[6] Notwithstanding the government's failure to create a record supporting its need for sealing at the time the Indictment was returned, we assume the government will argue that sealing the Indictment was necessary to enable it to "facilitat[e] [the] arrest" of the defendants, all of whom were located abroad.  *Srulowitz*, 819 F.2d at 40.

### 1.  Defense Counsel's October 15, 2020 Conversation with the Prosecutor Triggered the Government's Obligation to Unseal the Indictment

As explained above, during a telephone call on October 15, 2020, defense counsel informed the government that Mr. Wälchli was prepared to come to the United States to contest any charges filed against him.  *See* Temkin Decl. ¶ 8.  Defense counsel memorialized Mr. Wälchli's willingness to appear in a follow-up letter dated October 20, 2020.  *Id.* Ex. A.  In the face of Mr. Wälchli's offer, the government could no longer rely on its desire to facilitate his arrest to support sealing, and thus had an obligation to unseal the Indictment as to Mr. Wälchli.

*Gigante* is instructive.  In rejecting the government's assertion that, *inter alia*, it needed to keep an indictment under seal because the defendant "presented a flight risk," Judge Chin explained that "Gigante was well aware . . . that he was being investigated," his "whereabouts were never unknown, he repeatedly volunteered to meet with the Government prior to being indicted, he asked that he be allowed to surrender if he were indicted rather than being arrested on the street or in front of his children, and he notified the FBI when he traveled outside of the jurisdiction even before he was aware that he had been indicted."  436 F. Supp. 2d at 657.

As in *Gigante*, Mr. Wälchli asked that he be allowed to surrender voluntarily if indicted, and his whereabouts were known to the government.  Furthermore, the government knew that Mr. Wälchli and others were aware of the government's investigation.  Not only does the PB IHAG NPA describe the underlying conduct, but between June 2014 and September 2020, the DOJ was in contact with U.S. counsel representing PB IHAG, numerous witnesses, and at least one putative defendant.  *See* Temkin Decl. ¶ 18.   The government also sought legal assistance from the Swiss authorities which, as the government knew, triggered notice to Mr. Wälchli, Mr. Lampert, Mr. Rüegg, Mr. Sage, Mr. Schnellmann, and others.  *Id.* ¶ 20.  Indeed, the mere fact that Mr. Wälchli's

counsel affirmatively contacted the Prosecutor shortly after the Indictment was returned demonstrated the defendants' awareness that the investigation had reached a critical phase.

Although courts have upheld sealing an indictment to avoid tipping off co-defendants who might otherwise flee the jurisdiction, *see*, *e.g.*, *Muse*, 633 F.2d at 1044, the defendants in those cases were not already aware of the government's investigation. Furthermore, this is not a case in which the potential targets live in or regularly travel to the United States. Rather than seeking to prevent the defendants' "flight," the government was apparently hoping that by keeping the Indictment sealed, one or more defendants would travel in such a way as to expose themselves to arrest. But given their awareness of the investigation, the defendants already had significant incentives to restrict their travels to avoid possible arrest—to the extent they were predisposed to do so. At a minimum, the remote chance of arresting another defendant in a jurisdiction from which the government could successfully extradite does not justify the indefinite delay in unsealing the Indictment as to Mr. Wälchli, who had expressed his willingness to face any charges brought against him.

Even assuming the government genuinely believed that accepting Mr. Wälchli's offer to surrender would have rendered more difficult the successful prosecution of one or more of his co-defendants, it could have mitigated that risk by applying for a limited unsealing order with respect to Mr. Wälchli alone, as it did with Mr. Lampert following his arrest ███ in February 2021. *See* Temkin Decl. Ex. F. Such an order would have notified Mr. Wälchli of the charges against him while offering the government comfort that Mr. Wälchli's knowledge of the Indictment would not impact its ability to arrest his co-defendants.

13

Indeed, the government's actions with respect to Mr. Lampert demonstrate that it had no valid basis to continue sealing the Indictment as to Mr. Wälchli following the October 15, 2020 communication.  Upon his arrest ███████ in February 2021, Mr. Lampert stood in exactly the same shoes as Mr. Wälchli had for the preceding four months:  each was (a) a person charged in the Indictment who (b) was located in a country with which the United States did not have an extradition treaty applicable to this case (████████ for Mr. Lampert and Switzerland for Mr. Wälchli).  But the government revealed the Indictment to Mr. Lampert's counsel, while it chose not to make that same disclosure to Mr. Wälchli, notwithstanding his expressed willingness to come to the United States to defend against the charges.  Instead, it kept the Indictment sealed indefinitely as to Mr. Wälchli.

