UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　- v. -　　　　　　　)
　　　　　　　　　　　　　　　　)　　20-cr-497 (GHW)
DANIEL WÄLCHLI,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendant.　　)

———————————————

**<u>SENTENCING SUBMISSION ON BEHALF OF DANIEL WÄLCHLI</u>**

Dated: March 19, 2024　　　　　　　　　MORVILLO ABRAMOWITZ
　　　New York, New York　　　　　　　GRAND IASON & ANELLO P.C.

　　　　　　　　　　　　　　　　　　Jeremy H. Temkin
　　　　　　　　　　　　　　　　　　Richard F. Albert
　　　　　　　　　　　　　　　　　　Joshua Philip Bussen
　　　　　　　　　　　　　　　　　　565 Fifth Avenue
　　　　　　　　　　　　　　　　　　New York, NY 10017
　　　　　　　　　　　　　　　　　　(212) 856-9600 (telephone)
　　　　　　　　　　　　　　　　　　jtemkin@maglaw.com
　　　　　　　　　　　　　　　　　　ralbert@maglaw.com
　　　　　　　　　　　　　　　　　　jbussen@maglaw.com

　　　　　　　　　　　　　　　　　　*Attorneys for Defendant Daniel Wälchli*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ........................................................................................................................... 2

I.      DANI'S PERSONAL HISTORY ................................................................................... 2

        A.      Dani's Background and Early Life ..................................................................... 2

        B.      Dani's Military Service, Education, and Career ................................................ 5

        C.      Dani's Devotion to His Family ........................................................................ 10

        D.      Dani's Charitable Good Works and Acts of Kindness ..................................... 13

                1.      Support for Impoverished Children in Southeast Asia ........................... 14

                2.      Dani's Devotion to Others ...................................................................... 16

        E.      The Letters Submitted in Support of Dani Demonstrate His True Character ...... 18

II.     THE OFFENSE CONDUCT ........................................................................................ 21

        A.      Dani's Role at Holding and the Development of Helvetic ................................. 22

        B.      In the Wake of the DOJ-UBS Investigation, PB IHAG Explores "Solutions" for
                Substantial Accountholders ............................................................................. 22

        C.      Gubser and Allied Finance Incorporate Helvetic into Their Plan...................... 24

        D.      Dani's Participation in the Singapore Solution................................................. 25

        E.      Dani Persuades Others To Close Down the Singapore Solution ........................ 26

        F.      PB IHAG's Participation in the Swiss Bank Program.......................................... 27

        G.      Dani's Acceptance of Responsibility ████████████ .............................. 29

III.    IMPACT OF THE PROSECUTION ............................................................................ 32

IV.     A NON-CUSTODIAL SENTENCE IS WARRANTED AND APPROPRIATE UNDER
        18 U.S.C. § 3553(a) ..................................................................................................... 34

        A.      The Advisory Guidelines Calculation.............................................................. 36

        B.      Dani's History and Characteristics Support a Non-Custodial Sentence ............... 37

C.      The Nature and Circumstances of the Offense ....................................................... 38

D.      The Need To Avoid Unwarranted Sentencing Disparities ................................. 41

        1.      The Most Culpable Individuals—the U.S. Tax Evaders—Avoided
                Prosecution or Incarceration ..................................................................... 42

        2.      PB IHAG and Holding Avoided Criminal Prosecution ........................... 44

        3.      Most of the Singapore Solution Co-Conspirators Will Never Face
                Sentencing ....................................................................................................... 45

        4.      Almost Every Defendant Convicted of Similar Conduct Has Received a
                Non-Custodial Sentence ................................................................................ 47

E.      A Non-Custodial Sentence Would Afford Adequate Specific and General
        Deterrence ..................................................................................................................... 53

        1.      A Sentence of Incarceration Will Not Further General Deterrence .......... 53

        2.      Specific Deterrence and the Need To Protect the Community ................. 55

F.      A Custodial Sentence Would Likely Be Harsher for Dani Because He Is Not a
        U.S. Citizen .................................................................................................................... 56

CONCLUSION .......................................................................................................................... 59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Nelson v. United States,*
555 U.S. 350 (2009) ...................................................................................... 35

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................... 37

*United States v. Algahaim,*
842 F.3d 796 (2d Cir. 2016) .......................................................................... 40

*United States v. Amrein,*
No. 13-cr-972 (JSR) (S.D.N.Y.) ......................................................... 30, 42, 47

*United States v. Bachmann,*
No. 11-cr-95 (GBL) (E.D. Va.) ........................................................ 48, 52, 55

*United States v. Bagios,*
No. 12-cr-60260 (KAM) (S.D. Fla.) ............................................................. 48

*United States v. Bergantino,*
No. 11-cr-95 (GBL) (E.D. Va.) ............................................................... 47, 52

*United States v. Berlinka,*
No. 12-cr-02 (JSR) (S.D.N.Y.) ................................................................. 47-51

*United States v. Birkenfeld,*
No. 08-cr-60099 (WJZ) (S.D. Fla.) ......................................................... 48, 51-52

*United States v. Booker,*
543 U.S. 220 (2005) ...................................................................................... 34

*United States v. Buck,*
No. 13-cr-282 (JSR) (S.D.N.Y.) .................................................................... 48

*United States v. Casadei,*
No. 11-cr-866 (LTS) (S.D.N.Y.) .............................................................. 30, 47

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ............................................................ 35

*United States v. Dörig,*
    No. 11-cr-95 (GBL) (E.D. Va.) ........................................ 47, 52, 54

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ........................................................ 34-35

*United States v. Fellmann,*
    No. 12-cr-962 (JPO) (S.D.N.Y.) .......................................... 47, 52

*United States v. Frazzetto,*
    No. 11-cr-866 (JSR) (S.D.N.Y.) ................................................ 47

*United States v. Frei,*
    No. 12-cr-02 (JSR) (S.D.N.Y.) .......................................... 48-51, 58

*United States v.  Gadola,*
    No. 10-cr-20878 (JLK) (S.D. Fla.) ............................................ 48

*United States v. Jones,*
    531 F.3d 163 (2d Cir. 2008) ........................................................ 35

*United States v. Keller,*
    No. 12-cr-02 (JSR) (S.D.N.Y.) ............................................ 47-51

*United States v. Lack,*
    No. 11-cr-60184 (WPD) (S.D. Fla.) ........................................ 48

*United States v. Levenson,*
    314 F. App'x 347 (2d Cir. 2008) .............................................. 40

*United States v. Paltzer,*
    No. 13-cr-282 (JSR) (S.D.N.Y.) .............................................. 47

*United States v. Reist,*
    No. 12-cr-962 (JPO) (S.D.N.Y.) .......................................... 47, 52

*United States v. Rüegg Meier,*
    No. 11-cr-95 (GBL) (E.D. Va.) ............................................ 47, 52

*United States v. Schumacher,*
    No. 09-cr-60210 (DTKH) (S.D. Fla.) ...................................... 47

iv

*United States v. Stewart,*
   590 F.3d 93 (2d Cir. 2009) ........................................................................ 46

*United States v. Velazquez,*
   2017 WL 2782037 (S.D.N.Y. May 26, 2017) ........................................... 54

*United States v. Weil,*
   No. 08-cr-60322 (JIC) (S.D. Fla.)............................................................ 48


**Statutes**

18 U.S.C. § 371 ................................................................................... 31, 43

18 U.S.C. § 3553 ................................................................................. passim

18 U.S.C. § 3632 ...................................................................................... 58

26 U.S.C. § 6103 ........................................................................................ 1


**Rules**

U.S.S.G. § 4C1.1.......................................................................................... 56

U.S.S.G. § 5K1.1 ......................................................................................... 41


**Other Authorities and Articles**

*2023 Amendments in Brief,*
   United States Sentencing Commission (2023) ..........................................55

*Federal Prisoner Statistics Collected Under the First Step Act, 2022,*
   DOJ Bureau of Justice Statistics (Dec. 2022)..........................................57

*Five Things About Deterrence,*
   National Institute of Justice (2016)...........................................................54

*Inmate Security Designation and Custody Classification,*
   U.S. Bureau of Prisons (Sept. 4, 2019).....................................................56

*IRS News Release*,
 IR-2018-52 (Mar. 13, 2018) ...................................................................42

*Offshore Voluntary Disclosure Program*,
 Internal Revenue Manual (Apr. 27, 2021) ....................................................Passim

*Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates*,
 DOJ, OIG (Sept. 2021) ...........................................................................58

*Swiss Bank Program*,
 U.S. Dep't of Justice, Tax Div. (Feb. 22, 2023) .............................................Passim

*United States Sentencing Commission Quarterly Data Reports for Fiscal Years 2018-2022*,
 U.S.S.C (2018-2022) ............................................................................. 41

Michele Moser, *Switzerland: New Exceptions to Bank Secrecy Laws Aimed at Money Laundering and Organized Crime*, 27 Case W. Res. J. Int'l L. 321 (1995) .......................22-23

Helga Turku, *The International System of States' Checks and Balances on State Sovereignty: The Case of Switzerland*, 38 N.C. J. Int'l L. & Com. Reg. 809 (2013)........................... 22

Matthew Allen, *How the US Tax Evasion Crackdown Impacted Swiss Banking*,
 Swissinfo.ch (Dec. 5, 2023).................................................................... 28

Katharina Bart, *Swiss Banker Escapes Back to Switzerland*,
 Finews.com (Sept. 27, 2021) ....................................................................30

Christian Berthelsen, *Bankers Charged with Helping Hedge Fund Manager Dodge Taxes*,
 Bloomberg Tax (Sept. 29, 2021) ................................................................33

Chris Dolmetsch, *Swiss Banker Admits Helping Fund Manager Evade Taxes*,
 Bloomberg (Mar. 30, 2023) .....................................................................33

Karin Matussek, *Ex-Wegelin Banker Gets Retrial Over U.S. Extradition*,
 Bloomberg (Apr. 28, 2016) .....................................................................50

Rupert Neate*, Oldest Swiss Bank Wegelin To Close After Admitting Aiding US Tax Evasion*,
 The Guardian (Jan. 4, 2013) ................................................................... 28

Laura Saunders & Robin Sidel, *Whistleblower Gets $104 Million*,
 Wall St. J. (Sept. 11, 2012)....................................................................52

Alice Speri, *ICE Defied a Court Order in Vendetta Against Deportee*,
 The Intercept (Sept. 29, 2018) .................................................................58

*Top Ihag Executive Steps Aside After U.S. Charges*,
    Finews.ch (Sept. 29, 2021) ..................................................................................................33

Peter Talbot, *ICE Won't Let Inspectors into Tacoma Immigration Lockup Despite Court Order,
    State Says*, The Columbian (Feb. 6, 2024) ..............................................................................58

## PRELIMINARY STATEMENT

Daniel Wälchli ("Dani") will stand before this Court for sentencing on April 2, 2024.  As reflected in the 22 letters annexed to this Memorandum, Dani is a devoted and caring family man who participated in the charged conduct solely as a function of his employment at IHAG Holding AG ("Holding"), a holding company that owned PrivatBank IHAG ("PB IHAG"), a Swiss bank based in Zurich, Switzerland.  The conduct that brings Dani before the Court stands in stark contrast to the way in which he has otherwise lived his life.

Dani's choices after engaging in the charged conduct demonstrate his character.  Dani recognized that his conduct was improper and persuaded the necessary decisionmakers at Holding and PB IHAG that the accounts in question should be closed years before the government started its investigation.  When it became clear that charges were likely, Dani offered to come to the United States voluntarily to face the charges even before the government revealed the indictment—a significant decision considering he could have remained in his home country without fear of extradition, as many of his co-defendants have done.  Following this Court's rejection of his motions to dismiss the charges, Dani chose to plead guilty and accept responsibility for his conduct ████████████████████████████████████ ████████████████████████████████.[1]

---

[1] In this Memorandum and the accompanying letters, we have applied redactions as directed by the Court's Individual Rules of Practice in Criminal Cases, Rule 7(c).  We have also redacted information that was previously filed under seal, including the names of unindicted co-conspirators.  Gov. Bill of Particulars, No. 20-cr-497 (Jan. 19, 2023) ("Because this filing implicates the privacy and reputation interests of uncharged third parties, the Government respectfully requests that it be filed under seal."); *see also* Justice Manual § 9-27.760 (describing the Department of Justice's policy of not naming unindicted co-conspirators in public filings). Additionally, we have redacted the names of certain taxpayers pursuant to 26 U.S.C. § 6103.  In

In sentencing Dani, we ask the Court to consider his personal history, his motivation for participating in the charged conduct, his early determination to separate himself from the conduct before any investigation, and the substantial impact the conduct has already had on him.  We also ask the Court to consider the consequences borne by other, more culpable participants in the scheme—the U.S. taxpayers who used the scheme to evade their tax obligations, PB IHAG, which profited from the conduct, and the other defendants and their co-conspirators—who have largely avoided criminal penalties for their conduct.  Finally, we ask the Court to consider that other taxpayers who utilized offshore accounts to conceal assets, other banks that profited from their customers' conduct, and other Swiss nationals who facilitated that conduct have likewise largely avoided criminal prosecution and incarceration for their actions.

As set forth below, we respectfully submit that a non-custodial sentence—a modest variance below the Probation Department's recommendation of six months—is "sufficient, but not greater than necessary" to vindicate the factors set forth in 18 U.S.C. § 3553(a).

## DISCUSSION

### I.   DANI'S PERSONAL HISTORY

#### A.   Dani's Background and Early Life

Dani is a 56-year-old man who lives in Thalwil, a suburb of Zurich, Switzerland, with his wife, Antoinette, and their two daughters, Virginia and Raffaela.

Dani was born to Johann and Margrit Wälchli (now Margrit Huber) on May 6, 1967.  As described in his letter to the Court, Dani's formative years were spent in the small, working class

---

the unredacted version of this Memorandum, the information redacted pursuant to the Court's individual rules is indicated with grey highlight; all other redactions are indicated in blue highlight.

town of Urdorf, a suburb of Zurich with about 8,000 people.  Ex. 1, D. Wälchli Letter at 1.[2]

Johann operated an air conditioning installation and service business to support the family.  *Id.*

He was a stern and hard-working man, who routinely worked from 5:00 a.m. to 7:00 p.m., six to

seven days a week.  *Id.*  Margrit, Dani's mother, had been both an interior architect and pianist.