Alternatively, the government could have obtained a bare-bones superseding indictment charging Mr. Wälchli alone, thereby allowing it to fully unseal the charges against him without alerting the remaining defendants as to the fact that they too were named in charging instruments. Indeed, the government has done just that in other cases in this District.  *See*, *e.g.*, *United States v. Owens et al.*, 18-cr-693 (RMB) (charging multiple defendants in separate indictments that could be unsealed as defendants were apprehended); *United States v. Scott et al.*, 17-cr-630 (ER) (same).[7]

---

[7] Another option available to the government was to initiate a separate, sealed criminal case against Mr. Wälchli alone.  The very same prosecution team involved in this case did so in the related case *United States v. Chinn*, 19-cr-915 (VM) (S.D.N.Y.), which was sealed for nearly two years pending the government's decision to unseal the Indictment.  *See id.* Dkt. No. 7 (informing the court on September 27, 2021 that, "given the status of the [g]overnment's [related] investigation [into Mr. Wälchli and his co-defendants], there is no longer a need to continue to maintain this case under seal"); *see also U.S. Attorney Announces Unsealing Of Indictment Charging Six Individuals And One Corporate Entity With Tax Fraud Conspiracy, And Related Guilty Plea* (Sept. 28, 2021), https://www.justice.gov/usao-sdny/pr/us-attorney-announces-unsealing-indictment-charging-six-individuals-and-one-corporate (simultaneously announcing the Indictment and the *Chinn* case).

14

Put simply, once Mr. Wälchli offered to come to the United States to face any charges that were brought against him, the government no longer had any rationale to keep the Indictment sealed as to him.  Having chosen to pass on Mr. Wälchli's offer, the government was not entitled to the benefit of continued tolling of the statute of limitations indefinitely pending the fortuitous arrest and extradition of one of his co-defendants.  Rather, the statute of limitations began to run again when Mr. Wälchli communicated his offer on October 15, 2020.  As explained above, when the government first filed the sealed Indictment, the limitations period stopped with 213 days left on the clock.  Restarting the clock on October 15, 2020 resulted in the expiration of the statute of limitations 213 days later, on May 16, 2021, more than four months before the government finally unsealed the Indictment.

### 2. At a Minimum, Mr. Lampert's February 1, 2021 Arrest Triggered the Government's Obligation to Unseal the Indictment

Even assuming the October 15, 2020 phone call alone was insufficient to overcome the purported need to keep the Indictment sealed, the government could not delay unsealing the Indictment indefinitely.  *See Gigante*, 436 F. Supp. 2d at 655 ("Even if the Government has a legitimate prosecutorial purpose for sealing an indictment, the time period in which the indictment may remain sealed is not boundless.").  Rather, once Mr. Lampert was arrested, any claim by the government that the arrest of one defendant "would cause his co-defendants to flee" could no longer hold water.  *Muse*, 633 F.2d at 1044.  Having obtained a limited unsealing order as to Mr. Lampert, at minimum, the government could (and should) have done the same for Mr. Wälchli.

The government appears to have conceded, at least implicitly, that the press around Mr. Rüegg's August 2021 arrest triggered its obligation to unseal the Indictment.  *See* Dkt. No. 3. Although Mr. Lampert's arrest does not appear to have been reported in the press, the government

15

should have expected that the other defendants would learn of it.  According to the government, Mr. Lampert, a prominent member of the close-knit Zurich financial community, spent two months in ███, including approximately six weeks in custody.  *See* Temkin Decl. Ex. E.  The notion that the other defendants, four of whom had worked in the same community as Mr. Lampert, would not learn of his arrest was fanciful.

Nor can the government rely upon the limited unsealing order as evidence to the contrary. As an initial matter, while the order prohibits Mr. Lampert and his "Defense Team" from "provid[ing], disseminat[ing], or otherwise reveal[ing] the Indictment or the existence or any contents thereof to any person, entity, or third party, by any means, without first obtaining authorization from the Court," it does *not* prohibit them from discussing the fact of his *arrest*.  *Id.* Ex. F.  Moreover, the order was issued nineteen days *after* Mr. Lampert's arrest, leaving plenty of time for his counsel (much less others associated with Mr. Lampert, whom the order does not reach) to have discussed the fact that Mr. Lampert was arrested with others, including attorneys for suspected co-defendants.

Thus, even if Mr. Wälchli's initial offer to surrender did not trigger an obligation to unseal the Indictment as to him (which it did), there was no possible justification for continuing to keep Mr. Wälchli in the dark after Mr. Lampert's arrest.  If the statute of limitations began running again on the date of that arrest (February 1, 2021), it would have expired 213 days later on September 2, 2021—nearly four weeks before the government unsealed the Indictment.

* * *

Accordingly, the Indictment is time-barred as to Mr. Wälchli.  *See*, *e.g.*, *Gigante*, 436 F. Supp. 2d at 654–55; *Deglomini*, 111 F. Supp. 2d at 200–03.

## II.    The Indictment Must Be Dismissed Because it Relies Upon the Invalid Extraterritorial Application of the *Klein* Doctrine

The Indictment in this case charges a single violation of 18 U.S.C. § 371, which, in relevant part, prohibits conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose." While "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,'" *McNally v. United States*, 483 U.S. 350, 358 (1987), the Indictment does not allege that Mr. Wälchli and his co-conspirators sought to defraud the United States of money or property. Rather, the Indictment alleges a so-called *Klein* conspiracy, named after the Second Circuit's decision in *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), which interpreted the "defraud" clause of Section 371 as prohibiting conspiracies "to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Id.* at 916. In reliance on *Klein*, the Indictment alleges that Mr. Wälchli and the other defendants conspired to "defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes." Dkt. No. 2 ¶ 59.