*Id.* at 2.  She gave up her career to stay home with Dani and his brother Peter, who was born four

years after Dani.  *Id.* at 1-2.  Dani describes his mother as a kind woman and recalls that she had

(and still has) exceptional intellectual and emotional intelligence.  *Id.* at 2.



Despite his medical difficulties, Dani developed a love of sports and playing outdoors.

*Id.* at 2.  He and his brother Peter, who was and is Dani's best friend, spent their childhood

---

[2] Letters submitted to the Court by Dani, his family, and his friends are attached as Exhibits
("Ex.") 1 through 22.  Unless noted otherwise, citations to "Dkt." refer to the docket of this case.
Citations to the "PSR" refer to the Final Presentence Investigation Report issued by the U.S.
Probation Office for the Southern District of New York on March 7, 2024.  Dkt. No. 101.

[3] As Dani is a Swiss citizen, many of his friends and family who have submitted letters either do
not speak English or speak English as a second language.  Certain individuals submitted their
letters in German.  For those individuals' letters, we have included the original German version,
an English translation, and a certification of the accuracy of the translation.  All citations to these
letters are to the English translation.

outdoors, running, skiing, playing soccer and tennis, and climbing the trees in the forest near their hometown.  *Id.*; Ex. 6, P. Wälchli Letter at 1.

Growing up, Dani enjoyed competition and he especially loved team sports.  He enjoyed the camaraderie of having teammates and working with them for a common goal.  Even at a young age, he often found himself in leadership roles on his teams, which gave him immense satisfaction.  As noted by his mother, "[w]hat made Dani stand out was not just his sporting talent, but above all his ability to work in a team and his gift for forming a team with others and encouraging each other. This has remained one of his most important character traits."  Ex. 5, M. Huber Letter at 2.

Dani's childhood was not without hardship.  ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

Growing up, Dani's parents taught him the importance of hard work and being financially self-sufficient.  Dani spent his school holidays working at his father's air conditioning business, cleaning office buildings for his uncle, or assisting friends of his father who worked as tradesmen (a plumber, a carpenter, and a bricklayer).  *Id.* at 3; Ex. 5, M. Huber Letter at 3.  As noted by his mother, it was important to her and Dani's father that the boys learn "that success comes from

hard work." Ex. 5, M. Huber Letter at 3.  Similarly, Dani explains that "dad clearly taught us that if we wanted money, we needed to work for it. If you want to buy something, you will enjoy it much more if the purchase is a consequence of your own hard work."  Ex. 1, D. Wälchli Letter at 3.

### B.     Dani's Military Service, Education, and Career

In grade school, Dani initially performed very well.  He was near the top of his class and, at the age of 13, he tested into "Gymnasium"—a premier school in Switzerland that is open only to the students with top grades.  *Id.* at 2-3.  His acceptance into the school was a learning experience, but not in the way one might expect.

Dani had always done well in school without much effort, but he suddenly found himself in an environment where other students were working significantly harder than he was.  *Id.*  He struggled initially, which led him to leave school after only ten weeks.  *Id.*  Ultimately, Dani was able to graduate from Gymnasium, but only after learning that simply being smart or talented is not enough—success would require hard work.  *Id.*

After Gymnasium, Dani spent a year working for Swisslife, an international insurance company, before fulfilling his mandatory military service requirement by enlisting in the Swiss armed forces.  *Id.* at 3.  Dani joined the Swiss Army in 1988 and applied to be a member of the Grenadiers, a special forces infantry corps.  *Id.*  He was accepted into that unit, but shortly after he joined an injury required him to switch to the Swiss Army's Signals, a unit responsible for operating communication infrastructure.  *Id.*  Dani then applied for and was accepted into the Swiss Army's officer school.  *Id.*

Marcel Krist, who went through officer training with Dani, remembers bonding with Dani because they both came from a working-class background and were both eager to make their way in the world. Ex. 8, M. Krist Letter at 1 ("Our shared background helped us bond, as we both knew that we would need to work hard for our goals and that nothing would be given to us."). Marcel recalls that Dani was both competitive and someone who led by example. *Id.* For example, during their training, Dani, who was a strong runner, would "take the backpack or rifle from weaker runners in his group in order to support the entire team" on long marches. *Id.* at 1-2 (noting that Dani and Marcel "always tried to achieve all [their] goals together, even with weaker and unwilling recruits, through strong leadership, demanding performance, and by serving as good role models"). The Swiss Army has intermittent service obligations (generally about four weeks per year plus longer periods during training and officer school). As an officer, Dani was required to serve his intermittent obligation for about 14 additional months and, collectively, he served approximately two years in the Army between 1988 and 2004. Ex. 1, D. Wälchli Letter at 3-4. He was honorably discharged as a first lieutenant. PSR ¶ 130.

In 1989, Dani enrolled at the University of Zurich. Ex. 1, D. Wälchli Letter at 4. He studied business administration with a specialization in management studies. After graduating in 1994, Dani took a job with Zurich Kantonal Bank ("ZKB") in Zurich. *Id.* He spent his entire career at ZKB in the bank's back office/operations group, including by serving as a project leader for strategy and business. *Id.* While at ZKB, Dani did not interface with the bank's clients, let alone its U.S. clients.

Dani continued to pursue his education while at ZKB. In 2000 and 2001, he matriculated in the Executive MBA program offered by the Simon Business School at the University of

Rochester in conjunction with the University of Bern, Switzerland.  Dani started the program in January 2000 and spent the first five months of the program attending classes on the weekends in Thun, Switzerland.  *Id.* at 5.  As a part of the program, he spent nine weeks from May to July 2000 in the United States at the University of Rochester.  *Id.*  Dani enjoyed the program, especially "the study time with American students" and the Simon School's practical orientation. *Id.*

In 2002, ZKB seconded Dani to an internship at Westdeutsche Landesbank AG in London, England, where he worked on debt financing for corporate clients.  PSR ¶ 135.  He returned to ZKB in 2003.  *Id.* ¶ 134.  Although it was a challenge to move to a different country for Dani's work—particularly with a newborn (Raffaela) and two-year old (Virginia)—both Dani and Antoinette remember their time in London fondly.  Ex. 1, D. Wälchli Letter at 5; Ex. 2, A. Wälchli Letter at 2.

In November 2004, Dani left ZKB and accepted a position as Holding's vice president of strategy and business development.  PSR ¶ 133.  He was promoted to Holding's executive board in 2006 and remained at the company for nearly two decades, until shortly before his guilty plea.[4]  Holding was, and is, a privately-owned, multi-national holding company based in Zurich. It has a diverse, international investment portfolio that included ownership in a Swiss aircraft manufacturer, real estate and hotels in several countries, retail companies, food and beverage

---

[4] In April 2022, after the Indictment was unsealed, Holding terminated Dani's employment and he became a consultant.  In March 2023, shortly before Dani entered his guilty plea, Holding terminated his consulting agreement as well.  PSR ¶¶ 131, 133.

manufacturers (including, for a time, minority ownership of Barilla Pasta), IT and IT security firms, a high-precision camera manufacturer, a data analytics firm, and PB IHAG. *Id.*

Dani was employed by Holding, where he focused on managing the firm's assets, sitting on the boards of various companies in which Holding had invested, providing support and analysis for hedge funds and private equity funds in which Holding had an interest, and expanding Holding's investments in Asia. *Id.* ¶¶ 28, 133. At all times during his nearly 19 years at Holding, Dani did not work in banking and had limited interactions with PB IHAG. In fact, while at Holding, his only interactions with PB IHAG clients were brief meetings with two individuals regarding matters unrelated to their accounts. *See id.* ¶ 85.

Throughout his career, Dani, like his father, developed a reputation as an unusually and exceptionally hard worker. Ex. 2, A. Wälchli Letter at 1 ("I remember the days when he was in the office at 6 o'clock in the morning, never back before 11 in the evening, and often also worked most of the weekend. Weekly working hours of 70-90 hours were no exception at that time."). At one point, he had pushed himself so hard at work that he collapsed and broke his nose. *Id.*

While Dani was known for his work ethic, his direct reports remember him best for facilitating a "culture of trust, loyalty, and honest feedback." Ex. 9, S. Nogly Letter at 1. Sara Nogly, who worked for Dani at ZKB, describes Dani as a supportive boss who took ownership for mistakes and gave credit for accomplishments:

> [Dani] empowered me greatly in my career. Dani's feedback was always uncompromisingly direct, honest, and constructive. . . . As a team, we developed a culture of trust, loyalty, and honest feedback. I always knew where I stood. Dani always supported me and stood up for his team as a supervisor. Successful work was praised, not only within the team, but Dani always passed on internal and

8

> external praise directly to me and our team and never claimed it for himself. When there was praise, he always put his team first, and in the rare case of complaints, he stood in front of the team and backed us up. One of Dani's statements that has stuck with me is: "A boss is always as good as his team, if his team does a good job and receives praise, the boss automatically shines too".

*Id.* Ms. Nogly adds that Dani created a culture that ensured his direct reports were treated fairly and that they received the fair pay to which they were entitled. *Id.* at 2.

David Keller, who worked for Dani at Holding, notes that "Dani set ambitious, yet achievable goals as a line manager and he was not afraid to intervene or support if something went wrong, take responsibility or stand-up for a co-worker or myself if needed." Ex. 10, D. Keller Letter at 2. David recalls that Dani was the type of manager who would delegate responsibility; he would give David "a lot of room to handle the task," but would also stay involved in the process to provide guidance and support; and that Dani would step aside during presentations so that David could gain experience and earn credit for the work, even if Dani had contributed significantly to the project as well. *Id.*

Dani was more than just a good boss. He took the time to get to know his co-workers and direct reports and their families on a personal level. *Id.* at 3 ("Dani cared a lot about my overall family-wellbeing, and he met my wife Marina relatively soon after the start of my employment to ensure that she is happy with my job as well. Dani even organized a long weekend in the mountains to introduce Marina and myself to his wife, his two daughters as well as his mother and her partner. . . . I still remember when I told Dani that we were expecting our third child and how joyful he reacted and how happy he was that my little family was growing.").

His co-workers note that they are thankful for having worked for Dani, and that he continues to provide them with mentorship even now that they have parted ways professionally.

Ex. 10, D. Keller Letter at 3 (noting that Dani "remains one of [David's] private mentors" and that David is "very glad and thankful that [he] was able to spend some of [his] professional career with Dani"); Ex. 9, S. Nogly Letter at 1-3 (noting that working with Dani was "very valuable" to her and that she and Dani have remained close in the 20 years since they first met at ZKB).

### C.    Dani's Devotion to His Family

Dani's family is the center of his life.

He has shared a close bond with his mother and brother throughout his life.  Ex. 1, D. Wälchli Letter at 1-2; Ex. 6, P. Wälchli Letter at 1 ("[A]s I grew older, . . . my brother became the most important person in my life. No one is closer to me than him."); Ex. 7, J.P. Huber Letter at 1-2 ("[F]amily was always something of central importance to [Dani]. [He] has a close relationship to his mother. . . . [He] is always here and available for his mother and for me."); Ex. 5, M. Huber Letter at 4 ("Dani was and is always there for my husband and me.").  Further, when Dani's mother and her second husband, Jean-Pierre Huber, started dating, Dani was quick to welcome his future stepfather into the family.  Ex. 7, J.P. Huber Letter at 1 (noting that although it was probably difficult "to deal with a new man at the side of their mother after so many years," "Dani and his family immediately welcomed [Jean-Pierre] very warmly").  Through travel, holidays, and everyday events, he makes sure that his mother, stepfather, and brother have a significant role in his life and the lives of his wife and daughters.  *Id.* at 1-2; Ex. 6, P. Wälchli Letter at 1-2.

Dani met his wife Antoinette in 1995 while they were both working at ZKB.  She was "fascinated from the outset by his presence, his dedication, and his talent for simply explaining

complicated things." Ex. 2, A. Wälchli Letter at 1. Dani, similarly, describes how, upon
meeting Antoinette, he immediately knew that she was "the person [he] w[as] always looking
for." Ex. 1, D. Wälchli Letter at 5 ("While at ZKB, I met my wife. I never forget this moment.
When you meet somebody, and deep in your heart, you know that this is the person you were
always looking for. This is the person you want to marry, to have a family with."). Dani and
Antoinette were married in 1999 and welcomed their first daughter, Virginia, that same year.
Dani and Antoinette's second daughter, Raffaela, was born two and a half years later. Dani and
Antoinette will celebrate their 25th wedding anniversary this August. *Id.*

    As Antoinette writes in her letter to the Court, Dani never let his work get in the way of
being there for her and their daughters. ███████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████. Ex. 2, A. Wälchli Letter at 1. Dani notes that between his "job, the Executive
MBA program, taking care of Virginia, ████████████████████████████████, this
was maybe the most intense time in my life. I hardly slept and lost some weight. But I somehow
managed to keep all these balls in the air. After some time, ████████████████, and life got
back to normal." Ex. 1, D. Wälchli Letter at 5. The Simon School Executive MBA program
started in January of 2000 shortly after Virginia was born, and Dani would drive two-and-a-half
hours back from his classes at night (rather than staying at school over the weekend, as many
other students did) so that he could be with his family. Ex. 2, A. Wälchli Letter at 2 ("[Daniel]
was keen to take care of our daughter and me, even in the middle of the night.").

    Further, when Antoinette wanted to stop working to stay home with their daughters, Dani
supported her decision and always viewed her as an equal partner. *Id.* at 3 ("He has always

mentioned that the most important thing is home and that our daughters are becoming good people. He never saw his professional performance above mine.").

Dani's commitment to his family, and his daughters' appreciation of his devotion, is also apparent in Virginia's and Raffaela's letters.  Virginia describes Dani as "the greatest, fairest and most generous person" in her life.  Ex. 3, V. Wälchli Letter at 1.  Raffaela notes that she is a "very lucky one, to have a father that deeply cares about his family."  Ex. 4, R. Wälchli Letter at 2.