In *United States v. Coplan*, the Second Circuit called the continuing validity of *Klein* into question, acknowledging that the word "defraud" has been interpreted in Section 371 more broadly than its settled meaning under the common law, thereby rendering *Klein* conspiracies "a common law crime, created by the courts rather than by Congress." 703 F.3d 46, 60–61 (2d Cir. 2012); *see also United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997) ("Federal crimes are defined by Congress, not the courts."); *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment.").

We hereby assert and preserve the argument that the *Klein* doctrine is based on a misreading of the statute and is thus invalid. We nevertheless acknowledge that, in light of *Coplan*, this Court cannot sustain such a facial challenge to *Klein*. The specific *Klein* conspiracy charged in this case, however, seeks to apply the unsound doctrine to alleged conduct that occurred entirely outside the United States. Regardless of the validity of *Klein* generally, there is no basis to apply it extraterritorially, and thus the Indictment should be dismissed.

### A.    Background – The Problematic *Klein* Doctrine

The *Klein* doctrine is based on a flawed reading of Supreme Court precedent. In *Klein*, the Second Circuit predicated its interpretation of Section 371 as including conduct that interferes with or obstructs a lawful governmental function on the Supreme Court's decision in *Hammerschmidt v. United States*, 265 U.S. 182 (1924). *See Klein*, 247 F.2d at 916. In *Hammerschmidt*, however, the Supreme Court actually rejected a broadening of the existing federal conspiracy statute, reversing the convictions of a group of antiwar activists who were charged with defrauding the United States by impeding the military draft on the ground that the government had failed to establish that they engaged in any fraudulent conduct. *See* 265 U.S. at 185, 189 (finding that "a mere open defiance of the governmental purpose to enforce a law by urging persons subject to it to disobey it" did not constitute fraudulent conduct). Thus, the Supreme Court's comment that a conspiracy to defraud "means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest," was mere dicta. *Id.* at 188.

In addition to being based on an overbroad reading of *Hammerschmidt*, the *Klein* doctrine is not supported by the text of Section 371 or conventional rules of statutory interpretation.

18

Section 371 prohibits only conspiracies "to defraud the United States"; it does not refer to obstructing or interfering with the lawful functions of the government.  Where Congress has not defined a term in a statute, the term is presumed to have its settled meaning under the common law. *See Evans v. United States*, 504 U.S. 255, 259 (1992).  As the Supreme Court has explained, the common law meaning of the term "defraud" is to deprive another of property rights through deceptive means.  *See McNally*, 483 U.S. at 358.  To interpret Section 371 more broadly to prohibit a variety of conduct that does not involve the deprivation of money or property flies in the face of these basic principles.

Finally, in the decades since *Klein* was decided, the Supreme Court has repeatedly applied principles of due process and statutory interpretation to bar the overbroad application of federal criminal statutes, especially fraud and obstruction statutes, and has repeatedly emphasized that the reach of criminal fraud statutes is limited to schemes to deprive another of money or property.  *See, e.g., Kelly v. United States*, 140 S. Ct. 1565, 1571–72 (2020) (reversing wire fraud and federal program fraud convictions where the objects of the schemes were outside the statutory text's limitation to schemes to deprive another of money or property); *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) (adopting limiting construction of obstruction statute to require a nexus between the defendant's conduct and an administrative proceeding); *McDonnell v. United States*, 579 U.S. 550, 574 (2016) (limiting the scope of official acts that are captured by the federal bribery statute); *Skilling v. United States*, 561 U.S. 358, 404 (2010) (adopting limiting construction of honest services fraud to bribery and kickback schemes); *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000) (holding that mail fraud statute did not extend to an effort to obtain regulatory licenses through fraud).  By sweeping any "dishonest" or even "craft[y]" conduct within the scope

19

of Section 371, the *Klein* doctrine substantially broadens the reach of federal criminal law beyond

what Congress authorized and fails adequately to define what conduct is prohibited.  We

respectfully submit that *Klein* is wholly out of step with the last twenty years of Supreme Court

precedent, and that when given the opportunity, either the Second Circuit or the Supreme Court

will determine that the same due process and statutory interpretation considerations at issue in

these cases necessitate rejection of the *Klein* doctrine.

### B.   The *Klein* Conspiracy Charge Does Not Apply Extraterritorially to the Foreign Conduct Alleged in the Indictment

Even if this Court is bound by *Klein* and *Coplan*, the application of the *Klein* doctrine in

this case violates the presumption against extraterritoriality, which dictates that "legislation of

Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction

of the United States."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)).  Put differently, "[w]hen a statute

gives no clear indication of an extraterritorial application, it has none."  *Id.*  This canon of

construction reflects the basic premise that "United States law governs domestically but does not

rule the world."  *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007).  Moreover, the

presumption "serves to avoid the international discord that can result when U.S. law is applied to

conduct in foreign countries."  *RJR Nabisco, Inc. v. European Community,* 579 U.S. 325, 335

(2016).