To Dani, family time has always been more important than anything else.  Whether it is helping with homework or going to sporting events, Dani always made time to be there for his daughters.  Ex. 3, V. Wälchli Letter at 1-2 ("Every little thing at school, from sport to homework, was a matter close to his heart. In math, for example, he took so much time to explain the same problem for the ninth or tenth time. At school events, school sports or leisure activities, he was there almost without exception. It was so important to him and he was always incredibly proud of me and my sister."); Ex. 4, R. Wälchli Letter at 1 (noting that Dani is a "very proud and supportive father" who "attended every game to support [her]," and expressed true pride in all of her accomplishments, be it scoring a goal, completing a painting, or getting her driver's license).

Both his daughters also know that if something ever goes wrong in their lives, Dani will "drop[] everything and come[] to help immediately from wherever he is."  Ex. 3, V. Wälchli Letter at 2.  Virginia notes that one time in 2016 she got sick and, even though her mother was there to take care of her, Dani immediately cut short a business trip to Asia and "jumped on the next plane to return home."  *Id.*  Similarly, Raffaela describes a time when she got a concussion during a handball match—Dani "stayed with [her] in the hospital the whole time," "held [her]

hand," and read to her.  Ex. 4, R. Wälchli Letter at 2 ("This moment meant a lot to me, because I knew I was safe, and my dad was the one who made me feel this way.").

Dani is also an emotional person, who taught his daughters that "showing emotions, especially crying, is not a weakness, but rather a strength."  Ex. 3, V. Wälchli Letter at 3 ("He is also a very emotional person. I write him birthday cards every year, which makes him cry every time. He's a big music fan and has had to shed a few tears when a song touches him. I have also inherited this trait from him. He feels strongly and shows his emotions.").

Dani's adoration of his family is apparent to all who know him.  Ex. 5, M. Huber Letter at 3 ("Dani was, is and always will be a family man. His family is the most important thing for him. His willingness to help in every way is always there."); Ex. 11, S. Kirby Letter at 3 ("As a man with a wife and two daughters, his whole world is about caring for and protecting those three women."); Ex. 12, J. & S. Kirby Letter at 2 ("Dani's character is perhaps best exemplified by his kindness and his strong love for his wife and two daughters. Dani is so proud of his two daughters. He is always upbeat and positive with them, and he never points any negativity towards them in any way."); Ex. 9, S. Nogly Letter at 2 ("His relationship with his wonderful wife and two daughters is . . . characterized by a great deal of love and loyalty.").

### D.    Dani's Charitable Good Works and Acts of Kindness

As a self-made man, who was given little and worked hard to achieve his professional and financial success, Dani recognizes his good fortune in having opportunities available to him. As his stepfather notes in his letter, Dani believes that he has "a responsibility to help others"— "[n]ot only with money, but also with his heart and his personal commitment."  Ex. 7, J.P. Huber Letter at 2.

### 1.  Support for Impoverished Children in Southeast Asia

Since 2011, Dani has been providing support to children in Southeast Asia.  Dani's work required him to travel often to that part of the world.  While there, he observed a level of poverty and lack of opportunity that was very different from Switzerland.  *See* Ex. 1, D. Wälchli Letter at 6.  As Dani notes in his letter, when he travelled to India and Southeast Asia he would visit underprivileged areas and saw conditions that were "absolutely heartbreaking, unfair and a huge tragedy."  *Id.* (describing a trip to the Philippines where Dani witnessed intense poverty, including children living in terrible conditions near a garbage dump in Manila, and noting that "[f]rom that point onwards, it was clear . . . that I must do something to improve at least a few lives").  As is apparent to those who know him, his many journeys to that region "left their mark on him as a human being, in that they have strengthened his already existing good heart and social vein."  Ex. 7, J.P. Huber Letter at 2.

Fortunately, around this time, Dani was introduced to the Child's Dream charity, which he has supported for over a decade.  As described by its founders, Marc Thomas Jenni and Daniel Marco Siegfried, Child's Dream's mission is to "ensure that children and young adults in the Mekong Sub-Region of Asia, affected by inequality, grow up to be healthy and have access to quality education and employment opportunities."  Ex. 13, Child's Dream Letter at 1; *see also* Ex. 14, M. Vollenweider Letter at 2 (noting that Child's Dream has "built, operated and transferred more than 300 schools" in Laos, Cambodia, and Myanmar, and provided "specialized health services (specifically heart surgeries for children)").

Dani met the founders of Child's Dream in 2011.  Ex. 13, Child's Dream Letter at 1.  At that time, Dani was considering starting his own NGO to help those in need in Southeast Asia,

14

but after he saw how effectively Child's Dream was operating, he realized he could do more

good by supporting the existing organization.  Ex. 1, D. Wälchli Letter at 6-7.  Since then, Dani

has supported Child's Dream with both his money and his time.  Dani not only wanted to give

financially, he also "wanted to learn more about [the charity's] work 'on the ground'" and took a

sincere interest in helping the charity grow.  Ex. 13, Child's Dream Letter at 1.  As noted by his

former colleague at ZKB, Sara Nogly, Dani is very discerning when it comes to the causes he

supports:

> [Dani] has always donated money to social projects for as long as I
> have known him. But here too, the transparency and background of
> the social projects and organizations are very important to him. Dani
> would probably never make a donation to an organization that he
> had not personally checked . . . .  I am very sure that all these
> projects and organizations first had to pass a personal 'Dani
> Assessment' in order to gain his trust.

Ex. 9, S. Nogly Letter at 2.

Dani has visited Child's Dream in Chiang Mai, Thailand, on multiple occasions to see

firsthand the work the charity is doing and the people who are in need.  Ex. 13, Child's Dream

Letter at 1-2.  And as noted in several letters submitted to the Court, he has actively recruited

others in his community to support the charity.  *See, e.g.*, Ex. 14, M. Vollenweider Letter at 2

("Dani donates regularly and significantly to this organization, and he convinced us to do the

same."); Ex. 2, A. Wälchli Letter at 4 (noting that for Dani's 50th birthday, Dani "told everyone

that he would prefer if they donate money to this organization instead of bringing him a birthday

present," and almost everyone did); *see also* Ex. 13, Child's Dream Letter at 2 (describing an

event Dani organized at his daughter's school to support Child's Dream).  He has also found

15

other ways to support the charity, such as by personally delivering computers to Child's Dream in Chiang Mai.  Ex. 13, Child's Dream Letter at 1.

Overall, Marc and Daniel note that Dani's "long history of personal commitment and financial support reflects his true character" "as a very kindhearted, honest and reliable individual, who sees it as his responsibility to help the less privileged in society."  *Id.* at 2.

### 2.    Dani's Devotion to Others

In his professional career, Dani was often tasked with helping to make the companies in which Holding invested more profitable.  But Dani did more than just help the bottom line, he took a sincere interest in helping the employees who worked at the companies.

For example, Dani sat on the board of a company called Evaluserve after Holding acquired a stake in that company.  Marc Vollenweider, who was CEO of Evaluserve, notes that Dani's primary role on the board was to manage the institutional relationship between Holding and Evaluserve.  Ex. 14, M. Vollenweider Letter at 1.  Dani, however, also ensured that Corporate Social Responsibility was a focus of Evaluserve.  *Id.* at 2 (noting that Dani "made sure that CSR was always on the Board's agenda, [that] the Board got the CSR reports and allocated a substantial level of budget to the CSR project portfolio").  He also took a keen interest in the employees of that company and always made sure "the interests of Evalueserve's employees were taken care of."  *Id.* at 1.

Dani's care for employees of the companies he managed is best exemplified by his exceptional efforts to help employees of Evaluserve-India following a horrific bus accident in November 2016.  In his letter to the Court, Himanshu Sharma, a senior analyst at Evaluserve, describes how he lost his right arm, and how multiple other employees suffered catastrophic

injuries, when a bus carrying him and his co-workers to a company outing crashed. Ex. 15, H. Sharma Letter at 1-2; *see also* Ex. 14, M. Vollenweider Letter at 2.

In his letter, Himanshu's brother, Yomesh, explains that Evaluserve-India was not providing sufficient support to Himanshu in the immediate aftermath of the accident. Ex. 16, Y. Sharma Letter at 1. "However, once the information of the accident reached [Dani], . . . [Dani] took the lead among the board members to support the impacted employees including [Himanshu], on highest priority." *Id.*

Dani wanted to do more than just get the company to provide financial support. He personally saw to it that Himanshu was taken care of. Thus, Dani got on a plane and flew to Delhi to visit Himanshu and his family. Ex. 15, H. Sharma Letter at 1; *see also* Ex. 17, V. Sharma Letter at 2. He visited the Sharma home, asked how he could help, and gave Himanshu his personal contact information. Ex. 15, H. Sharma Letter at 1.

Dani did not just promise to help Himanshu ███████████████, he immediately started coordinating ████████ and Evaluserve to ensure that Himanshu got the care he needed. Ex. 17, V. Sharma Letter at 2. After Himanshu was able to travel, Dani arranged for him to come to Switzerland ████████████████████. *Id.* Dani made sure that Himanshu's brother, Yomesh, could travel with Himanshu so that he would not be alone. Ex. 16, Y. Sharma Letter at 2.

Dani recognized that Himanshu and Yomesh were in a strange country while they were in Switzerland, and he and Antoinette looked after them personally, opening their home to them:

> [D]uring our stay in Zurich, Switzerland, Daniel and his wife both dedicated time to making sure we were okay. ████████████
> ████████████████████████
> They also invited us into their home to share a meal with them and

17

took time to show us the sights in Zurich ███████████████████████
███████ .

*Id.*; *see also* Ex. 15, H. Sharma Letter at 2 ("████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████ ").

After Himanshu left Switzerland ███████████████████████ , Dani continued to check in on

him.  Ex. 15, H. Sharma Letter at 2 ("To this day, he continues checking on my wellbeing. It is

been almost seven years since my accident but Daniel has continued to maintain a constant and

caring presence in my life and always keep checking about my wellbeing and supporting me in

never to give up on life."). ████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████  In response, Dani helped Himanshu transfer

to Evaluserve-Chile so he could start anew.  Ex. 14, M. Vollenweider Letter at 2 (noting that

Himanshu now has a wife and two young children in Chile, and that "[t]his would not have

happened without Dani's direct leadership and personal involvement").  Himanshu and his wife

recently welcomed a new baby, and asked Dani to be the godfather, which he happily accepted.

Ex. 2, A. Wälchli Letter at 4.

Himanshu's story is just one example of Dani's kindness in response to this terrible

situation.  Dani also ensured that the other employees injured in the bus accident received similar

support.  Ex. 14, M. Vollenweider Letter at 2.

### E.    The Letters Submitted in Support of Dani Demonstrate His True Character

Dani's friends, family, and others have submitted letters evidencing his honesty, loyalty,

and dedication to helping others.

Dani's daughter, Virginia, describes Dani as a gentleman in the "old" fashion, "who gives up his seat for older people on public transport, who stands up when we ladies arrive a little late for dinner in a restaurant, or shakes hands when he thanks people." Ex. 3, V. Wälchli Letter at 2; *see also* Ex. 10, D. Keller Letter at 2 (Dani is the kind of person who does the "simple things like opening somebody the door, helping people to lift hand luggage to the overhead compartment on a plane, inviting the janitor of our office building to a coffee/croissant or just caring about a foreigner who seemed to be lost on the street."); Ex. 2, A. Wälchli Letter at 1 ("To this day, Daniel is a gentleman. I am fascinated by the way he cares for me with respect and an unaffected manner. His (equally self-critical) humor, as well as his reliability and generosity make Daniel a very special person for me.").

Christiane Egger-Le Coultre, who is in her 80s, and her late husband, Hans, were Dani's neighbors since 2005. Ex. 18, C. Egger Letter at 1. Christiane describes Dani as a wonderful neighbor who always took the extra step to help them without being asked. *Id.* ███████████ ███████████████████████████████████████████████████████ Dani would invite him for meals so that they could talk about world news, politics, and other topics that interested Hans. *Id.* at 2.

███████████████████████████████████████████████████████████████████

███████████████████████████████████ Christiane also notes that Dani surprises her with small acts of kindness, like shoveling her driveway after a heavy snow. *Id.* (noting that having Dani and his family as neighbors was "a great stroke of luck"). Adrian Duerlewanger, who was a neighbor of Dani's family before they moved to Thalwil, similarly notes in his letter that it was "very fulfilling to have [Dani] as a neighbor and friend." Ex. 20, A. Duerlewanger Letter at 1.

Second only to his dedication to family, Dani's defining characteristics are his honesty and reliability. *See, e.g.*, Ex. 9, S. Nogly Letter at 2 (Dani "is one of the most straightforward and strictly honest people I know."); Ex. 7, J.P. Huber Letter at 3 ("Dani has proven to me over the last 20 years that I can rely on him. I have always known him as an honest friend with integrity."); Ex. 19, P. von Michaelis Letter at 3 ("Dani Walchli is a good person. He's someone I always could and would rely on when needed without him asking anything in return."); Ex. 21, H. Karrer Letter at 2 ("I know Dani as someone you can rely on, as someone who not simply puts himself in the foreground but also stands up for the interests of society as a whole but also for those who are weaker, as someone who is trusted because he justifies this through his behavior and commitment."); Ex. 22, R. Brinkmann Letter at 2 ("Dani is an honest person, with high integrity and sincerity for his friends and his family, whom I would not want to miss in my life, because I know that he will always stand up for me, even if he does not benefit from it.").

Dani is quick to offer help when his friends are in need.  For example, Philipp von Michaelis owns a company that provides reconstruction assistance to war-torn countries.  Ex. 19, P. von Michaelis Letter at 2-3.  These efforts generally take place after a conflict has concluded, but Philipp's company was looking for a way to provide support to Ukraine.  *Id.*  Because of Switzerland's commitment to neutrality, Philipp needed to navigate "a very complex political landscape" to be able to provide this support during an active conflict.  *Id.* at 3.  In response to Philipp's request for assistance, Dani actively supported Philipp's mission and helped Philipp successfully navigate the complexities of Swiss neutrality and provide support to Ukraine.  *Id.* (noting that Philipp's company has been able to partner with the Swiss government to implement a $100 million aid package for humanitarian efforts in Ukraine).