In *RJR Nabisco*, the Supreme Court articulated a two-step framework for determining when

a federal statute applies extraterritorially.  *See id.* at 337.  First, the Court must decide "whether the

statute gives a clear, affirmative indication that it applies extraterritorially."  *Id.*  If not, the Court

must then "determine whether the case involves a domestic application of the statute," which it

does by looking to the statute's focus.  *Id.*  The Supreme Court has described the focus of a statute

as "the object of its solicitude, which can include the conduct it seeks to regulate, as well as the

parties and interests it seeks to protect or vindicate."  *WesternGeco LLC v. ION Geophysical Corp.*,

138 S. Ct. 2129, 2137 (2018) (citation, quotation marks, and alterations omitted).  "[I]f the conduct

relevant to the focus occurred in a foreign country, then the case involves an impermissible

extraterritorial application" of the statute.  *RJR Nabisco*, 579 U.S. at 337.[8]

As an initial matter, the *Klein* conspiracy charge against Mr. Wälchli fails the *RJR Nabisco*

test because it does not derive from the express terms of a criminal statute created by Congress.  As

---

[8] To the extent that the government might seek to argue that the extraterritorial application of *Klein*
is governed instead by *United States v. Bowman*, 260 U.S. 94 (1922), a hundred-year-old Supreme
Court case that pre-dates the Supreme Court's more recent jurisprudence on the extraterritorial
application of federal statutes, such an argument is unavailing.  In *Bowman*, three U.S. citizens
were charged with, *inter alia*, conspiring to defraud the U.S. Shipping Board Emergency Fleet
Corporation (the "Fleet Corporation").  *See id.* at 95–96.  The defendants argued that the
indictment should be dismissed because the conspiracy was committed outside the United States.
*See id.* at 96–97.  In reversing the district court's dismissal of the indictment, the Supreme Court
held that the statute at issue applied extraterritorially because, when Congress amended the statute,
it did so specifically to protect the Fleet Corporation, which Congress expected would engage in
business "on the high seas and in foreign ports and beyond the land jurisdiction of the United
States."  *Id.* at 101–02.  In other words, the Supreme Court found that Congress specifically
contemplated and authorized the extraterritorial application of the statute.  *See id.*; *see also United
States v. Al-Imam*, 373 F. Supp. 3d 247, 259 (D.D.C. 2019) ("*Bowman* also suggested that the
presumption against extraterritoriality cannot be rebutted inferentially unless the enacting Congress
very likely envisioned, and can be assumed to have authorized, a considerable number of
extraterritorial applications.")  Here, by contrast, there is nothing in the text of Section 371 or
otherwise to suggest that Congress intended the statute to apply to foreign conduct.  It cannot,
therefore, overcome the presumption against extraterritoriality.  *See United States v. Perez*, 962
F.3d 420, 439 n.5 (9th Cir. 2020) (noting that notwithstanding *Bowman*, the government is
required "to show that the presumption against extraterritoriality has clearly been rebutted by the
text of the statute").  Finally, although the indictment in *Bowman* also included charges against a
fourth defendant who was a British citizen, that defendant had not yet been apprehended at the
time the case was decided, and so the Supreme Court expressly reserved deciding the issue of
whether the statute would apply extraterritorially to him.  *See Bowman*, 260 U.S. at 102–103; *see
also United States v. Vasquez*, 899 F.3d 363, 373 n.6 (5th Cir. 2018) (noting that *Bowman* "reserved
the question of whether the statute would apply to a non-U.S. national codefendant").

noted above, *see supra* Point II.A., the plain text of the "defraud" clause of Section 371 does not

proscribe conspiracies to interfere with or obstruct the lawful governmental functions of the IRS.

As a result, a *Klein* conspiracy is a "common law crime" that was created by the courts, not

Congress. *Coplan*, 703 F.3d at 61.

Just as courts do not have the power to create crimes, *see Lanier*, 520 U.S. at 267 n.6

("Federal crimes are defined by Congress, not the courts"), they likewise do not have the power to

extend the territorial reach of criminal statutes outside the United States. The presumption against

extraterritoriality specifically delegates to Congress the task of determining when federal laws

apply to foreign conduct. As the Supreme Court explained in *RJR Nabisco*, "federal laws will be

construed to have only domestic application" unless there is "clearly expressed *congressional*

intent to the contrary." *RJR Nabisco*, 579 U.S. at 335 (emphasis added). Because Congress did not

create the *Klein* doctrine, let alone express any intent to expand it to cover foreign conduct, it

cannot be applied extraterritorially.

Even assuming for the sake of discussion that this Court might accept the notion that a

*Klein* conspiracy can be evaluated under the *RJR Nabisco* test, it cannot in this case overcome the

presumption against extraterritoriality. First, there is no clear, affirmative indication in the text of

the "defraud" clause of Section 371 to suggest that the statute applies extraterritorially. As a result,

the inquiry turns on whether the conduct relevant to the statute's focus occurred in the United

States.