20

Dani also finds ways to use his passions and hobbies to benefit others.  Dani loves to ski, and became a licensed ski instructor in Switzerland.  Ex. 7, J.P. Huber Letter at 2.  Since 2021, he has spent many hours as a ski instructor teaching others to ski while donating his instructor salary to a foundation that helps people with disabilities learn to ski.  Ex. 3, V. Wälchli Letter at 2.  He was also an avid tennis player, who captained a local adult team.  Ex. 19, P. von Michaelis Letter at 1.  Philipp von Michaelis describes Dani as the consummate team player, always helping his teammates improve.  *Id.* at 1-2. (Dani "made it his mission to get the team to play up to its potential. He developed training plans, organized regular team meetings and created an incredible team atmosphere.  . . . [He] gave up a lot of his personal time to make being a part of the team a rewarding experience").  Dani continued serving the team even after suffering an injury that forced him to give up competitive tennis, staying on as "'non-playing captain' and continued to fulfill his role." *Id.* at 2; Ex. 22, R. Brinkmann Letter at 1 ("He was a true leader with sportsmanship qualities. Although he had to retire from tennis . . . due to injury, he did not hesitate for a minute to stand up for the team as a non-playing team captain . . . .").

## II.   THE OFFENSE CONDUCT

As reflected in his guilty plea, statement of the offense submitted to the Probation Department, *see* PSR ¶¶ 83-87, and letter to the Court, Ex. 1, D. Wälchli Letter at 1, Dani fully accepts responsibility for his conduct, which he recognizes was not only illegal, but also inconsistent with the high ethical standards he set for himself.  We discuss the offense conduct here to provide necessary context to Dani's actions.

21

### A.  Dani's Role at Holding and the Development of Helvetic

Before Dani joined Holding, the company had been looking for ways to invest in the
Asian market.  Holding saw Asia as an attractive region in which it did not have enough assets.
In 2006, Dani was given a mandate to develop the company's Asia strategy, and he explored
investments in various sectors.  Ultimately, at Dani's recommendation, Gratian Anda, who was
Holding's Chairman, CEO and principal owner as well as the Chairman of PB IHAG, and
Holding's board of directors decided to pursue investments in the Asian financial services sector.
By 2008, Dani had further focused on developing an asset manager in Singapore, and he was
devoting substantial time and effort to this project.  His efforts ultimately resulted in the
formation of Helvetic Investments Pte Ltd. ("Helvetic") in Singapore.[5]

### B.  In the Wake of the DOJ-UBS Investigation, PB IHAG Explores "Solutions" for Substantial Accountholders

Like many Swiss banks, PB IHAG had clients outside of Switzerland, some of whom
took advantage of the country's long-standing bank secrecy laws to conceal assets and income
from their home country's taxing authorities.  Historically, Swiss banks (and bankers) have
viewed a depositor's relationship with his or her home revenue authority as a matter of the
depositor's individual responsibility, not that of the bank.[6]

---

[5] While the Singapore asset manager was not registered with the Singapore authorities and
named Helvetic until mid-2009, we refer to it as "Helvetic" throughout this submission.

[6] Helga Turku, *The International System of States' Checks and Balances on State Sovereignty:
The Case of Switzerland*, 38 N.C. J. Int'l L. & Com. Reg. 809, 837 (2013) ("Swiss banking
secrecy is protected through banking laws, criminal laws, civil laws, and codes of professional
obligation.  The Swiss Banking Act of 1934 codified the protection of bank secrecy in
Switzerland.  These laws require that Swiss banks preserve the privacy of their clients.
Punishment for disclosing such information includes criminal and civil liability."); Michele

In 2008, however, that approach started changing in the wake of reports that the DOJ was investigating UBS AG, Switzerland's largest bank, for its role in assisting U.S. taxpayers evade taxes through undeclared accounts.  In response, PB IHAG and other Swiss banks started developing "disclose-or-leave" policies that would require U.S. clients to either disclose their accounts to the Internal Revenue Service ("IRS") or close those accounts.  PB IHAG adopted a "disclose or leave" policy in 2009.  PSR ¶ 25.

But over a year before PB IHAG formally adopted this new policy, it began quietly looking for ways to allow certain long-standing, substantial account holders to remain at the bank without disclosing their accounts.  *Id.* ¶ 26.  Without Dani's knowledge or involvement, by at least the summer of 2008, Michael Gubser—PB IHAG's general counsel and chief compliance officer—was working to develop a "solution" for these clients.  *Id.*  At the direction of PB IHAG's executive management, Gubser approached Allied Finance Trust AG ("Allied Finance"), a Swiss financial services firm that had expertise in building complex trusts and corporate structures, for assistance with the project.  *Id.*  Over the ensuing months, Gubser worked with Rolf Schnellmann, Bernhard Lampert, and others at Allied Finance to develop a mechanism that would allow certain PB IHAG account holders to keep undisclosed accounts at the bank.  *Id.*

---

Moser, *Switzerland: New Exceptions to Bank Secrecy Laws Aimed at Money Laundering and Organized Crime*, 27 Case W. Res. J. Int'l L. 321, 323 (1995) ("Bank secrecy in Switzerland derives from the principle of personal privacy and reflects the value placed by Switzerland on individual economic liberties. Swiss law does not specifically define Swiss banking secrecy, but according to legal custom its definition is 'a banker's professional obligation to keep in strictest confidence, all business and affairs related to the financial and personal circumstances of clients and some third parties to the extent that knowledge of such matters is acquired in the course of business.'" (citations omitted)).

By December 2008, Gubser and Allied Finance had designed such a mechanism, which came to be known as the "Singapore Solution." *Id.* ¶¶ 26-28. Under the plan, undisclosed accounts maintained at PB IHAG would be closed, the funds in those accounts would be transferred through accounts at banks in Hong Kong, and ultimately the funds would be returned to PB IHAG in the name of an unrelated third party. *Id.* ¶ 27. Through this mechanism, PB IHAG's internal records would not reflect the identity of the beneficial owners, or the account holders' connection to the United States, thereby enabling U.S. taxpayers to maintain their undisclosed funds at PB IHAG. *Id.* It was, in essence, a means for PB IHAG to circumvent its own "disclose-or-leave" policy and continue offering undisclosed accounts to certain wealthy clients.

### C.   Gubser and Allied Finance Incorporate Helvetic into Their Plan

Dani was not involved in Gubser's and Allied Finance's development of the Singapore Solution, and their initial plans for the Singapore Solution did not envision any role for the asset manager that Dani was designing. But Gubser was aware of Dani's work in forming Helvetic, and in or about January 2009, he approached Dani and asked whether it could be used in connection with his and Allied Finance's plan. *Id.* ¶ 28.

After speaking with Gubser, ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

in January 2009, Dani presented an 11-page slide deck describing the "Asia Financial Services Strategy" ████████████████████████████████████████████████████████

24

███████████████████████████████.[7]  *See id.*  While the presentation focused on the
formation of Helvetic, which he had been working on for many months, it included three slides
describing the Singapore Solution.  These slides contained the structures that Gubser had
designed with Allied Finance with only minor alterations, including that they replaced an
unrelated Singapore-based asset manager with Helvetic, thereby ensuring that PB IHAG and
Holding could obtain additional fees from the solution.  ████████████████████████
████████████████████████████████

### D.  Dani's Participation in the Singapore Solution

███████████████████████████████████████████, Dani assisted
Gubser in executing the Singapore Solution, both by continuing this work on forming Helvetic
and by coordinating the efforts of PB IHAG (through Gubser and Peter Rüegg, PB IHAG's
Deputy CEO), Allied Finance (through Schnellmann and Lampert, Allied Finance's owner), and
Allied Financial Partners ("AFP") (through Roderic Sage).  *Id.*

In the fall and early winter of 2009, three PB IHAG clients—including two U.S. based
clients[8]—participated in the Singapore Solution.  Both of the U.S. based clients' families had
held accounts with PB IHAG since at least the 1960s:  one was the ████ family, which had
accounts totaling more than $50 million; the other was an American couple (████████), with
approximately $13 million at PB IHAG.  *See id.* ¶¶ 49-61.  Although Dani was aware these

---

[7] ████████████████████████████████████████████████████████.

[8] The crackdown on the use of Swiss accounts to evade taxes was not limited to U.S. taxpayers,
and a third PB IHAG client—a German citizen—also participated in the Singapore Solution in
2009.

clients were taking advantage of the Singapore Solution, he never spoke with or otherwise had contact with them.

      The "round-trip" transfers for these clients were completed by the end of December 2009 with the assets that had been held in accounts controlled by the ███████████ now being held in accounts in the name of Helvetic. *Id.* In early 2010, after the invoices for the fees associated with the three accounts were issued and paid, Dani ceased his active participation in the Singapore Solution. PB IHAG, Helvetic, Allied Finance, and AFP all received fees from the "round-trip" transfers, and Holding benefitted from those fees through its ownership interests in PB IHAG, Helvetic, and AFP. *Id.* ¶¶ 15-16. Dani, however, did not receive any financial remuneration (that is, either additional salary or increased bonus) as a result of his participation.[9]

      **E.**    **Dani Persuades Others To Close Down the Singapore Solution**

      Over time, Dani became increasingly uncomfortable with the Singapore Solution. In or about late 2010, he raised the issue of closing the Singapore Solution accounts at a meeting with ████████████████████████████████████████████████████ Rüegg, Gubser, and another member of Holding's executive board. *Id.* ¶ 86. At that meeting, Dani "argued that the Singapore Solution was wrong and should be terminated." *Id.* He was heavily criticized for expressing his concerns; indeed, the bankers in attendance scorned Dani

---

[9] In the spring and summer of 2010, a third U.S. PB IHAG client, Wayne Franklyn Chinn, executed a similar, but not identical, "round trip" transfer of funds held at PB IHAG. While Dani was aware that the ███████████ had executed the Singapore Solution in late 2009, and knew that the Singapore Solution could be used to assist other clients in concealing their beneficial ownership of accounts at PB IHAG, he was not aware of Chinn and did not participate in the transactions relating to his accounts.

and called him "weak" for wanting to shut down the accounts. ████████████████

████████████████

Dani raised the issue again in 2011.  This time, he succeeded in persuading the others to

close the Singapore Solution accounts.  *Id.*  Relieved, Dani called ████████████████

████████████████, and made clear that Helvetic was not to open any more accounts for U.S.

clients, telling him there should be "no drugs, no weapons, and no Americans" at Helvetic.  Ex.

1, D. Wälchli Letter at 7.  Dani had no further involvement in the accounts or the Singapore

Solution.  *Id.*

After it was decided that the Singapore Solution accounts would be closed, Gubser, Ivo

Bechtiger (the former head of compliance at PB IHAG who had his own asset management firm)

and others, without Dani's involvement, transferred the funds ultimately to other undisclosed

accounts at DBS Bank and Credit Suisse.  PSR ¶ 48.

### F. PB IHAG's Participation in the Swiss Bank Program

On August 29, 2013, the United States Department of Justice announced the Program for

Non-Prosecution Agreements or Non-Target Letters for Swiss Banks ("Swiss Bank Program"),

which offered Swiss banks that were not already under investigation the opportunity to disclose

information regarding their cross-border business and U.S. clients in exchange for non-

prosecution agreements.  Under the Swiss Bank Program, banks paid penalties based on the size

of the U.S. accounts they opened at various points in time but could reduce their penalties by

encouraging their U.S. clients to participate in the Offshore Voluntary Disclosure Program

("OVDP") offered by the IRS.[10]  Through the program, 84 "Category 2" banks (banks that were

not already under criminal investigation) received non-prosecution agreements and paid

penalties.  All told, through the Swiss Bank Program and other investigations and prosecutions,

the Swiss banks paid over $7.5 billion in penalties, resulting in the collapse or liquidation of

multiple banks, including Wegelin & Co. ("Wegelin"), Switzerland's oldest bank.[11]

PB IHAG participated in the Swiss Bank Program, which ultimately resulted in it

entering a non-prosecution agreement with the Department of Justice and paying a $7.4 million

penalty.  *Privatbank IHAG Zürich AG, DOJ Swiss Bank AG Program—Category 2, Non-*

*Prosecution Agreement* (Nov. 19, 2015) ("PB IHAG NPA").[12]  PB IHAG also persuaded the

████████████████████[13] to participate in the OVDP, thereby ensuring that the ██████

---

[10] As discussed more fully below, the OVDP was offered by the IRS in several iterations
between 2009 and 2018.  Under the OVDP, U.S. taxpayers with undisclosed income from
offshore assets were given the opportunity to resolve their income tax liabilities and delinquent
reporting requirements.  The program allowed these taxpayers to repatriate their funds and
provided protection from criminal prosecution and a uniform civil penalty structure for taxpayers
who came forward voluntarily before the IRS received information regarding their
noncompliance.  *Offshore Voluntary Disclosure Program*, Internal Revenue Manual § 4.63.3
(Apr. 27, 2021), https://www.irs.gov/irm/part4/irm_04-063-
003r#:~:text=The%20Offshore%20Voluntary%20Disclosure%20Program,assets%2C%20and%2
0FBAR%20reporting%20requirements.

[11] *Swiss Bank Program*, U.S. Dep't of Justice, Tax Div. (Feb. 22, 2023),
https://www.justice.gov/tax/swiss-bank-program; Rupert Neate, *Oldest Swiss Bank Wegelin To
Close After Admitting Aiding US Tax Evasion*, The Guardian (Jan. 4, 2013)
https://www.theguardian.com/world/2013/jan/04/swiss-bank-wegelin-close-tax-evasion;
Matthew Allen, *How the US Tax Evasion Crackdown Impacted Swiss Banking*, Swissinfo.ch
(Dec. 5, 2023), https://www.swissinfo.ch/eng/business/how-the-us-tax-evasion-crackdown-
impacted-swiss-banking/49032750.

[12] https://www.justice.gov/opa/file/795676/download.

[13] ████████████████████████████████.

█████ accounts would be excluded from its penalty[14] and that its former clients would avoid prosecution for their decades of lucrative tax evasion.  *See* Swiss Bank Program, Pt. II.H (Aug. 29, 2013), https://www.justice.gov/tax/file/631356/dl?inline.