"[T]he extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is

coterminous with that of the underlying criminal statute." *United States v. Hoskins*, 902 F.3d 69,

96 (2d Cir. 2018) (citation omitted). Thus, a charge under the "offense" clause of Section 371,

which prohibits a conspiracy to commit any offense against the United States, requires looking at the focus of the underlying substantive offense.  *See id*. at 95–97.  With respect to *Klein*, however, there is no underlying statute.

As explained in Point II.A, pursuant to *Klein*, "[t]he term 'defraud' when used in section 371 is interpreted much more broadly than when it is used in the mail and wire fraud statutes," and does not require that the government be cheated of money or property.  *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988); *see also United States v. Ballistrea*, 101 F.3d 827, 831–32 (2d Cir. 1996) (Section 371 "covers acts that interfere with or obstruct one of the United States' lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest, even if the Government is not subjected to property or pecuniary loss by the fraud") (citation, quotation marks, and alterations omitted).  In other words, a *Klein* conspiracy only requires that a defendant engage in deceptive or deceitful conduct, and not that the fraudulent conduct deprive the government of money or property.  As a result, the focus of a *Klein* conspiracy is the conduct that it seeks to regulate, namely "deceit, craft or trickery, or at least by means that are dishonest."  *Klein*, 247 F.2d at 916.

Indeed, without deceptive or deceitful conduct, a conviction under *Klein* cannot be sustained.  In *United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993), the government argued that the "defraud" clause of Section 371 prohibits any conspiracy to obstruct a governmental function, even if the obstruction was not performed deceitfully or dishonestly.  *See id.* at 1059.  In rejecting that argument, the Ninth Circuit held that the term "'defraud' is limited only to wrongs done 'by deceit, craft or trickery, or at least by means that are dishonest'" and that "[o]bstructing government functions in other ways . . . can't constitute 'defrauding.'"  *Id.* (quoting

*Hammerschmidt*, 265 U.S. at 188); *see also Hammerschmidt*, 265 U.S. at 189 (Section 371 cannot

be violated by "mere open defiance," as that does not constitute fraudulent conduct).  Because

obstruction alone cannot make out a violation of Section 371, deceptive conduct is necessarily the

focus of the statute.

Here, the Indictment alleges that Mr. Wälchli and his co-defendants—none of whom are

U.S. citizens, lived in the United States, or are even alleged to have traveled to the United States in

connection with the charged conspiracy—designed and implemented a scheme to conceal offshore

accounts maintained by the Clients.  Dkt. No. 2 ¶¶ 1, 9.  As alleged in the Indictment, all of the

conduct associated with the deceptive scheme—including all twenty-four of the overt acts alleged

in the Indictment—occurred abroad.

*First*, all of the meetings described in the Indictment occurred in Europe and Asia; none

occurred in the United States.  *See, e.g., id.* ¶¶ 16 (semi-annual meetings at PB IHAG's offices in

Switzerland between Client-1 and Mr. Rüegg), 18 (meeting in Hong Kong between Client-1,

Client-1's brother, Mr. Sage, and Mr. Rüegg), 27 (meeting in Singapore between Client-1, Mr.

Bechtiger, and a PB IHAG employee), 60(r) (meeting in Singapore between Mr. Bechtiger, a PB

IHAG employee, and representatives of a Singapore trust company).

*Second*, all of the emails described in the Indictment were sent by and to individuals based

in Europe and Asia; none were sent from or to the United States.  *See, e.g.*, *id.* ¶¶ 60(a) (email from

Mr. Schnellman to a PB IHAG employee), (c) (email from a PB IHAG employee to an Allied

Finance employee, copying Mr. Schnellman), (h) (email from Mr. Sage's personal assistant to Mr.

Wälchli, copying Mr. Sage), (r) (email from the CEO of a Singapore trust company to Mr. Bechtiger and a PB IHAG employee).

*Third*, the Indictment also describes the creation of nominee entities in Hong Kong and the British Virgin Islands and nominee bank accounts in Hong Kong; none of the entities or bank accounts were based in the United States. *Id.* ¶¶ 13(c) and (d).

*Fourth*, the Indictment describes asset management agreements between Helvetic, a Singapore asset manager, and Allied Finance, a Swiss financial services company; no persons or entities based in the United States were parties to any of the agreements described as having been entered in furtherance of the scheme. *Id.* ¶¶ 22 (investment management agreement between Helvetic and Allied Finance for Client-1's funds), 38 (investment management agreement between Helvetic and Allied Finance for Client-2's funds), 50 (investment management agreement between Helvetic and two nominee foundations managed by Mr. Bechtiger).

Finally, as part of the scheme, the Clients' funds were transferred in a series of "round-trip" transactions from bank accounts in Switzerland, to nominee corporate bank accounts in Hong Kong, then back to Switzerland, and ultimately to bank accounts in Singapore. *Id.* ¶¶ 10-11. Although a portion of Client-3's funds were incidentally routed through correspondent bank accounts in the United States while en route from Hong Kong to Switzerland and then again from Switzerland to Singapore, none of the transfers originated from or resulted in funds remaining in the United States. *Id.* ¶¶ 60(q) and (u).