Pursuant to the Swiss Bank Program, PB IHAG disclosed the Singapore Solution to the DOJ no later than May 2014.  Among other things, PB IHAG's presentation described the roles that Dani and certain PB IHAG employees played in the underlying transactions.

On September 15, 2020—over ten years after Dani's last active involvement in the Singapore Solution, approximately nine years after he persuaded ████████████████ to terminate the scheme, and over six years after PB IHAG disclosed the Singapore Solution to the DOJ in connection with the Swiss Bank Program—a grand jury sitting in the Southern District of New York returned a one count indictment charging Dani, Bechtiger, Lampert, Rüegg, Sage, Schnellmann, and Allied Finance with having conspired to defraud the U.S. government in connection with the Singapore Solution by concealing U.S. clients' undeclared assets and income held at PB IHAG.

### G.    Dani's Acceptance of Responsibility ████████████

Even before the indictment was unsealed Dani, through counsel, contacted the government and offered to come to the United States to face the charges.[15]  The significance of

---

[14] Based on the formula governing the Swiss Bank Program, given the size of the ████████ ███████ accounts, and the fact that they had been opened prior to 2008, it appears that PB IHAG was able to reduce its penalty by approximately $12 million by persuading the ████████ ███ to disclose their accounts through the OVDP.  *See* Swiss Bank Program, Pt. II.H (Aug. 29, 2013), https://www.justice.gov/tax/file/631356/dl?inline.

[15] As noted in Dani's motions to dismiss, on October 20, 2020, Dani's counsel informed the government that, if charges were brought against him, Dani was prepared to travel to the United

this offer, which the government accepted almost a year later, cannot be overstated.  Under the

U.S.-Swiss extradition treaty, the government could not have extradited Dani from Switzerland,

and thus he could have avoided prosecution indefinitely by remaining in his home country.

Rather than doing so, however, before the indictment was unsealed Dani committed to appear in

this Court and answer the charges against him.

Dani's conduct stands in stark contrast to most of his co-defendants.  Bechtiger and Sage

have avoided prosecution by remaining outside the United States.  Lampert was arrested ███

███████████████████ but refused to come to the United States and was allowed to return to his

home.  Rüegg was arrested in Spain, but he jumped bail and absconded to Switzerland, thereby

thwarting the government's efforts to extradite him.[16]  And approximately three years after Dani

_____

States to face the charges assuming the parties could reach an agreement on a reasonable bail
package.  Ex. B to J. Temkin Decl., Dkt. No. 46.  Asking the government to agree to a
reasonable bail package was entirely appropriate and not a substantial "condition" to Dani's offer
to appear in the United States.  It is common in this courthouse for white collar defendants who
voluntarily surrender and have neither engaged in any obstructive conduct nor given the
government reason to believe they would be a risk of flight to receive a "reasonable bail"
package.  Moreover, having offered to waive extradition and appear voluntarily, Dani's request
that he be allowed to remain in Switzerland with his family during the pendency of the
potentially lengthy pretrial proceedings was not extraordinary.  Indeed, the government had
previously agreed to similar travel parameters for multiple other Swiss nationals.  *See, e.g.*,
Hearing Tr. at 25, *United States v. Amrein*, No. 13-cr-972 (SHS) (S.D.N.Y. Mar. 31, 2015) (Dkt.
No. 12); Feb. 2, 2016 Min. Entry, *United States v. Casadei*, No. 11-cr-866 (JSR) (S.D.N.Y. Feb.
2, 2016).  As the Court is aware, shortly after the government unsealed the Indictment, the
parties agreed on a bail package and Dani voluntarily appeared in the United States for
arraignment.

[16] Katharina Bart, *Swiss Banker Escapes Back to Switzerland*, Finews.com (Sept. 27, 2021)
("Peter Rueegg, who in August was detained by Spain's national police at the request of U.S.
prosecutors, is back in Switzerland," after "absconding for the safety of home . . . ."),
https://www.finews.com/news/english-news/48066-peter-rueegg-ihag-switzerland-doj-tax.

offered to come to the United States, and a year and a half after Dani appeared, Schnellmann was extradited from Italy and appeared in this Court.

Dani, on the other hand, put his trust into the U.S. judicial system and came to the United States voluntarily. This included asking the Court to dismiss the *Klein* conspiracy charged in the Indictment as an improper extraterritorial application of U.S. law and to find that the prosecution was untimely in light of the government's delay in unsealing the Indictment in light of his offer to travel to the United States in 2020 and the arrest of Lampert in 2021. In denying Dani's motions to dismiss, the Court noted that Dani had "raised strong arguments that *Klein*, in criminalizing dishonest conduct that does not actually deprive the government of any property, appears discordant both with the plain text of 18 U.S.C. § 371 and recent guidance from the Supreme Court concerning the reading of criminal statutes." Jan. 5, 2023 Hearing Tr. at 83-84 (noting that it "would be useful" if the government "consulted with the Solicitor General's office to confirm that it will support any conviction obtained in this case"). Approximately 11 weeks after the Court denied his motions, and before the parties filed pretrial submissions, Dani notified the Court that he intended to plead guilty.

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

█████████████████████████████████

████████████████████████████████

███████████████████████████

31

█████████████████████████████████████████████

███████████████████████████

At bottom, Dani made real mistakes, but he did the right thing by voluntarily coming to the United States to face the charges and admitting his guilt.  Ex. 1, D. Wälchli Letter at 1 ("[I]t has always been clear to me that, if you make a mistake, you admit it, you correct it, you apologize for it and you accept responsibility for it.").  His friends and loved ones are not surprised by his decision, as that is how they know him.  Ex. 8, M. Krist Letter at 3 ("I give Dani a lot of credit for facing the court in this matter. I would not have expected anything else from him . . . ."); Ex. 5, M. Huber Letter at 4 ("He faced up to the situation, as is his way. That shows me that he is a good, righteous person.").

## III.  IMPACT OF THE PROSECUTION

As Dani's friends and family note in their letters, Dani's conduct in this matter does not accord with his values or how he has otherwise lived his life.  Ex. 19, P. von Michaelis Letter at 3 ("Dani Wälchli is a good person. He's someone I always could and would rely on when needed without him asking anything in return."); Ex. 8, M. Krist Letter at 3 ("I was very surprised when I heard [about this case] from Dani. After all, I have always known him to be a very correct and law-abiding person over the years.").

Dani deeply regrets his actions.  *See* Ex. 1, D. Wälchli Letter at 1, 8.  And those who love and care about him confirm the sincerity of his remorse.  Ex. 2, A. Wälchli Letter at 4 ("I can tell that Daniel has had hardly a quiet night since 2011. The whole topic has already weighed on him for more than 12 years."); Ex. 5, M. Huber Letter at 3 ("Dani has suffered unspeakably in this matter."); Ex. 6, P. Wälchli Letter at 2 ("Dani has suffered enormously from this for many years.

32

The loss of his beloved job is one thing, but the huge psychological burden is another. This burden was and still is immense, and this was evident time and again in our conversations.").

Dani's conduct, and the ensuing investigation and prosecution, have destroyed so much of his life. He spent decades cultivating a successful career based on his hard work, honesty, and loyalty, as his former colleagues confirm. Ex. 9, S. Nogly Letter at 2-3 (noting that Dani is "straightforward," "strictly honest," and "a loyal person on whom his family, his friends and those around him can always rely"). Indeed, Dani's involvement in the Singapore Solution was solely attributable to his employment at Holding ██████████████████████████████ ██████████████████████████████████. But he nonetheless was terminated from Holding shortly after the Indictment was unsealed, and his consulting contract was cancelled shortly before he pleaded guilty.

Dani has also been publicly shamed. Dani had no public profile before this case. Now, it is difficult to find a mention of him on the Internet not related to his indictment.[17] He also has been punished in other jurisdictions. He was the subject of proceedings in Singapore, where he was sanctioned by the Monetary Authority of Singapore, and in Germany, where he resolved charges relating to a German citizen's evasion of his German tax obligations.

---

[17] *See, e.g.*, Chris Dolmetsch, *Swiss Banker Admits Helping Fund Manager Evade Taxes*, Bloomberg (Mar. 30, 2023), https://www.bloomberg.com/news/articles/2023-03-30/swiss-banker-admits-helping-hedge-fund-manager-evade-us-taxes; *Top Ihag Executive Steps Aside After U.S. Charges*, Finews.ch (Sept. 29, 2021), https://www.finews.com/news/english-news/48117-ihag-holding-indictment-switzerland-tax; Christian Berthelsen, *Bankers Charged with Helping Hedge Fund Manager Dodge Taxes*, Bloomberg Tax (Sept. 29, 2021), https://news.bloombergtax.com/daily-tax-report-international/swiss-firm-five-bankers-charged-in-u-s-tax-avoidance-scheme.

The length of the investigation and prosecution of this case has also been very difficult for Dani and his family.  Ex. 5, M. Huber Letter at 3 ("This matter has been a great burden for him and the whole family for about 14 years now . . . ."); Ex. 11, S. Kirby Letter at 3 ("I know this whole case and experience has put a tremendous amount of stress on Dani and his family. We have had many tear-filled conversations when he has confided in me about his sadness for putting his family through this case. . . . I can't imagine what it must have been like to have this hanging over his head for so long.").  Dani has spent the last 14 years with this matter hanging over his head. ██████████████████████████████████████ And he and his family have spent more than a decade without knowing what his future will hold. Ex. 3, V. Wälchli Letter at 2 ("As you can imagine, my father is not doing well today. He has to deal with this whole case since nearly 14 [y]ears and this has taken its toll."); Ex. 2, A. Wälchli Letter at 4 ("Daniel can hardly sleep through the night anymore and is plagued by bad dreams. Daniel's fun and carefree personality has been lost. He loved his job, had always seen his superiors as people to be respected but has now been ostracized by them. Daniel has lost his job and with it some of his dignity. He is a broken man and that is the worst thing for me to witness. It breaks my heart every day to see him suffer.").

In short, this case has already had a tremendous impact on Dani's life.  He deeply regrets his participation in the conduct underlying this prosecution.  He fully accepts responsibility for his actions and looks forward to moving past this low point in his life.

## IV.   A NON-CUSTODIAL SENTENCE IS WARRANTED AND APPROPRIATE UNDER 18 U.S.C. § 3553(a)

Following *United States v. Booker*, 543 U.S. 220 (2005), it is "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory."  *United States v. Dorvee*, 616 F.3d

34

174, 183 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en

banc)).  Although the Court must "give fair consideration to the Guidelines before imposing

sentence, in the end, it must make an 'individualized assessment' of the sentence warranted by

§ 3553(a) 'based on the facts presented.'"  *United States v. Jones*, 531 F.3d 163, 170 (2d Cir.

2008) (citations omitted); *see also Cavera*, 550 F.3d at 188-89.  In this process, "[t]he Guidelines

are not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable."

*Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original).  Further, under the

"parsimony clause" of § 3553(a), "it is the sentencing court's duty to impose a sentence

sufficient, but not greater than necessary to comply with the specific purposes set forth at 18

U.S.C. § 3553(a)(2)."  *Dorvee*, 616 F.3d at 182 (quotation marks omitted).

Under § 3553(a)(2), the court must impose a sentence that: (A) "[reflects] the seriousness

of the offense, [promotes] respect for the law, and [provides] just punishment for the offense;"

(B) "[affords] adequate deterrence to criminal conduct;" (C) "[protects] the public from further

crimes of the defendant;" and (D) "[provides] the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner."

In addition to these mandatory factors, § 3553(a) also directs the court to consider "the nature

and circumstances of the offense and the history and characteristics of the defendant"; "the kinds

of sentences available"; the Guidelines and any policy statements; "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct"; and "the need to provide restitution to any victims of the offense."

We respectfully submit that the factors in 18 U.S.C. § 3553(a) weigh heavily in favor of

leniency, and support the conclusion that a non-custodial sentence is sufficient but no greater than necessary in this case.

### A.     The Advisory Guidelines Calculation

The Sentencing Guidelines calculation set forth in the Presentence Investigation Report results in an adjusted offense level of 15 and criminal history category of I, which yields an advisory Guidelines range of 18-24 months.

The Probation Department recommends a significant downward variance from the Guidelines—six months' imprisonment.  PSR at 39.  In arriving at this recommendation, the Probation Department recognizes many of the mitigating factors discussed herein, including Dani's acceptance of responsibility and sincere remorse, his decision to come to the United States voluntarily when he could not have been extradited, his lack of any criminal history, and his family ties and responsibilities in Switzerland. *Id.* at 40.

The mitigating factors not considered by the Probation Department in recommending this well-below Guidelines sentence further support a non-custodial sentence.  The Probation Department's justification for its recommendation does not account for Dani's responsibility for terminating the Singapore Solution years before any investigation.  It does not consider that almost all Swiss defendants indicted for similar crimes have received no prison time, or that many other culpable parties—the taxpayers who utilized the offshore accounts to conceal their assets, and the banks and financial professionals who facilitated the taxpayers' conduct—have largely avoided criminal prosecution or incarceration.  And it does not consider the unusually harsh conditions Dani, as a deportable alien, will likely face if sent to prison, including that any prison sentence will likely be extended while he undergoes deportation proceedings, and that he

will likely be required to serve a longer sentence under worse conditions than a similarly situated American defendant because he is a noncitizen.

Thus, as explained below, a non-custodial sentence, which is a modest variance from the six months recommended by the Probation Department, is appropriate here.

### B.    Dani's History and Characteristics Support a Non-Custodial Sentence

As Judge Rakoff wrote in *United States v. Adelson*, 441 F. Supp. 2d 506, 512-13 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008), "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  Other than the current offense, Dani has led an exemplary life.

Dani's lifetime of hard work has resulted in professional success.  But to Dani, his success came with a responsibility to help others who have not been as fortunate.  *See, e.g.*, Ex. 7, J.P. Huber Letter at 2 (noting that Dani felt he always had "a responsibility to help others. Not only with money, but also with his heart and his personal commitment").  As described above in detail, *see supra* 13 to 16, Dani has devoted substantial resources to helping impoverished people whom he has never met and who live on the other side of the world.  Dani does so not just by giving money—to him, the real service comes from finding a worthy cause and throwing his support behind it, or by finding ways to help people in their everyday life, such as by helping Himanshu in his recovery after losing his arm.   Ex. 15, H. Sharma Letter at 2.