Simply put, all of the deceptive conduct alleged in the Indictment occurred outside the United States. The charged *Klein* conspiracy, therefore, constitutes an impermissible extraterritorial application of Section 371 and must be dismissed.[9]

**C.     The Government Cannot Rely on the Clients to Establish Conduct Within the United States**

The government may seek to argue that the *Klein* conspiracy involved other fraudulent conduct not described in the Indictment that took place in the United States by the Clients, who are U.S. taxpayers. That argument is unavailing because, on the face of the Indictment, the Clients are neither charged nor unindicted co-conspirators.

Although the Indictment describes each of the Clients, it does not identify them as unindicted co-conspirators, as the government often does in similar cases. *See, e.g., United States v. Paltzer, et al.,* 13-cr-282 (JSR) (S.D.N.Y.), Doc. No. 1 (alleging that defendants conspired with U.S. taxpayers to conceal the taxpayers' bank accounts from the IRS); *United States v. Little,* 12-cr-647 (PKC) (S.D.N.Y.), Doc. No. 14 (alleging that defendant conspired with family members of deceased U.S. person to file false tax returns); *United States v. Weil,* 08-cr-60322 (JIC) (S.D. Fl.), Doc. No. 3 (identifying U.S. clients of Swiss bank as unindicted co-conspirators). Having refused

---

[9] We are aware of two cases in this District where defendants argued that the "defraud" clause of Section 371 does not apply extraterritorially. In *United States v. Buck*, 13-cr-282 (VM), 2017 WL 4174931 (S.D.N.Y. Aug. 28, 2017), the court found that Section 371 applies extraterritorially, but the court did not analyze Section 371 using the *RJR Nabisco* test because it erroneously concluded that *RJR Nabisco* has no bearing on criminal statutes. *See id.* at *7; *compare United States v. Napout*, 963 F.3d 163, 178–81 (2d Cir. 2020) (applying *RJR Nabisco* to criminal statute). By contrast, in *United States v. Zarrab, et al.*, 15-cr-867 (RMB) (S.D.N.Y.), the court rejected arguments made by several defendants that Section 371 does not apply extraterritorially, finding that the indictment contained sufficient allegations of domestic conduct—not present in the instant case—to obviate the need to address the question of extraterritorial application. *See United States v. Halkbank*, 15-cr-867 (RMB), 2020 WL 5849512, at *2, *6, *7 (S.D.N.Y. Oct. 1, 2020); *United States v. Zarrab*, 15-cr-867 (RMB), 2016 WL 6820737, at *4, *5 (S.D.N.Y. Oct. 17, 2016).

to provide a Bill of Particulars identifying all unindicted co-conspirators, *see* Temkin Decl. ¶ 21, the government cannot salvage its faulty Indictment by asserting, *ipse dixit*, that the Clients are unindicted co-conspirators.

Moreover, the Indictment does not include any allegations regarding the Clients' tax filings, let alone identify those filings as overt acts in furtherance of the alleged conspiracy. Indeed, if the government had charged the defendants under the "offense" clause of Section 371 with, for example, conspiracy to evade taxes in violation of 26 U.S.C. § 7201, conspiracy to file false tax returns in violation of 26 U.S.C. § 7206, or conspiracy to file false Reports of Foreign Bank and Financial Accounts (FBARs) in violation of 31 U.S.C. §§ 5314 and 5322(a) and 31 C.F.R. §§ 1010.350, 1010.306(c) and (d), and 1010.840(b), it would have obviated any challenge to either the *Klein* doctrine or the extraterritorial application of the statute, since the conspiracy necessarily would have involved conduct by the Clients in filing false tax returns or FBARs with the IRS.  Because the government opted not to do so, and the Indictment does not allege that the Clients were co-conspirators, any actions taken by the Clients in the United States do not alter the conclusion that the criminal scheme as alleged in the Indictment took place abroad.

### III.    If the Court Does Not Dismiss the Indictment, It Should Order the Government to Produce a Bill of Particulars, a Witness List, an Exhibit List, and Jencks Act and Impeachment Material on a Timely Basis

Between March 2022 and July 2022, the government produced discovery consisting of approximately 24,000 documents spanning approximately 171,000 pages, including witness statements for approximately twenty-one individuals.  Temkin Decl. ¶ 16.[10]  At the same time, the

---

[10] It is unclear whether the witness statements produced with respect to these individuals are complete.

government has withheld impeachment materials for its witnesses, as well as all witness statements relating to the individual that defense counsel anticipate will be the principal cooperating witness at trial. The government also refused to provide Mr. Wälchli with a list of unindicted co-conspirators. *See* Temkin Decl. ¶ 21.

In the event the Court does not dismiss the Indictment, it should direct the government to produce a Bill of Particulars identifying all known, unindicted co-conspirators. In addition, to enable Mr. Wälchli both to prepare for trial and to craft appropriate and narrowly-tailored motions *in limine*, the Court should direct the government to produce, no later than sixty days in advance of Mr. Wälchli's deadline to move *in limine* with respect to such materials: (1) a list of witnesses it intends to call in its case in chief; (2) any statements of such witnesses as defined in 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2; (3) any impeachment material relating to such witnesses; and (4) an exhibit list and copies of the exhibits it intends to offer in its case-in-chief.