More generally, Dani lives his life by a code of honesty, loyalty, and forthrightness.  *See, e.g.*, Ex. 9, S. Nogly Letter at 2.  A prime example is his decision to voluntarily come to the United States to face these charges and take responsibility for his conduct.

37

By all accounts, Dani is a generous, hardworking man, with close ties to his family and community.  The crimes to which he has pleaded guilty, although serious, are inconsistent with the way he has otherwise lived his life.

### C.   The Nature and Circumstances of the Offense

Dani accepts full responsibility for his offense.  He acknowledges that he participated in a scheme that allowed U.S. citizens to hide their undeclared Swiss accounts from the IRS.  Several mitigating factors, however, warrant a non-custodial sentence.

*First*, the context in which Dani committed his offense suggests a significantly lower level of culpability than the other individuals involved in the scheme.[18]  The principal participants in the Singapore Solution were PB IHAG's U.S. clients, who financially benefitted from decades of evading taxes, and bankers and other professionals who spent many years earning their livelihoods helping these and other U.S. citizens evade their tax obligations.  For years before the institution of the Singapore Solution, Gubser (PB IHAG's general counsel and head of compliance), Rüegg (PB IHAG's deputy CEO), and Bechtiger (PB IHAG's former head of legal and compliance) had all been counseling Americans with undeclared Swiss bank accounts at PB IHAG.[19]  And Lampert, Schnellmann, and Sage had all made their livelihood

---

[18] As discussed below, *see infra* at 47-53, Dani is also significantly less culpable than other Swiss individuals who have been convicted of aiding other U.S. taxpayers in maintaining undisclosed accounts.

[19] For example, as noted in the PSR, nearly 15 years before the Singapore Solution, Bechtiger helped the ▮▮▮ open an undisclosed account in the name of a Liechtenstein foundation, Gubser served as the director of that foundation, and Rüegg was the ▮▮▮ relationship manager for their undisclosed account at PB IHAG.  PSR ¶ 49; *see also* PSR ¶ 55 (noting that Gubser had been helping ▮▮▮ maintain an undisclosed account prior to the Singapore

designing trusts, foundations, and other structures that enabled taxpayers to evade taxes in their home countries.  PSR ¶¶ 20, 22-23, 25-26.  Participation in the Singapore Solution was not a "one off" occurrence for these individuals—it was an extension of the type of conduct they had been engaging in for years.

Dani, conversely, was not a part of the Swiss banking system.  Although he was an executive at Holding, he was not a banker, he did not set bank policy, and he had never worked with PB IHAG's clients, much less helped them hide undisclosed bank accounts.  He never met or interacted with the ▮▮▮▮▮▮▮▮▮▮▮.  He became involved in the Singapore Solution only because, as part of his work for Holding, he was developing a legitimate Asia-based asset manager at the point in time when executives at PB IHAG were looking for ways to evade PB IHAG's own "disclose or leave" policy.  *Id.* ¶ 25; *id.* ¶ 28 (reflecting that it is undisputed that Dani set out to create Helvetic as a legitimate asset manager wholly separate from PB IHAG and its U.S. clients).  Thus, Dani's actions were significantly more limited than those of his coconspirators.

*Second*, years before the Swiss Bank Program, while his coconspirators were happy to continue the scheme, Dani became increasingly uncomfortable with the Singapore Solution and persuaded ▮▮▮▮▮▮▮ to close the Singapore Solution accounts.  He first attempted to do so in late 2010 but was rejected.  He persevered in 2011 and succeeded in persuading ▮▮▮ and others to close the accounts.

Solution).  It bears noting that the accumulation of wealth in the accounts implicated in this case entirely pre-dates Dani's involvement in the Singapore Solution.

*Third*, Dani received no financial remuneration for his conduct.  He received neither additional salary nor an increased bonus for his participation.

*Fourth*, the loss amount in this case reflects the taxes evaded by the U.S. clients.  It was not Dani who evaded his taxes, and he did not receive any profits from the Singapore Solution. Because pecuniary reward played no role in Dani's decision to participate in the conduct at issue, the loss amount does not reflect his culpability.  *See United States v. Levenson*, 314 F. App'x 347 (2d Cir. 2008) (noting that the district court had imposed a sentence substantially below the Guidelines range based on its conclusion "that a loss amount of $40 million overstated the seriousness of Levenson's role in the offense since Levenson never received any benefit from the fraud apart from his own salary" (cleaned up)).[20]

*Fifth*, unlike his co-defendants, Dani affirmatively volunteered to come to the United States to face the charges even before the indictment was unsealed. ███████████████

███████████████████████████████████████

███████████████████████████████

*Finally*, as discussed in the following section, although Dani's conduct was wrong, many more culpable participants in the systemic tax evasion resulting from Swiss bank secrecy have avoided prosecution altogether or have received sentences that entailed little or no prison time.

---

[20] Dani does not offer this argument as a basis for a departure under the Sentencing Guidelines. Rather, under § 3553(a), the Court may consider that the loss amount in this case is not a reliable metric to gauge Dani's culpability.  *See, e.g.*, *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (noting the "unusualness" of the Guidelines' fixation on loss amount and remanding the case so that the trial court could "consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence").

### D.   The Need To Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[21]

In evaluating sentencing parity, it is important to consider the fact that the most culpable participants in offshore tax evasion generally and the Singapore Solution specifically—the U.S. taxpayers and Swiss banks—were able to avoid prosecution through the OVDP and Swiss Bank Program.  Recognizing the inequity in prosecuting Swiss financial professionals while more blameworthy parties commonly avoid criminal prosecution, courts have imposed non-custodial

---

[21] Outside the Swiss banking context, defendants sentenced for aiding or assisting tax evasion have generally received non-custodial sentences or sentences far below the advisory Guidelines range.  As noted in the PSR, from 2018 to 2022 there were 117 defendants who were sentenced under the same Guideline (§ 2T1.4), offense level (15), and Criminal History Category (I) as Dani.  PSR at 34-35.  Twelve defendants (10%) received a § 5K1.1 substantial assistance departure; 89 defendants (76%) received a downward departure or variance; and 16 (14%) received a sentence within the Guidelines range.  *Id.*  Of the 105 defendants who did not receive a §5K1.1 substantial assistance departure, 38 (36%) received non-custodial sentences.  *Id.*  For the defendants who were sentenced to prison, the average length of imprisonment was 10 months, which is 8 months below the bottom of the advisory Guidelines range of 18 to 24 months.  *Id.*

Further, data published by the United States Sentencing Commission shows that over the same period of time (2018 to 2022) courts gave substantial downward variances to tax offenders generally, without regard for their offense level.  The average and median decrease from the Guidelines was approximately 64%; on the whole, tax offenders received an average decrease of 14.2 months and median decrease of 12 months below the bottom of the advisory Guidelines range.  *See United States Sentencing Commission Quarterly Data Reports for Fiscal Years 2018-2022*, Table 18, U.S.S.C (2018-2022), https://www.ussc.gov/research/data-reports/quarter/quarterly-sentencing-updates.  As explained below, U.S. taxpayers convicted for failing to disclose offshore accounts and Swiss defendants convicted of facilitating U.S. tax evasion have been sentenced far more leniently than the average defendant convicted of a tax crime in the United States.

or time-served sentences on Swiss nationals accused of facilitating U.S. clients' concealment of their assets and income overseas. Overall, the treatment of the U.S. taxpayers, the Swiss banks, and the few similarly situated Swiss nationals who have been charged supports imposition of a non-custodial sentence here.

### 1. The Most Culpable Individuals—the U.S. Tax Evaders—Avoided Prosecution or Incarceration

Although it does not excuse Dani's conduct, the ███████████—the U.S. citizens ultimately responsible for paying their taxes—are the most culpable individuals involved in the conduct at issue. As Judge Rakoff explained in *United States v. Amrein*:

> [I]n the Court's view, the most culpable people in this entire situation are the U.S. taxpayers who knowingly, willfully, intentionally, and in disregard not just of the law, but of the most elementary regard for their fellow citizens chose to evade taxes through the device of these secret Swiss bank accounts.
>
> I've never understood why so many of these taxpayers wind up getting off the hook in the sense that they get immunity, though they have to pay a lot of money, when what they have chosen to do is motivated by the most elementary greed.

Sent'g Tr. at 5-6, *United States v. Amrein*, No. 13-cr-972 (JSR) (S.D.N.Y. Mar. 22, 2018) (Dkt. No. 30).

Between 2009 and 2018, the IRS offered a series of Offshore Voluntary Disclosure Programs and Initiatives (and related programs) that effectively immunized U.S. taxpayers for conduct relating to their previously undisclosed accounts. IRS News Release, IR-2018-52 (Mar. 13, 2018), https://www.irs.gov/newsroom/irs-to-end-offshore-voluntary-disclosure-program-taxpayers-with-undisclosed-foreign-assets-urged-to-come-forward-now. Taxpayers were eligible to make a voluntary disclosure any time before IRS Criminal Investigation received

information regarding their noncompliance.  Eligibility was unrelated to the size of the account, the length of time the taxpayer had evaded their tax obligations, or any other metric of the taxpayer's culpability.[22]  Over 56,000 Americans participated in the OVDP and paid over $11 billion in back taxes, interest, and penalties.  *Id.*

Despite being the most culpable participants in the Singapore Solution scheme, the ████████████████████ avoided prosecution by participating in the OVDP in 2013 and 2014, after representatives of PB IHAG informed them that their names would likely be disclosed to the IRS in connection with the Swiss Bank Program.  Thus, although they had been cheating on their taxes for years before the Singapore Solution and it was their money, their accounts, and

---

[22] Under the OVDP, U.S. taxpayers could not participate in the program if the IRS had already received information regarding their noncompliance.  While over 56,000 taxpayers took advantage of the OVDP, only a small fraction of U.S. taxpayers who held undisclosed offshore accounts were prosecuted.  In Exhibits 23 and 24, we have compiled the 103 cases we were able to locate in which defendants were sentenced for charges related solely to offshore accounts during the period 2008 through 2024.  We included defendants who were convicted of violating Titles 26 or 31 of the U.S. Code, or of violating 18 U.S.C. § 371 by conspiring to defraud the United States or to file false tax returns.  We excluded cases where the defendant was charged with other conduct, such as for wire fraud or making false statements to investigators, or had engaged in tax violations beyond failing to disclose their offshore accounts and income derived from those accounts (*e.g.*, cases involving domestic tax evasion or failure to file tax returns).

Exhibit 23 includes the 19 of the 103 cases that were prosecuted in this District.  Of those 19, the majority (12, or 63%) received sentences of probation, time served, or one day in prison.  The remaining seven defendants all received below-Guidelines sentences that ranged from 33% to 95% below the bottom of the advisory Guidelines range, with a median of 83% and an average of 73% below the bottom of the Guidelines range.

Exhibit 24 includes the remaining 84 cases prosecuted in the rest of the country.  In 48 of those 84 cases (57%), the defendants received sentences of probation, time served, or one day in prison.  Of the remaining defendants who were sentenced to a period of incarceration, 32 out of 36 (89%) received a below-Guidelines sentence.  Of those 32, the sentences ranged from 25% to 99% below the bottom of the advisory Guidelines range, with a median of 63% and average of 66% below the bottom of the Guidelines range.

their tax obligations that were evaded through the Singapore Solution, the taxpayers were able to avoid prosecution by disclosing their accounts and paying only the taxes they had evaded over the prior eight years with interest and a penalty.[23]  Notwithstanding his more-limited involvement in off-shore tax evasion, Dani was not similarly offerred this opportunity.

Without Dani's knowledge or involvement, Chinn engaged in a similar "round trip" transaction in May 2010.  He did not participate in the OVDP, was indicted, and pleaded guilty to tax evasion.  *United States v. Chinn*, 19-cr-915 (VM) (S.D.N.Y.).  On December 3, 2021, Judge Marrero sentenced Chinn to five years' probation with 18 months' house arrest to be served at his home in San Francisco.  However, on November 7, 2023—approximately two years into Chinn's five-year probationary period—Judge Marrero modified Chinn's conditions of release by terminating his supervision and authorizing him to "travel to Vietnam and remain permanently there with family."  *See* Endorsement at 2, No. 19-cr-915 (Dkt. No. 39).

### 2.    PB IHAG and Holding Avoided Criminal Prosecution

For years, Swiss financial institutions reaped substantial profits by offering clients the ability to conceal their assets and income.  In the wake of the successful prosecution of UBS AG

---

[23] Through clever maneuvering, the ▬▬▬ were able to mitigate even the financial impact of the OVDP.  In connection with their voluntary disclosures, ▬▬▬ amended their 2005 through 2012 returns were required to repay their taxes along with a penalty. With respect to their amended returns for the years their accounts were involved in the Singapore Solution, 2009 through 2012, the ▬▬▬ paid $497,000 in additional taxes.  The ▬▬▬ 2012 amended returns, however, showed substantial capital loss carryforwards that appeared to have been generated in their Singapore Solution accounts.  After their OVDP closing agreements were finalized, the ▬▬▬ amended their 2013 and 2014 returns to take advantage of those capital losses.  In connection with those amended returns, the ▬▬▬ claimed a total of $914,000 in refunds.  At the Court's request, we are happy to provide our analysis of ▬▬▬ tax returns and supporting documentation.

and publicity regarding its investigation of Credit Suisse AG, in August 2013, the DOJ offered

Swiss banks that were not already under investigation the opportunity to resolve their criminal

exposure and obtain non-prosecution agreements.  *Swiss Bank Program*, DOJ Tax Div.,

https://www.justice.gov/tax/swiss-bank-program (last visited Feb. 21, 2024).  Eighty-four banks

completed the Swiss Bank Program.  *Id.*

Unlike Dani, PB IHAG had been helping U.S. clients maintain undisclosed accounts to

evade U.S. taxes for decades before the Singapore Solution.  *See* PB IHAG NPA (PB IHAG

"intentionally opened and maintained accounts that were undeclared with the knowledge that, by

doing so, the Bank was helping [] U.S. taxpayers violate their legal duties.").  Indeed, PB IHAG

offered services specifically aimed at helping U.S. clients hide their foreign accounts, and it also

"assisted clients in establishing foundations used to hold their assets at the Bank" in order to

"mask[] the true beneficial ownership of the accounts by U.S. persons."  *Id.*

Yet like dozens of other Swiss banks, PB IHAG used the Swiss Bank Program to obtain a

non-prosecution agreement in exchange for disclosing its conduct and information relating to its

accountholders and paying a $7.4 million penalty.  *Id.*  And of course, Holding, Dani's

employer, ██████████████████████████████████████

received no penalty whatsoever.