A.   **The Court Should Order the Government to Produce a Bill of Particulars Naming All Unindicted Co-Conspirators**

"Rule 7(f) . . . permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). The decision to grant a bill of particulars rests within the court's discretion. *See id*.

In determining whether a defendant is entitled to a bill of particulars identifying known, unindicted co-conspirators, courts in this Circuit generally consider: "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government

28

otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation." *United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).

Here, each factor weighs in favor of granting the requested Bill of Particulars. As alleged in the Indictment, the conspiracy spanned six years and included at least five companies. *See* Dkt. No. 2 ¶¶ 1–2. As a result, there are dozens of possible unindicted co-conspirators. *See Nachamie*, 91 F. Supp. 2d at 572 ("If there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met."). Moreover, unlike many charging instruments filed in this District, the Indictment does not designate anyone as a "CC" or a "co-conspirator not named as a defendant herein." *See supra* at Point II.C (discussing the fact that the Indictment does not specify that Clients 1–3 are co-conspirators). While counsel is diligently reviewing the voluminous discovery materials produced by the government, that review will not answer the critical question of which of the hundreds of people named in those documents the government will claim was a co-conspirator. As courts have recognized, such an endeavor is not "an adequate substitute for a straightforward identification in a bill of particulars." *United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988); *see also United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006) ("[A] large volume of discovery warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial.")

Finally, given the non-violent nature of the crime alleged in the Indictment, there is no conceivable danger to the co-conspirators or potential harm to the government's investigation if the

29

co-conspirators are identified.  *See, e.g.*, *United States v. Savin*, No. 00-cr-45 (RWS), 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001) (no evidence of danger to co-conspirators in case involving allegations of investment fraud).

Under similar circumstances, courts in this Circuit have required the government to provide the defendant with a list of unindicted co-conspirators.  *See, e.g., United States v. Akhavan*, 20-cr-188 (JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (granting bill of particulars where the charged conspiracy lasted three years, the co-conspirators were from several different organizations, and the volume of discovery was so large that it was "practically impossible for the defendants to ascertain whom the Government considers a co-conspirator"); *United States v. Barrett*, 153 F. Supp. 3d 552, 572–73 (E.D.N.Y. 2015) (granting bill of particulars where the number of co-conspirators was uncertain, the conspiracy spanned two years, and the defendant received tens of thousands of pages of discovery); *United States v. Kahale*, 789 F. Supp. 2d 359, 372-73 (E.D.N.Y. 2009) (granting bill of particulars where the number of co-conspirators was potentially large and the conspiracy lasted five years and extended across the United States and potentially even internationally); *Savin*, 2001 WL 243533 at *3, *5 (granting bill of particulars where the conspiracy spanned up to six years and involved six companies, the defendant received 100,000 pages of discovery, and there was no danger to co-conspirators or harm to the government's investigation); *Nachamie*, 915 F. Supp. 2d at 573 (granting bill of particulars where the conspiracy spanned more than three years, involved a large number of co-conspirators, including eight defendants, the government produced more than 200,000 pages of discovery, and there was no danger to the co-conspirators or harm to the government's investigation).  This Court

should likewise order the government to provide Mr. Wälchli with a list of unindicted co-conspirators.

**B.** **The Court Should Direct the Government to Produce Its Witness List, Exhibit List, and Jencks Act and Impeachment Materials at Least Sixty Days in Advance of Mr. Wälchli's Deadline to Move *in Limine* With Respect To Such Materials**

Pursuant to 18 U.S.C. § 3500, Rule 26.2 of the Federal Rules of Criminal Procedure, and the Court's general trial supervisory authority, Mr. Wälchli further requests that the Court direct the government to produce (1) a list of witnesses it intends to call in its case in chief; (2) any statements of such witnesses as defined in 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2; (3) any impeachment material relating to such witnesses; and (4) an exhibit list and copies of the exhibits it intends to offer in its case-in-chief[11] in the form in which such exhibits will be offered at trial at least sixty days in advance of Mr. Wälchli's deadline to move *in limine* in connection with such materials.[12]

Courts in this Circuit have routinely ordered the government to produce Jencks Act and impeachment material, witness lists, and exhibit lists well in advance of trial where, as here,

---

[11] Mr. Wälchli is not asking the Court to direct the government to produce documents that it intends only to use for impeachment purposes in the cross-examination of defense witnesses, the redirect examination of government witnesses, or in any rebuttal case.