### 3.  Most of the Singapore Solution Co-Conspirators Will Never Face Sentencing

Although Dani was not the most culpable defendant who participated in the Singapore

Solution, most of his co-conspirators will never face the consequences of their actions.  Some

were never indicted, others opted to remain in Switzerland or other jurisdictions from which the

government could not (or did not) pursue extradition, and some went so far as to flee when they

were caught.  These individuals stand in stark contrast to Dani who voluntarily came to the United States to face the charges.

Beyond that, as Judge Calabresi has explained, the need for sentencing parity should not be limited to consideration of the sentences imposed on others who were convicted of similar offenses, but should include cases that were not brought at all.  *United States v. Stewart*, 590 F.3d 93, 161-62 (2d Cir. 2009) (Calabresi, J., concurring) ("[W]e should not forget that there might be even greater disparities between a defendant and other individuals who were not charged at all.").  Here, several significant participants in the Singapore Solution—including ██████████████████████—were never indicted.  Moreover, although all 84 banks that participated in the Swiss Bank Program admitted to violating U.S. law, this appears to be the only case arising out of that program in which criminal charges were brought against Swiss facilitators.

We do not fault the IRS for offering taxpayers an opportunity to "come clean" through the OVDP, nor do we fault the DOJ for offering Swiss Banks the opportunity to resolve their exposure by providing information and paying a fine.  The IRS brought thousands of taxpayers into compliance and raised billions of dollars for the U.S. Treasury by so prioritizing the payment of back taxes, interest, and penalties over prison sentences.  And, through the Swiss Bank Program, the DOJ obtained over $7.5 billion in penalties, received information about non-compliant taxpayers that would not have been accessible given Swiss bank secrecy laws, and incentivized participating banks to push their clients to participate in the OVDP.  Finally, we do not fault the government for its inability to bring other participants in the Singapore Solution before this Court.  It is, however, important for the Court to consider that many other culpable

46

individuals have avoided criminal liability entirely when considering sentencing disparities under § 3553(a)(6).

          **4.**     **Almost Every Defendant Convicted of Similar Conduct Has Received a Non-Custodial Sentence**

Unlike the taxpayers and the Swiss banks, financial professionals were not given an opportunity to avoid prosecution by coming forward. Moreover, although 84 banks participated as Category 2 banks in the Swiss Bank Program and 56,000 taxpayers participated in the OVDP, only eighteen Swiss "enablers" have been convicted in the United States. Some avoided prosecution by remaining in Switzerland after being indicted, and others were never indicted at all.

Recognizing that the most culpable parties (*i.e.*, thousands of U.S. taxpayers, dozens of Swiss banks, and many Swiss financial professionals) have avoided prosecution, courts have sentenced sixteen of the eighteen Swiss "enablers" who have been convicted in the United States to non-custodial or time-served sentences.[24] Dani's relative culpability, when compared to these eighteen defendants, supports a non-custodial sentence here.

---

[24] Sixteen defendants have received non-custodial sentences. *United States v. Berlinka*, No. 12-cr-02 (JSR) (S.D.N.Y.) (probation); *United States v. Keller*, No. 12-cr-02 (JSR) (S.D.N.Y.) (time served for period in a German jail while fighting extradition); *United States v. Fellmann*, No. 12-cr-962 (JPO) (S.D.N.Y.) (probation); *United States v. Reist*, No. 12-cr-962 (JPO) (S.D.N.Y.) (probation); *United States v. Casadei*, No. 11-cr-866 (LTS) (S.D.N.Y.) (time served for hours spent on the day of arrest and supervised release); *United States v. Paltzer*, No. 13-cr-282 (JSR) (S.D.N.Y.) (time served for hours spent on the day of arrest and supervised release); *United States v. Frazzetto*, No. 11-cr-866 (JSR) (S.D.N.Y.) (time served for hours spent on the day of arrest and supervised release); *United States v. Amrein*, No. 13-cr-972 (JSR) (S.D.N.Y.) (probation); *United States v. Rüegg Meier*, No. 11-cr-95 (GBL) (E.D. Va.) (unsupervised release); *United States v. Bergantino*, No. 11-cr-95 (GBL) (E.D. Va.) (unsupervised probation); *United States v. Schumacher*, No. 09-cr-60210 (DTKH) (S.D. Fla.) (unsupervised probation); *United States v. Dörig*, No. 11-cr-95 (GBL) (E.D. Va.) (unsupervised release); *United States v.*

*First*, Dani is less culpable than each of the three defendants who did not cooperate with the government. Urs Frei, Roger Keller, and Michael Berlinka were each client advisors at Wegelin in Zurich. Gov. Sent'g Mem. at 2, No. 12-cr-02 (Dkt. No. 65). In 2012, Messrs. Frei, Keller, and Berlinka were indicted on the same charge brought in this case: a felony count of conspiring to defraud the IRS. Indictment, No. 12-cr-02 (Dkt. No. 1). Unlike Dani, they refused to come to the United States for nearly a decade and their intransigence was ultimately rewarded when the government allowed them to plead guilty to *misdemeanor* charges. Gov. Sent'g Mem. at 10, No. 12-cr-02 (Dkt. No. 65) (Frei, Berlinka, and Keller "chose, for the better part of a decade, to not appear in the United States"); Nov. 19, 2021 Sent'g Tr. at 14-15, No. 12-cr-02 (Dkt. No. 71) (Judge Rakoff noting that he had "very little affirmative sympathy for any of the three defendants" including because after they were indicted, they remained in Switzerland where they could not be extradited and only came to the United States after being offered "a really good, cheap deal"). Notwithstanding the fact that they were allowed to resolve their case through misdemeanors, each of the three Wegelin bankers engaged in far more culpable conduct than Dani.

---

*Bachmann*, No. 11-cr-95 (GBL) (E.D. Va.) (unsupervised probation); *United States v. Lack*, No. 11-cr-60184 (WPD) (S.D. Fla.) (probation); *United States v. Bagios*, No. 12-cr-60260 (KAM) (S.D. Fla.) (time served, 37 days in pretrial detention before being released on bail); *United States v. Gadola*, No. 10-cr-20878 (JLK) (S.D. Fla.) (probation).

Two defendants have been sentenced to prison. *United States v. Birkenfeld*, No. 08-cr-60099 (WJZ) (S.D. Fla.) (40 months' imprisonment); *United States v. Frei*, No. 12-cr-02 (JSR) (S.D.N.Y.) (two months' imprisonment).

And an additional two defendants were acquitted at trial. *United States v. Weil*, No. 08-cr-60322 (JIC) (S.D. Fla.); *United States v. Buck*, No. 13-cr-282 (JSR) (S.D.N.Y.).

At sentencing, the government argued that Frei was the most culpable of the three.  Gov. Sent'g Mem. at 7, No. 12-cr-02 (Dkt. No. 65).  "Prior to joining Wegelin, Frei had extensive, decades-long experience in the banking business, including prior experience servicing U.S. clients in private banking in Switzerland."  *Id.*  When he joined Wegelin in 2006, he managed undeclared accounts for approximately 20 U.S. taxpayers holding approximately $40 million in assets."  *Id.* at 3.  While that was "the largest number of U.S. clients with undeclared accounts" at Wegelin at the time, by 2009, in the wake of the DOJ's crackdown on UBS, Frei had assisted "an estimated 50 to 70 U.S. clients with undeclared accounts" and "his clients' undeclared [assets] totaled more than approximately $250 million."  *Id.* at 3-4, 7.  He traveled to the United States to recruit U.S. clients, opened undisclosed accounts for U.S. taxpayers using code names, and opened new accounts for U.S. taxpayers with undisclosed accounts leaving UBS.  *Id.* at 3-4.

The government argued that the length of Frei's participation in the underlying conduct and the number and size of accounts that he managed warranted a below-Guidelines sentence that included "some imprisonment."  *Id.* at 1, 12.  Judge Rakoff agreed with the government's argument of Frei's relative culpability, particularly based on the length of time he had assisted U.S. taxpayers in evading their taxes.  Nov. 19, 2021 Sent'g Tr. at 52, No. 12-cr-02 (Dkt. No. 71).  Nonetheless, Judge Rakoff concluded that Frei "doesn't deserve a long sentence," *id.* at 55, and imposed a period of two months' imprisonment, no supervised release, and a $10,000.00 fine, Judgment, No. 12-cr-02 (Dkt. No. 69).

The government and court both viewed Keller and Berlinka as less culpable than Frei.  Gov. Sent'g Mem. at 7, No. 12-cr-02 (Dkt. No. 65).  Keller was Frei's "back-up" at Wegelin, and he managed undeclared accounts "for at least 30 U.S. taxpayers holding a total of

49

approximately $120 million," "including clients with undeclared assets who were fleeing UBS." *Id.* at 2, 4, 7.  After refusing to come to the United States following his indictment in 2012, Keller was arrested in Germany in 2015 pursuant to a red notice issued by the U.S. government. *Id.* at 5 & n.3.  Keller fought the extradition, including by appealing to Germany's Federal Constitutional Court, and was detained for around seven months before extradition was ultimately denied.[25]  Although Keller's conduct was significant, Judge Rakoff agreed that Keller was less culpable than Frei.  Nov. 19, 2021 Sent'g Tr. at 55, No. 12-cr-02 (Dkt. No. 71) ("I do feel that Mr. Frei is more culpable than the other two.").  And although the court considered the fact that Keller had spent time in jail fighting extradition, this factor appeared to weigh more on the court's decision to impose a smaller fine than imposed on either of Keller's co-defendants, and was a lesser consideration in its assessment of whether prison time was appropriate.  *Id.* at 40, 42 (viewing the period Keller served while contesting extradition as a mitigating factor weighing in favor of a lesser fine).  Judge Rakoff sentenced Keller to time served and a $5,000 fine.  Judgment, No. 12-cr-02 (Dkt. No. 68).

Berlinka similarly "engaged in many of the same techniques as his co-defendants to help U.S. clients evade their taxes."  Gov. Sent'g Mem. at 7, No. 12-cr-02 (Dkt. No. 65).  Between 2008 and 2009, he opened undeclared, coded-name accounts for multiple U.S. taxpayers fleeing

---

[25] A Frankfurt court initially cleared the extradition, but Keller appealed, and Germany's Federal Constitutional Court ordered a new hearing.  Karin Matussek, *Ex-Wegelin Banker Gets Retrial Over U.S. Extradition*, Bloomberg (Apr. 28, 2016), https://www.bloomberg.com/news/articles/2016-04-28/ex-wegelin-banker-gets-german-retrial-of-u-s-extradition-demand?embedded-checkout=true.  "Ultimately, extradition was denied by the German court and Keller returned to Switzerland."  Gov. Sent'g Mem. at 5, No. 12-cr-02 (Dkt. No. 65).

UBS. *Id.* at 2. He reassured those clients "that Wegelin would not disclose their identities or account information to the IRS, and explained that since Wegelin had no offices outside of Switzerland, it was less susceptible and less vulnerable to United States investigators." *Id.* Although Berlinka had "opened new undeclared accounts for numerous U.S. taxpayers fleeing UBS," (S1) Indictment, No. 12-cr-02 (Dkt. No. 6), only five of the undeclared accounts that Berlinka serviced were accounted for at sentencing, but those accounts alone were worth approximately $35 million, Gov. Sent'g Mem. at 2, No. 12-cr-02 (Dkt. No. 65). He also engaged in structuring on multiple occasions by sending checks in small amounts to avoid the U.S. government's detection. *Id.* at 2-3. Berlinka received 2 months' probation and a $30,000 fine. Judgment, No. 12-cr-02 (Dkt. No. 67).

Although their sentencing exposure was capped at 12 months because they were allowed to plead to misdemeanors, Frei, Keller, and Berlinka were far more culpable than Dani by every metric. For many years they made their livelihoods assisting multiple U.S. clients evade their tax liabilities; they caused a larger tax loss ($1.3 million—more than double the tax loss attributable to Dani); their Guidelines sentencing ranges (30-37 months) were higher than Dani's (18-24 months); and, unlike Dani, they refused to come to the United States for nearly a decade, and only did so when they were allowed to plead to misdemeanor charges. Gov. Sent'g Mem. at 5-6, No. 12-cr-02 (Dkt. No. 65).[26]

---

[26] The only defendant other than Frei sentenced to prison was Bradley Birkenfeld. The circumstances of his case were significantly different from the other Swiss defendants. Birkenfeld is a U.S. citizen who, with his knowledge of U.S. tax laws, moved to Switzerland with the purpose of taking a job at UBS where he could and did assist U.S. taxpayers in evading their tax obligations. Sent'g Tr. at 32, *United States v. Birkenfeld*, No. 08-cr-60099 (WJZ) (S.D. Fla Aug. 21, 2009) (Dkt. No. 82). Birkenfeld also continued to participate in the scheme even

*Second*, Dani is less culpable than most, if not all, of the fifteen Swiss defendants who were allowed to cooperate.  These defendants were bankers or financial-service professionals who, by in large, assisted more U.S. taxpayers evade more taxes for a longer period of time.[27]

---

after he became a whistleblower and, although he agreed to be forthcoming with U.S. prosecutors in return for leniency, he disclosed everyone's wrongdoing except his own.  *Id.* at 32-33.  The United States subsequently obtained evidence of Birkenfeld's involvement.  *Id.*  He was sentenced to 40 months' incarceration, a $30,000 fine, and 3 years' supervised release.  *Id.* at 35.  Birkenfeld subsequently received more than $100 million as a whistleblower.  Laura Saunders & Robin Sidel, *Whistleblower Gets $104 Million*, Wall St. J. (Sept. 11, 2012), https://www.wsj.com/articles/SB10000872396390444017504577645412614237708.