[12] As discussed in our August 26, 2022 letter to the Court, the parties conferred regarding the timing of the production of these materials, and the government "propose[d] that the parties exchange electronic exhibits, exhibit lists, witness lists, witness statements, and impeachment materials on or before May 15, 2023, three weeks before the trial date." Dkt. No. 38. By contrast, Mr. Wälchli proposes to produce his witness list, witness statements, exhibit list, and exhibits two weeks after the government's deadline. *See id.* This schedule is consistent with the government's burden of proof and the sequence in which evidence is presented at trial. It also reflects the fact that the evidence that the defendant will present at trial will turn on the evidence that the government proposes to introduce at trial, and thereby avoids duplication of efforts to the extent the parties' exhibits overlap.

discovery is voluminous and the charges are broad, complex, and non-violent.  *See*, *e.g.*, *United States v. Vilar*, 530 F. Supp. 2d 616, 639–41 (S.D.N.Y. 2008) (witness and exhibit lists due 60 days before trial); *United States v. Bonventre*, No. 10-cr-228 (LTS), 2013 WL 2303726, at *9 (S.D.N.Y. May 28, 2013) (witness and exhibit lists due 60 days before trial, and Jencks Act and impeachment materials due 45 days before trial); *United States v. McDonald*, No. 01-cr-1168 (JS), 2002 WL 2022215, at *3 (E.D.N.Y. Aug. 6, 2002) (exhibit list due eight weeks before trial); *see also United States v. Ferguson*, 478 F. Supp. 2d 220, 244 (D. Conn. 2007) (denying motion for disclosure of exhibit list under Rule 16 where "[t]he government . . . agreed to a scheduling order under which it would provide all defendants with its exhibit list two months before trial").

Early production of these materials is essential to enable defense counsel to prepare for trial in this case.  Without such production, defense counsel will have to guess, for example, which of the approximately 171,000 pages of documents—a number of which are in a foreign language— will need to be addressed at trial.  *See*, *e.g.*, *United States v. Turkish*, 458 F. Supp. 874, 881–82 (S.D.N.Y. 1978) (requiring the government to produce exhibit lists to avoid "burying the defendant in paper"), *aff'd*, 623 F.2d 769 (2d Cir. 1980).  Similarly, without production of impeachment materials, defense counsel will be unable to conduct an appropriate pretrial investigation into the government's witnesses—particularly because most, if not all, of the government's key witnesses likely are located overseas.  *See*, *e.g.*, *United States v. Meregildo*, No. 11-cr-576 (WHP), 2012 WL 4378047, at *7 (S.D.N.Y. Sept. 24, 2012) (explaining that the court must "order[] that the [g]overnment produce . . . Jencks Act and *Giglio* material" with "sufficient [time] to allow for full exploration and exploitation by the defense") (internal quotation marks omitted).

On September 2, 2022, the Court issued a scheduling order setting a deadline of March 10, 2023 for all "pretrial materials required by Rule 6 of the Court's Individual Rules of Practice in Criminal Cases, including motions *in limine*."  Dkt. No. 39.  Because such motions necessarily must address the witnesses the government intends to call and the exhibits it intends to offer at trial, the Court should order the government to produce its witness list, exhibit list, and exhibits by January 9, 2023—sixty days in advance of the motions *in limine* deadline.[13]

It is simply not feasible for defense counsel to frame meaningful motions *in limine* on the full scope of discovery, and any motions that are the product of such an effort will result in the parties and the Court devoting resources to motions that will ultimately be moot to the extent the government does not actually intend to offer the documents or call the witnesses at issue.  Indeed, having informed the Court that it anticipates presenting its case-in-chief in two weeks, the government clearly does not intend to offer the vast majority of documents produced in discovery, or to call all of the witnesses for whom it produced witness statements.

Furthermore, Mr. Wälchli cannot move *in limine* with respect to witnesses until after the government produces Jencks Act and impeachment materials since it is impossible to frame motions addressed to potential testimony or lines of impeachment that have yet to be identified. Accordingly, the Court should also order the government to produce Jencks Act and impeachment

---

[13] By asking the Court to direct the government to produce these materials by January 9, 2023, we are not seeking to preclude the government from, for example, using any exhibits or calling any witnesses not identified in the production.  Rather, we anticipate that the government will prepare the exhibits, exhibit list, and witness list in good faith, and then supplement them as necessary prior to the start of trial.  The same applies to the production of Jencks Act and impeachment materials.

material by January 9, 2023.  Belated production of Jencks Act and impeachment material would

necessitate additional motions *in limine* on the eve of trial.

In the alternative, in the event the Court declines to order the government to produce its

witness list, exhibit list, exhibits, and Jencks Act and impeachment materials sixty days prior to the

current deadline for motions *in limine* previously fixed by the Court, Mr. Wälchli respectfully

requests that the Court order production of those materials sixty days before trial and provide a

schedule for supplemental motions *in limine* addressed to such materials.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Indictment against Mr. Wälchli.  In

the event the Court does not dismiss the Indictment, it should direct the government to provide a

Bill of Particulars and produce its witness list, exhibit list, exhibits, and Jencks Act and

impeachment materials on the schedule set forth herein.

Dated: September 30, 2022
       New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.

By:  /s/ *Jeremy H. Temkin*
     Jeremy H. Temkin
     Richard F. Albert
     Daniel P. Gordon
     Katherine J. Drooyan
     565 Fifth Avenue
     New York, NY 10017
     (212) 856-9600 (telephone)
     (212) 856-9494 (facsimile)

     *Attorneys for Defendant Daniel Wälchli*

34