[27] By objective measures such as the length of time they facilitated U.S. taxpayers evading their tax obligations, the number of U.S. taxpayers they assisted, the size of the taxpayers' accounts, and the amount of taxes evaded, Dani was less culpable than most if not all of the 15 cooperating defendants.  *See, e.g.*, *United States v. Dörig*, 11-cr-95 (GBL) (E.D. Va.) (Dkt. Nos. 28, 52, 64) (from 1996 to 2011, Dörig formed, managed, and maintained nominee tax haven entities, or structures for U.S. taxpayers—whose accounts in aggregate were worth hundreds of millions—to assist them in evading their income taxes; he was responsible for a tax loss of $7 to $20 million); *United States v. Bergantino,* No. 11-cr-95 (GBL) (E.D. Va. 2016) (Dkt. Nos. 89-90) (between 2002 and 2009, Bergantino assisted at least 40 taxpayers in concealing their ownership of undeclared accounts at Credit Suisse, travelled to the United States to meet with and recruit customers, and engaged in structuring to avoid detection by the U.S. government; he caused a tax loss of $1.5 to $3.5 million); *United States v. Bachmann*, 11-cr-95 (GBL) (E.D. Va.) (Dkt. Nos. 17-18) (from 1994 to 2013, Bachmann aided and assisted U.S. taxpayers in evading their taxes, engaged in structuring to avoid detection by the U.S. Government, and travelled to the United States to meet with U.S. clients and pick up or drop off cash from their accounts; he caused a tax loss of $1 to $2.5 million); *United States v. Rüegg Meier*, 11-cr-95 (GBL) (E.D. Va.) (Dkt. Nos. 124-25, 131) (between 2002 through 2011, Rüegg Meier who was a supervisor on Credit Suisse's North American desk, travelled to the United States on numerous occasions to visit U.S. clients, took deliberate steps to conceal the illicit purpose of her business, assisted U.S. customers in concealing their ownership of their accounts by holding those accounts in the names of nominee tax haven entities, and assisted several U.S. clients to continue the concealment of their assets in 2008 when Credit Suisse began closing U.S. clients' accounts; she caused a tax loss of $3.5 to $9.5 million).

Of the 15 cooperating defendants, 13 were charged with felony counts and two were charged with misdemeanors.  The two charged with misdemeanors (Fellmann and Reist) did not receive formal cooperation agreements but were allowed to plead to misdemeanors despite causing a similar tax loss as Dani.  Of the remaining 13 charged with felony counts, the Guidelines ranges



[28]

*   *   *

We respectfully submit that, in light of Dani's culpability in relation to other participants in offshore tax evasion generally and in the Singapore Solution specifically, a sentence of imprisonment would create an unwarranted sentencing disparity.

### E.  A Non-Custodial Sentence Would Afford Adequate Specific and General Deterrence

#### 1.  A Sentence of Incarceration Will Not Further General Deterrence

Assessing general deterrence is complicated in the best of circumstances. Recent studies have questioned the existence of a link between severity of punishment and general deterrence. The National Institute of Justice ("NIJ")—an agency of the DOJ—has stated that "sending an

for 12 (as calculated by the government) were higher than Dani's (ranging from 24-30 months to 70-87 months).

28 

individual convicted of a crime to prison isn't a very effective way to deter crime." *See* Five Things About Deterrence, NIJ (2016).[29]  Courts in this District have also recognized that "every major survey of the evidence" has found that although "certainty of punishment has a deterrent effect, increases in severity of punishments do not yield significant (if any) marginal deterrent effects." *United States v. Velazquez*, No. 16-cr-233 (AKH), 2017 WL 2782037, at *4 (S.D.N.Y. May 26, 2017) (quotation marks omitted).

Even setting such studies to the side, a prison sentence here will not further general deterrence because there is no remaining message to be sent.  Dani's conduct is nearly *fifteen* years old.  In the intervening fourteen years, tens of thousands of U.S. taxpayers have disclosed their offshore tax evasion through the OVDP, scores of foreign financial institutions have received NPAs through the Swiss Bank Program, Congress passed and the Treasury Department implemented the Foreign Account Tax Compliance Act ("FATCA"), and the DOJ has instituted criminal proceedings against individual taxpayers, banks, and Swiss financial professionals.

The criminal and civil penalties imposed on taxpayers, Swiss financial professionals, and banks have had their intended effect.  The international banking industry has reformed.  And U.S. taxpayers have received a strong message that offshore accounts are no longer impenetrable and that attempting to evade their tax obligations through offshore vehicles exposes them to criminal prosecution. *See* Gov. Sent'g Mem. at 5, *United States v. Dörig*, No. 11-cr-95 (GBL) (E.D. Va. Mar. 20, 2015) (Dkt. No. 64) (acknowledging in a case against a Swiss enabler that the "broad participation in IRS voluntary disclosure programs indicates *that the message of general*

---

[29] https://www.ojp.gov/pdffiles1/nij/247350.pdf.

*deterrence has been widely received by U.S. citizens* seeking to return to or otherwise enter into compliance with the United States' tax system" (emphasis added)); Gov. Sent'g Mem. at 5, *United States v. Bachmann*, No. 11-cr-95 (GBL) (E.D. Va. Mar. 20, 2015) (Dkt. No. 63) (same). No further general deterrence is needed or would be accomplished by imprisoning Dani for conduct that took place nearly 15 years ago.

### 2. Specific Deterrence and the Need To Protect the Community

Prison also is unnecessary to prevent Dani from committing further crimes. This is Dani's first offense, and he has lived an otherwise law-abiding life. He has already suffered significant consequences from his conduct, *see supra* at 32-34, and there is no reason to suspect he will commit another offense.

Moreover, as discussed above, Dani was not a financial professional who made his livelihood by promoting or facilitating Swiss bank secrecy. He committed this offense under very specific circumstances that are not likely to be repeated.

Recent amendments to the sentencing Guidelines further underscore that a non-custodial sentence is appropriate for defendants, such as Dani, with no criminal history. Recidivism data recently analyzed by the U.S. Sentencing Commission shows that offenders with zero criminal history points, such as Dani, have considerably lower recidivism rates than any other offenders. *See* 2023 Amendments in Brief at 2, U.S.S.C. (2023).[30] Among other findings, the Commission concluded that "zero-point" offenders were less likely to be rearrested than "one point" offenders (27% compared to 42%), the largest variation of any comparison of offenders within the same

---

[30] https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf.

Criminal History Category.  *Id.*  In light of this recidivism data, the Sentencing Commission

amended the Sentencing Guidelines to provide a two-level decrease for first time, nonviolent

offenders such as Dani.  U.S.S.G. § 4C1.1.

> ### F.    A Custodial Sentence Would Likely Be Harsher for Dani Because He Is Not a U.S. Citizen

Finally, in considering what sentence is appropriate, we ask the Court to consider that a

prison sentence for Dani, a foreign national, will be longer and likely harsher than for a similarly

situated U.S. white collar offender.

A U.S. citizen convicted of Dani's crime would almost certainly be designated to serve

his sentence in a prison camp.  It is likely, however, that Dani will be deemed a "Deportable

Alien" and thus be ineligible for a camp.  *See Inmate Security Designation and Custody*

*Classification*, Ch. 5 at 9, 12, U.S. Bureau of Prisons (Sept. 4, 2019).[31]  Under the Bureau of

Prisons' ("BOP") Security Designation Manual, "Deportable Aliens" are assigned a Public

Safety Factor that requires them to "be housed in at least a Low security level institution."  *Id.*  In

a Low security level institution, Dani will be subject to worse and more dangerous prison

conditions in at least three principal ways.  *First,* inmates at low security facilities have physical

barriers and restrictions far beyond those experienced by prisoners at prison camps.[32]  *Second*,

while the median number of inmates in each federal prison camp is approximately 135, the

---

[31] https://www.bop.gov/policy/progstat/5100_008cn.pdf.

[32] *About Our Facilities*, Fed. Bureau of Prisons (noting that camps have "a relatively low staff-to-inmate ratio, and limited or no perimeter fencing," whereas Low-security facilities "have double-fenced perimeters" and a higher "staff-to-inmate ratio" than in camps), https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Feb. 22, 2024).

median number of inmates in low security facilities is approximately 1,000, with one facility

holding over 3,500 inmates.[33]  The substantially larger population means that inmates at low-

security facilities generally are kept in dormitory housing with communal showers, and they face

more crowding, greater wait times for services, and more noise and unsanitary conditions than

their counterparts in camps.[34]  *Third,* while the federal camp population consists of inmates

serving sentences of ten years or less with no history of violence who pose no public safety

threat, low-security facilities include prisoners serving sentences between 10 and 20 years, many

of whom have prior records involving a gun or violent offense, including individuals with gang

affiliation.[35]  Unsurprisingly, low security prisons have a higher instance rate of violence than

prison camps.[36]

Moreover, Dani will spend more time in confinement than a similarly situated U.S.

citizen due to his status as a noncitizen.  In the normal course, a deportable alien is turned over to

U.S. Immigration and Customs Enforcement ("ICE") custody to face deportation proceedings at

the conclusion of his sentence.  The deportation process can take months or longer.  On top of

the time spent being transferred to ICE custody, the Office of Inspector General ("OIG") recently

---

[33] *See Population Statistics*, Fed. Bureau of Prisons,
https://www.bop.gov/mobile/about/population_statistics.jsp (last visited February 8, 2024).

[34] *Federal Prison Security Levels*, FederalPrisonTime.com ("Federal prisoners in low-security
FCIs live in open dormitories. Bathrooms are in a common area, under the 'open' plan. Federal
inmates live in close proximity to each other and there are minimal levels of privacy."),
https://www.federalprisontime.com/federal-prison-security-levels (last visited Feb. 22, 2024).

[35] *Id.*

[36] *See Federal Prisoner Statistics Collected Under the First Step Act, 2022* at Table 4, DOJ
Bureau of Justice Statistics (Dec. 2022),
https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/fpscfsa22.pdf.

found that "only 29 percent" of inmates who received a final order of removal after entering ICE

detention were removed within a month, and that, on average, they spent an additional *three*

*months* in ICE detention at the conclusion of their sentence.   *Review of the Institutional Hearing*

*and Removal Program Expansion for Federal Inmates* at 20-21, DOJ, OIG (Sept. 2021),

https://oig.justice.gov/sites/default/files/reports/21-123.pdf.[37]

While Dani could seek to have his removal order issued before his sentence begins or

concludes, which might allow him to self-deport or be deported more promptly by ICE following

the end of his sentence, doing so would render him ineligible for First Step Act credits, which

effectively reduce an inmate's sentence by approximately two and a half months per year.   18

U.S.C. § 3632(d)(4)(E) (deportable noncitizens may receive First Step Act credits only if they

---

[37] In *United States v. Frei*, No. 12-cr-02 (JSR) (S.D.N.Y. Jan. 31, 2022), Judge Rakoff
recognized that it would be "grossly unfair" to subject Frei—who as discussed above, was
sentenced to two months' imprisonment—to deportation proceedings after he travelled to the
United States for the sole purpose of serving his two-month prison sentence.  Order at 2, No. 12-
cr-02 (Dkt. No. 74).  Judge Rakoff held that deportation proceedings were "unwarranted" and
issued an order directing that Frei be allowed to self-deport at the end of his sentence.  *Id.* at 3.
The order allowed Frei both to be designated to a prison camp and self-deport from the country.

As noted at Dani's plea hearing, in the event Dani is sentenced to prison, we plan to ask the
Court to issue a similar order.  Even if the Court agrees to issue such an order, however, there is
no assurance that ICE will abide by it.  *See, e.g.*, Alice Speri, *ICE Defied a Court Order in
Vendetta Against Deportee*, The Intercept (Sept. 29, 2018),
https://theintercept.com/2018/09/29/ice-deportation-immigration-system/; Peter Talbot, *ICE
Won't Let Inspectors into Tacoma Immigration Lockup Despite Court Order, State Says*, The
Columbian (Feb. 6, 2024), https://www.columbian.com/news/2024/feb/06/ice-wont-let-
inspectors-into-tacoma-immigration-lockup-despite-court-order-state-says/.

have not received a final order of removal).   Accordingly, in either case, Dani will spend more time in custody than a similarly situated U.S. citizen.[38]

The conditions that Dani will face due to his citizenship status, and the extended time he will spend in custody, further support a non-custodial sentence.

## CONCLUSION

Dani is a loving and charitable family man who has already paid dearly for the mistakes he made.  Although he did not do so for financial gain, Dani engaged in conduct that was wrong and inconsistent with the way he has otherwise lived his life.  His choices after engaging in this conduct, however, favor leniency.

Long before any investigation, Dani recognized that his conduct was wrong and persuaded ███████████████████████ to close down the so-called Singapore Solution. Before charges were ever filed, he offered to come to the United States voluntarily rather than hiding in Switzerland as so many others have done.  And after the Court rejected his motions to dismiss, he chose to plead guilty and accept responsibility for his conduct ████████████ ████████████████████████████████████████ ██████████████████████████.

Considering Dani's circumstances as a whole, a non-custodial sentence would be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.  Sending Dani to

---

[38] The government has raised the possibility of Dani entering into a consent judicial removal order, which might allow him to self-deport at the conclusion of any prison sentence.  While such an order would allow Dani to avoid spending time in ICE deportation proceedings, it would preclude him from receiving credits under the First Step Act and it is unclear if such an order would allow Dani to be designated to a prison camp rather than a Low security level institution.

prison will not further principles of general deterrence and is unnecessary for specific deterrence. Further, a non-custodial sentence would avoid sentencing disparities with the many other culpable individuals who have avoided prison or criminal prosecution.

For the reasons considered by the Probation Department (in reaching its recommendation of six months' imprisonment) and the additional reasons set forth in this Memorandum, we respectfully submit that a custodial sentence is unwarranted, and ask the Court to impose a non-custodial sentence.

Dated: March 19, 2024
New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.

By: /s/ *Jeremy H. Temkin*
Jeremy H. Temkin
Richard F. Albert
Joshua Philip Bussen
*Attorneys for Defendant Daniel Wälchli*

60