O42WwalS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 Cr. 497 (GHW)

5   DANIEL WALCHLI,

6              Defendant.
                                          Sentence
7   ------------------------------x

8                                         New York, N.Y.
                                          April 2, 2024
9                                         10:00 a.m.

10  Before:

11
                        HON. GREGORY H. WOODS,
12
                                          District Judge
13
                             APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  OLGA I. ZVEROVICH
         Assistant United States Attorney
17       -and-
         NANETTE L. DAVIS
18       Special Assistant United States Attorney

19  MORVILLO, ABRAMOWITZ, GRAND, IASON & ANELLO, P.C.
         Attorneys for Defendant
20  BY:  JEREMY H. TEMKIN
         RICHARD F. ALBERT
21       JOSHUA P. BUSSEN

22
    Also Present:  Dr. Andreas Lanzlinger
23

24

25

O42WwalS

1              (Case called; appearances noted)

2              THE COURT:  Good morning.

3          We're here to conduct a sentencing hearing for the

4    defendant, Mr. Walchli.  First, I note that in the past Mr.

5    Walchli has proceeded without the need for the use of an

6    interpreter.  I've reviewed the transcript of our prior

7    proceeding, and counsel assured me that one was not needed.

8              Counsel for defendant, can I hear from you; does the

9    defendant require the services of an interpreter --

10             MR. TEMKIN:  No, your Honor.

11             THE COURT:  -- for these proceedings?

12             MR. TEMKIN:  No, your Honor.

13             THE COURT:  Thank you.

14         So it's your understanding that he will understand

15   everything that's said here today.

16             MR. TEMKIN:  Yes, your Honor.

17             THE COURT:  Thank you.

18         Mr. Walchli, please let me know if at any point you

19   have any difficulty hearing or understanding anything that's

20   said here today.

21             THE DEFENDANT:  Thank you, your Honor.

22             THE COURT:  Thank you.

23         First, I've received and reviewed the following

24   materials in connection with the sentencing:

25         First, the presentence report, which is dated March 7,

O42WwalS

| | |
|---|---|
| 1 | 2024; |
| 2 | Second, the defendant's sentencing memorandum, which |
| 3 | is dated March 19, 2024, together with its exhibits; |
| 4 | Third, the government's sentencing memorandum, dated |
| 5 | March 26, 2024, together with its exhibits; and |
| 6 | Fourth, the defendant's supplemental sentencing |
| 7 | submission, which is dated March 28, 2024. |
| 8 | Counsel, have each of the parties received all of |
| 9 | those materials? |
| 10 | Counsel, first, for the United States. |
| 11 | MS. DAVIS:  Yes, your Honor. |
| 12 | THE COURT:  Thank you. |
| 13 | Counsel for the defendant. |
| 14 | MR. TEMKIN:  Yes, your Honor. |
| 15 | THE COURT:  Thank you. |
| 16 | I know that the defendant's sentencing memorandum had |
| 17 | been filed with the clerk of the court subject to some |
| 18 | redactions that I'd like to talk about now.  The government's |
| 19 | sentencing submissions were initially filed on the docket, but |
| 20 | due to a docketing error, those were provisionally sealed.  I'd |
| 21 | like to talk about that as well. |
| 22 | First, counsel for defendant, I've reviewed the |
| 23 | proposed redactions to your sentencing submissions.  All of the |
| 24 | defendant's redactions in colors other than blue are approved. |
| 25 | They relate to health and other privacy information as to which |

O42WwalS

```
 1   the defendant's and other privacy interests outweigh the
 2   presumption of public access in judicial documents.
 3          Now, as to the redactions in blue, I just want to
 4   discuss them briefly, because I'm not sure why they all need to
 5   be redacted.  The principal question, I think, here is about
 6   the nature of the ODVP program and whether and to what extent
 7   it requires the redaction of the identity of people that
 8   participated in that program.  That's my principal question
 9   here.
10          MR. TEMKIN:  Your Honor, we proposed that redaction
11   out of courtesy to the government.  My understanding, having
12   done a number of voluntary disclosures, is that the identity of
13   taxpayers who do voluntary disclosures is subject to 26 U.S.C.
14   6103, which is confidentiality of tax matters.
15          As your Honor will hear later, we think that there are
16   some issues with the fact that taxpayers are able to avoid even
17   public shaming by virtue of their participation in voluntary
18   disclosure program.  But it is, I think, practice to redact
19   their names.  The government has done so throughout, so we did
20   so as a courtesy.  I certainly have no objection to having
21   their names unsealed.
22          THE COURT:  Thank you.
23          Apart from that information, which the government, I
24   expect, will argue should be protected as a result of the fact
25   that the information was disclosed as part of the program,
```

O42WwalS

```
1    there's other information that's also proposed to be redacted

2    there that does not disclose identities of taxpayers who

3    participated in the amnesty program.

4         Does the defense have any arguments in favor of those

5    proposed redactions, or were those redacted, again, as a

6    courtesy to the government?

7         MR. TEMKIN:  Those were redacted because the names

8    appear in the bill of particulars as unindicted coconspirators.

9    The bill of particulars was filed under seal, so because we

10   were disclosing materials that are otherwise sealed, we thought

11   that it was appropriate to submit those in redacted form.

12        THE COURT:  Thank you.

13        Does that relate just to the names?

14        MR. TEMKIN:  The names, yes.  It's the names, and

15   certainly the positions of the individuals would effectively

16   identify them by name.  So by giving the position that the

17   person holds, you're effectively identifying the person for the

18   public.

19        THE COURT:  Thank you.

20        Let me hear from the government about the names and

21   I'll call it the broader description of the roles of the people

22   involved.

23        Counsel for the government, let me hear your argument.

24        MS. DAVIS:  Your Honor, Mr. Temkin is correct that we

25   have limitations, based on Section 6103 of the Internal Revenue
```

O42WwalS

```
1   Code, and we take that obligation quite seriously, so we try to

2   err on the side of caution.

3           THE COURT:  Thank you.

4           That's fine.  Understood.

5           MS. DAVIS:  Yes.

6           THE COURT:  I appreciate that argument with respect to

7   the people that participated in the program, and I think that

8   that interest as well as the statutory authority cited by

9   defendant are sufficient to outweigh the presumption of public

10  interest in judicial documents.  I should say with respect to

11  this issue that the weight of the presumption is very low.  The

12  identities of the particular people involved has very little --

13  really, no -- weight in my decision-making here.

14          What about the other information?

15          MS. DAVIS:  Your Honor, just as department policy does

16  militate in favor of not publicly identifying unindicted

17  coconspirators, I think the policy specifically refers to an

18  indictment, but we also try to be cautious about it for privacy

19  and reputational reasons, and that would be the reason to not

20  identify those people by name.  And I agree with Mr. Temkin

21  that there are some instances where identifying them by

22  position would lead one to easily identify them by name.

23          THE COURT:  Thank you.

24          On this, as to the names, I appreciate the issue, but

25  part of my concern about some of the proposed redactions --
```

O42WwalS

1  again, the ones in blue -- is that they go to what I understand

2  to be one of Mr. Walchli's arguments, which is that his conduct

3  was not undertaken by him alone but that he went to others with

4  respect to the conduct.  That information is significant for my

5  decision-making here, and it's not apparent from the face of

6  the documents what those facts are with the redactions in the

7  scope that had been proposed here.

8            Any other argument on this?

9            MS. DAVIS:  Not from the government, your Honor.

10           THE COURT:  Thank you.

11           Counsel for defendant, let me hear from you.

12           MR. TEMKIN:  Your Honor, in redacting those names and

13  the other identifying information, we were acting pursuant to,

14  again, the fact that the coconspirator list was sealed and also

15  aware of the Department of Justice's policy against essentially

16  publicly shaming people who don't have an opportunity to appear

17  and defend themselves.

18           THE COURT:  Sorry.  Let me just pause you.

19           Counsel for the government, let me point you, for

20  example, to the defendant's sentencing submission, just to

21  frame the conversation with more concrete information for us.

22           Look at the bottom paragraph on page 24 of their

23  sentencing submission and the carryover paragraph.  Let's start

24  with the last sentence of that carryover paragraph on page 25.

25           Why should that be redacted?

O42WwalS

| | |
|---|---|
| 1 | MS. DAVIS:  Your Honor, we would have no objection to |
| 2 | that last sentence being unredacted. |
| 3 | THE COURT:  Thank you. |
| 4 | And similarly, the redaction to the first sentence in |
| 5 | that paragraph, what's the argument in favor of redacting that |
| 6 | information? |
| 7 | MS. DAVIS:  I think in that particular paragraph, your |
| 8 | Honor, I think that if just the name is redacted, that that |
| 9 | would be sufficient. |
| 10 | THE COURT:  Thank you. |
| 11 | Good. |
| 12 | I'm going to approve more limited redactions with |
| 13 | respect to the content that was redacted in the defendant's |
| 14 | submissions in blue.  I think that there has been a sufficient |
| 15 | showing, as I described earlier, for redaction of the |
| 16 | identities of the individual taxpayers who participated in the |
| 17 | amnesty program for the reasons that I articulated earlier. |
| 18 | I also believe that there's sufficient justification |
| 19 | for maintaining under seal the specific names that are |
| 20 | identified in the redactions otherwise, but there's a |
| 21 | substantial amount of information.  For example, the one that I |
| 22 | understand now to be undisputed, just for illustrative |
| 23 | purposes, a statement that Holding's board approved the |
| 24 | formation of Helvetic, including its role in the Singapore |
| 25 | solution.  Such statements regarding the board approval of Mr. |

O42WwalS

1    Walchli's accused conduct I don't think should be redacted.  It

2    has substantial weight in my assessment of the defendant's

3    arguments regarding his role in this criminal conduct, and

4    because of that, the weight of the presumption is high.  And I

5    don't think that there's a sufficient showing of a

6    countervailing privacy interest that outweighs that

7    presumption, so I'm going to approve the proposed redactions in

8    blue by the defense insofar as they pertain to the specific

9    identities -- that is, the names -- of the people involved.

10   But otherwise, without a further showing, I'm not going to

11   permit the remaining redactions that have been provided to the

12   Court in blue in the defendant's submissions.  And so I'm

13   directing that the defense file a new version of those

14   submissions with the more limited redactions that have been

15   approved by me.

16          With respect to the government's submissions, as I

17   understand it, the majority of the redactions are ones that are

18   permitted under the rules in any event.  Those are permitted

19   under the rules.  There are two redactions that are sought in

20   addition to those.  Those relate to the information provided on

21   footnote 4 -- I'm sorry.

22          MS. DAVIS:  Footnote 1, your Honor.

23          THE COURT:  Thank you.

24          -- footnote 1 on page 4 of the government's sentencing

25   submission.  There, the information has very little weight --

O42WwalS

```
1    really, no weight -- in the Court's decision-making.  As a
2    result, the presumption is very low.  There is substantial
3    privacy interest and perhaps other equities involving
4    international comity which outweigh the presumption of public
5    access to judicial documents, and so I approve that.
6            Counsel for the government, because the version that
7    was filed online was the unredacted version, I don't know what
8    the specific reference is to the other thing that you wanted to
9    redact.
10           Is it the first name in bullet 1?
11           MS. DAVIS:  Yes.  There are a few instances, I
12   believe, of the same name reference as in the defendant's
13   motion that we've just covered.  I think we did it in a more
14   narrow way.  Other than the redactions that are authorized by
15   the Court's local rules, the other redactions were primarily in
16   the exhibits, and they related to individuals who worked for
17   the companies who otherwise had no role in anything.
18           THE COURT:  Thank you.
19           Understood.
20           Those redactions are also approved.  As counsel's
21   argued, they have no role in the underlying offenses.  Their
22   identities have no bearing on the Court's assessment of this
23   issue, and therefore, the weight of the presumption is very
24   low.  On the other hand, there are substantial privacy
25   interests implicated by disclosure of their identities, given
```

O42WwalS

1    that, as the government has described, they had no role in the

2    incident itself.

3           Counsel for the government, I direct that you file the

4    properly redacted versions of those documents on the public

5    docket as promptly as practicable after today's proceeding and,

6    in any event, no later than this Thursday.

7           Very good.

8           Counsel, are there any other submissions in connection

9    with this sentencing?

10           First, counsel for the government.

11           MS. DAVIS:  No, your Honor.

12           THE COURT:  Thank you.

13           Counsel for defendant.

14           MR. TEMKIN:  No, your Honor.

15           THE COURT:  Thank you.

16           Let me turn, first, to counsel for defendant.

17           Counsel, have you read the presentence report?

18           MR. TEMKIN:  Yes, your Honor.

19           THE COURT:  Have you discussed it with your client?

20           MR. TEMKIN:  Yes, your Honor.

21           THE COURT:  Thank you.

22           Mr. Walchli, have you read the presentence report?

23           You can remain seated until I ask you to stand.

24           THE DEFENDANT:  Yes, sir, your Honor.

25           THE COURT:  Thank you.

O42WwalS

1              Have you discussed it with your counsel?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Have you had the opportunity to review

4      with your counsel whether there are any errors in the report?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Have you had the opportunity to review

7      with your counsel whether there are any other issues with the

8      presentence report that should be addressed by the Court?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Thank you.

11             Counsel for the United States, have you read the

12     presentence report?

13             MS. DAVIS:  Yes, your Honor.

14             THE COURT:  Do you have any objections related to the

15     factual accuracy of the presentence report?

16             MS. DAVIS:  Not technically to the factual accuracy.

17     We believe that the fine reference may have omitted the

18     possibility, not on the first page but in the body of it, the

19     possibility of twice the pecuniary gain or loss as an

20     alternative fine measure.

21             THE COURT:  Thank you.

22             Understood.

23             But there are no objections related to the factual --

24             MS. DAVIS:  No.

25             THE COURT:  -- accuracy of the presentence report, is

O42WwalS

1    that right?

2         MS. DAVIS:  That's correct, your Honor.

3         THE COURT:  Thank you.

4         Counsel for defendant, do you have any objections

5    related to the factual accuracy of the presentence report?

6         MR. TEMKIN:  Your Honor, we do not.

7         I do want to call your Honor's attention to -- it was

8    a footnote in the reply submission that we filed last week that

9    noted that there was an error in the presentence report.

10   Paragraph 85 referred to, attributed something to our statement

11   of the offense, which we think is in error.  I don't think it's

12   a factual error.  I don't think it's material, but I did want

13   to make sure that your Honor was aware of that.

14        THE COURT:  Thank you.

15        I am.

16        Counsel for the defense, I understand there are no

17   objections related to the factual accuracy of the report.  Is

18   that correct?

19        MR. TEMKIN:  That's correct, your Honor.

20        THE COURT:  Thank you.

21        Given that there are no objections to the factual

22   recitations in the presentence report, the Court adopts the

23   factual recitations in the presentence report.  The presentence

24   report will be made a part of the record in this matter and

25   will be placed under seal.  If an appeal is taken, counsel on

O42WwalS

1    appeal may have access to the sealed report without further

2    application to the Court.

3            Now, although district courts are no longer required

4    to follow the sentencing guidelines, we are still required to

5    consider the applicable guidelines in imposing sentence, and to

6    do so, it's necessary that we accurately calculate the advisory

7    sentencing guidelines range.

8            In this case, the defendant pleaded guilty to Count

9    One of the indictment in this case, which is numbered 20 Cr.

10    497.  Count One charged him with conspiracy to defraud the

11    United States.

12            Counsel for the United States, does the government

13    agree that a two-level adjustment is appropriate here under

14    Section 3E1.1(a)?

15            MS. DAVIS:  Yes, your Honor.

16            THE COURT:  And is the government moving for an

17    additional one-level adjustment under 3E1.1(b)?

18            MS. DAVIS:  Yes, your Honor.

19            THE COURT:  Thank you.

20            I calculate the sentencing guidelines in a manner

21    consistent with the presentence report.  The applicable

22    sentencing guidelines manual is the November 1, 2023,

23    sentencing guidelines manual.

24            Pursuant to Section 2T1.9, I look to Section 2T1.4 to

25    determine the base level for the offense.

O42WwalS

1          Pursuant to Section 2T1.4(a)(1) and 2T4.1(g), the

2     offense level is 18 because the agreed-upon loss tax is more

3     than $250,000 but less than $550,000.

4          Because the offense involved the use of sophisticated

5     means, a two-level increase is warranted pursuant to Section

6     2T1.4(b)(2).

7          Because the defendant has no criminal history points

8     and the other conditions set forth in Section 4C1.1 do not

9     apply, a two-level reduction is warranted pursuant to Section

10    4C1.1.

11         Because the defendant has demonstrated acceptance of

12    responsibility for his offense through his plea allocution, I

13    apply a two-level reduction pursuant to Section 3E1.1(a).

14         Upon motion by the United States, an additional

15    one-level reduction is warranted under Section 3E1.1(b).

16         As a result the applicable sentencing guidelines

17    offense level is 15.

18         The defendant has no criminal history points.  As a

19    result, the defendant is in criminal history category I.

20         I've considered whether there's an appropriate basis

21    for departure from the advisory range within the guidelines

22    system, and while I recognize that I have the authority to

23    depart, I do not find any grounds warranting a departure under

24    the guidelines.

25         In sum, I find that the offense level for this offense

O42WwalS

```
 1   is 15 and that the defendant's criminal history category is I.

 2   Therefore, the guidelines range applicable to this matter is 18

 3   to 24 months' imprisonment.

 4          Counsel, does either party have any objections to the

 5   sentencing guidelines calculation?

 6          First, counsel for the United States.

 7          MS. DAVIS:  No, your Honor.

 8          THE COURT:  Thank you.

 9          Counsel for defendant.

10          MR. TEMKIN:  No, your Honor.

11          THE COURT:  Thank you.

12          Counsel for defendant, do you wish to be heard with

13   respect to sentencing?

14          MR. TEMKIN:  Yes, your Honor.

15          THE COURT:  Thank you.

16          Please proceed.

17          MR. TEMKIN:  May I use the lectern, your Honor?

18          THE COURT:  You may.

19          MR. TEMKIN:  Your Honor, thank you very much.

20          First, as we get started, I'd just like to introduce

21   Mr. Walchli's family and friends who are here today.

22          In the front row, starting with his friend Sean Kirby,

23   who traveled up from Virginia to be with Mr. Walchli today,

24   Mr. Kirby wrote a letter to your Honor, and his parents who

25   also wrote a letter had intended to be here but could not
```

O42WwalS

1    because of medical issues.

2        Next are Mr. Walchli's wife Antoinette and his

3    daughters Virginia and Raffaela, followed by his brother Peter

4    and his mother and stepfather, Margrit and Jean-Pierre Huber.

5    All of the Walchlis have traveled, obviously, from Switzerland

6    to be here with Dani today.

7        I know your Honor has read all of the materials that

8    we've submitted, and I'll try to be brief this morning.  I'll

9    do my best.

10        Your Honor, the government has asked for a guidelines

11    sentence.  As your Honor knows, probation recommended a

12    six-month sentence based on several mitigating factors that it

13    has identified, and we have asked for a noncustodial sentence.

14    We did not make that request lightly, your Honor, but we do

15    believe that the factors set forth in Section 35553(a) and

16    mitigating factors not addressed by the probation department

17    warrant a noncustodial sentence.

18        I'm going to start by talking briefly about Dani's

19    personal history and characteristics.

20        Section 3553(a) recognizes that while the defendant is

21    obviously here because of the offense conduct, in determining

22    an appropriate sentence, your Honor is permitted -- in fact,

23    required -- to consider the entire person.  And I think our

24    sentencing memo and the supporting letters demonstrate that

25    Dani is a good, decent, honorable person; came from a modest

O42WwalS

background, in a small working-class community in Switzerland, to achieve substantial success, through hard work, dedication, and whose sole contact with law enforcement is a result of his involvement in what we call the Singapore solution.

First and foremost, the letters describe Dani as a loving husband, caring father, devoted son, loyal adviser to his brother. They describe him as a kind and decent man, who cares for elderly neighbors, who's an exceptionally hardworking executive but who, while he was demanding of himself, also was a mentor to his subordinates.

I was struck by the letters that Sara Nogly and David Keller wrote to your Honor, describing how Dani gave them opportunities to flourish, ensured that they would receive credit for success but also stood up for them if there were complaints. So he was the kind of supervisor who showed real support for his colleagues and genuine interest in their careers, as your Honor saw.

The letters also talked about Dani's commitment to leaving the world a better place than he found it. Your Honor, I know, read Dani's account of his trip to the Philippines and how he was struck by the poverty that he observed and how he felt a calling to do something about it. Fortunately, he was connected with the Child's Dream charity, based in Thailand, and that charity's mission of providing education and health care to poor children throughout Asia. As Mr. Jenni and

Mr. Siegfried wrote in their letter to your Honor, Dani's commitment was not just about giving money.  He personally traveled to Thailand, the Myanmar border, Cambodia, to observe Child's Dream's work in person.  He even went so far as to deliver laptops to the children.

Dani also introduced Child's Dream to his friends and family, who have become supporters of the charity as well, and it says something about Dani's commitment to leaving the world a better place.  But of all the letters we submitted, the ones that sort of struck me most and said the most about Dani's character were the ones that described his commitment to the victims of the horrific bus accident involving several employees of Evaluserve in India.

As your Honor knows, Dani served on Evaluserve's board by virtue of his employer's investment in that company. Nothing in that position required Dani to take a personal interest or get personally involved in the lives of the victims of that accident.  But after he heard about the accident, Dani was so concerned that he got on a plane and flew to Delhi to visit the victims personally and assure them they would be taken care of.

But this was not a perfunctory fly-by visit.  Dani took a genuine interest in the lives of people he never met before.  He personally made medical arrangements for victims of the accident, including Himanshu Sharma.  And when Himanshu

O42WwalS

1    later traveled to Switzerland for medical care, Dani and

2    Antoinette visited him in the hospital, invited him and his

3    brother to their home and generally made sure that they were

4    comfortable in a strange country.

5         In his letter to your Honor, which is exhibit 15,

6    Himanshu describes Dani as a pillar of strength for him and his

7    family.  If your Honor permits, I'll read a brief portion of

8    the letter, where Himanshu says:

9         What makes Daniel's actions even more exceptional is

10   the fact that at the time of the accident, he was a complete

11   stranger to me.  Our paths had never crossed before, and yet

12   Daniel treated me as if I were a beloved family member.

13   Daniel's selflessness and genuine actions exemplify the essence

14   of humanity, proving that compassion knows no bounds.

15        Your Honor, I respectfully submit that the most

16   genuine reflection of a person's character is how they behave

17   towards others who they know will never be in a position to

18   reciprocate.  Dani's relationship with Himanshu and the other

19   victims of the bus accident speaks volumes about his character.

20        Before I turn to the offense conduct, your Honor, I

21   want to speak about one other aspect of Dani's character that I

22   think bears mentioning and bears consideration.

23        Other defendants, both in this case and in other,

24   similar cases, have opted to avoid facing the consequences of

25   their conduct by staying in their home countries.  One of

O42WwalS

```
1    Dani's codefendants went so far as to jump bail when he was
2    arrested in Spain.  As your Honor knows, Dani could have stayed
3    in Switzerland and waited out the Department of Justice.  In
4    fact, the defendants in the Wegelin case did just that, and
5    ultimately, after nearly a decade, those defendants were
6    rewarded for their intransigence and they were allowed to plead
7    to misdemeanors.  But Dani was not going to hide from the
8    Court's jurisdiction.  Instead, he directed us to notify the
9    government of his willingness to come to the United States to
10   face the charges.
11           Now, to be clear, it was to face the charges; before
12   Dani pleaded guilty, we raised what we thought at the time, and
13   still think, were meritorious motions.  We challenged the crime
14   conspiracy doctrine generally and especially its
15   extraterritorial application in this case.  We also challenged
16   the application of the statute of limitations in light of the
17   delay in unsealing the indictment.  But after your Honor denied
18   those motions, Dani agreed to plead guilty.
19           We understand that the government would have preferred
20   Dani to waive extradition, plead guilty, cooperate before even
21   returning the indictment, but in considering Dani's character,
22   it cannot be that his decision to voluntarily come to the
23   United States, when he could have remained in his home country
24   for the rest of his life, deserves absolutely no consideration.
25   So we ask your Honor to consider it as one of the mitigating
```

O42WwalS

1    factors that weighs in favor of a noncustodial sentence.

2    Your Honor, obviously, Section 3553(a) requires

3    consideration of the nature and circumstances of the offense

4    and the need to afford just punishment.  And Dani stands before

5    your Honor having pleaded guilty to the one count, the sole

6    count, of the indictment charging him with a conspiracy to

7    defraud the United States, in violation of Section 371.  I

8    don't want anything I say to be interpreted as minimizing

9    Dani's conduct.  OK?  But I think it's important to put that

10    conduct in context and consider his culpability relative to the

11    other participants in the offense.

12    Let me start with Dani joining Holding.

13    In 2004, he went to work at Holding, where his job

14    involved, among other things, investing assets in various parts

15    of the world, especially in Asia.  Now, Holding also owned a

16    private bank, PrivatBank IHAG, but it's important, your Honor,

17    to stress -- it's important for me to stress -- that Dani did

18    not work at PrivatBank IHAG.  He did not set its policies.  He

19    did not oversee its bankers.  He did not deal with its clients.

20    The bank was an island within Holding.  It had its own

21    leadership, who were senior, experienced executives with

22    longstanding relationships to the owner of Holding, and the

23    owner oversaw the bank as its chairman.

24    Now, like other banks in Switzerland, for many years

25    PrivatBank IHAG offered bank secrecy to depositors from around

O42WwalS

1    the world, including the United States.  And in 2008, while

2    PrivatBank IHAG was adopting what's generally referred to as a

3    disclose-or-leave policy with respect to its U.S. clients, the

4    bank's general counsel and head of compliance, Michael Gubser,

5    worked with people at Allied Finance to develop a, quote,

6    solution.  The solution was, in essence, a means of enabling

7    high-net worth clients to evade the bank's own policy, to evade

8    this new policy that the bank was adopting.  And by December of

9    2008, Mr. Gubser and Mr. Schnellmann, of Allied Finance, had

10   designed what we've come to refer to as the Singapore solution.

11          The Singapore solution, as the government goes into

12   great detail in its submission, involved a series of transfers

13   that would, in essence, enable PrivatBank IHAG to remove from

14   the client files any reference to the fact that the

15   accountholders were U.S. persons, that the ultimate beneficial

16   owners were U.S. citizens and therefore had U.S. tax

17   obligations.

18          So the idea was take an account -- and the file in the

19   account shows that it's a U.S. account -- and make it a

20   non-U.S. account.  Mr. Gubser and Mr. Schnellmann had designed

21   a way of doing that.  Their initial design, as we pointed out

22   to your Honor in our reply submission, their initial design

23   involved another Singapore asset manager.  But Mr. Gubser was

24   aware that Dani was in the process of starting a Singapore

25   asset manager for IHAG, for Holding, and that ultimately became

O42WwalS

known as Helvetic.  So in January of 2009, Mr. Gubser

approaches Dani and asks whether Helvetic can be incorporated

in the design that he and Schnellmann had already developed, so

basically take out an unrelated asset manager and plug in

Helvetic.

A couple of points bear emphasis here.

First, there's no dispute that when Dani developed

Helvetic it was for legitimate purposes and that Mr. Gubser

co-opted, hijacked the asset manager into the scheme that he

and Mr. Schnellmann had otherwise designed.

Second, Dani did not have the authority, on his own,

to approve the use of Helvetic in this way.  Instead, as your

Honor noted before, and as we've argued, he presented the issue

to higher-ups at Holding, and it was only after those

higher-ups approved Helvetic's role in the Singapore solution

that Dani helped coordinate the efforts of the various

participants in the Singapore solution.  But it was based on

the express approval and direction of the higher-ups at

Holding.

Now, there were two round trips that took place in

late 2009.  They were round trips involving client family 1 and

client 2.  And early in 2010, so about a year after he first

was approached by Mr. Gubser, Dani approved the invoices for

the fees associated with the transfers.  That was Dani's last

active involvement in the Singapore solution -- the approval of

O42WwalS

1    the invoices.

2              Now, I think it's undisputed that later in 2010, Dani

3    became increasingly uncomfortable with his and Helvetic's role

4    in the Singapore solution, and he attempted to persuade the

5    powers that be that the Singapore solution should be

6    terminated.  When he raised the issue, the bank executives

7    scorned Dani for being weak, and his attempt to terminate the

8    Singapore solution was rejected.  But the following year, Dani

9    came back and again attempted to persuade the others to

10   terminate the Singapore solution.  This time he was successful,

11   called the head of Helvetic, told him to get rid of the

12   American clients, and after that call, Dani had nothing further

13   to do with the Singapore solution accounts.

14             We subsequently have learned that Gubser and another

15   defendant, Ivo Bechtiger, followed that up and moved the money

16   so that the American clients could continue to conceal their

17   assets.  Now, again, nothing in my comments is intended to

18   suggest that Dani did not violate U.S. law.  But in considering

19   the offense conduct as one of the 3553(a) factors, we ask your

20   Honor to consider Dani's relative culpability.  I think that in

21   any tax evasion scheme, the most culpable participant is the

22   U.S. taxpayers; obviously, it's their obligation to pay taxes

23   that's evaded.

24             Now, the two largest accountholders were able to avoid

25   the consequences of their years of tax evasion.  Decades before

O42WwalS

Dani was even involved, before he was even employed at Holding, these two taxpayers had been cheating on their taxes.  But they were able to avoid any responsibility, culpability, even public shaming, as I've noted, by virtue of the voluntary disclosure program.

Dani, we submit, is also less culpable than the senior bank executives at PrivatBank IHAG and the financial professionals at Allied Finance who spent decades helping U.S. citizens evade their tax obligations, including through other sophisticated devices.  There were years and years of sophisticated means of concealing accounts, including Liechtenstein foundations, Panamanian cooperations, BVI corporations.  There were countless ways in which U.S. taxpayers concealed their accounts and were helped in doing so by bank executives and client relationship managers.

The senior executives at the bank and the financial professionals at Allied Finance designed the Singapore solution to enable their clients to keep the undisclosed assets at PrivatBank IHAG.  Dani never met the clients who participated in the Singapore solution, but Gubser and Peter Ruegg, the bank's deputy CEO, had longstanding relationships with those clients.  Rather than enforcing the bank's disclose-or-leave policy and push those individuals to participate in the voluntary disclosure program that was available in 2009, the bank executives developed the Singapore solution so that they

O42WwalS

1    could continue to service those clients.

2            We also ask your Honor to consider that Dani's role or

3    involvement in the Singapore solution was solely in his

4    capacity as an employee of Holding.  He did not exercise any

5    supervisory authority over the bankers.  He did not receive any

6    additional compensation or a bonus as a reward for having

7    participated.

8            Now, we respectfully disagree with the government's

9    suggestion that Dani could have prevented the Singapore

10   solution or that he had the authority to terminate it.  Dani

11   might have been able to tell Gubser that Helvetic would not

12   play a role in the Singapore solution.  He might have been able

13   to do that, but as we pointed out in our reply letter to your

14   Honor, Helvetic was not an essential cog in the scheme, in the

15   Singapore solution.  There was an original asset manager that

16   was envisioned to be used, and if Helvetic was not available,

17   there's no reason to think that Gubser and Schnellmann would

18   not have found some other asset manager or means of

19   effectuating that piece of the Singapore solution.

20           The government also argues that Dani was somehow

21   uniquely situated to end the Singapore solution.  But I think

22   that's belied by what actually happened, because in 2010, when

23   Dani tried to end the Singapore solution, his efforts were

24   rejected.  But Dani nonetheless did press to try to close the

25   Singapore solution, and he ultimately succeeded in doing so in

O42WwalS

 1    2011.

 2            Now, the government suggests that Dani should have

 3    forced the clients to disclose their accounts to the United

 4    States.  But Dani didn't know the clients.  He didn't have a

 5    relationship with the clients.  What he was doing was

 6    terminating his role in the conspiracy.  Now, should those

 7    accounts have been disclosed?  Yes.  But Mr. Gubser and

 8    Mr. Bechtiger decided to go off and continue to help the

 9    clients.  But that wasn't Dani's decision.

10            I'm going to turn now, if your Honor pleases, to the

11    issue of deterrence.

12            3553(a) directs that your Honor consider both general

13    and specific deterrence in protecting the public from future

14    crimes by the defendant.  Nothing in Dani's background suggests

15    that he is at all at risk of exposing the public to further

16    criminal activity or that he needs specific deterrence in any

17    way.

18            Throughout its submission, the government argues that

19    the Court should send Dani Walchli, from Switzerland, to jail

20    to deter U.S. taxpayers from cheating on their taxes.  In the

21    *Gardellini* case, which we cited to your Honor in our reply,

22    now–Justice Kavanaugh questioned the value of general

23    deterrence and the elevated importance that the government

24    places on it in tax cases like this.  But even setting aside

25    questions of general deterrence in the ordinary case, the

O42WwalS

government makes no effort to explain how sending a Swiss
citizen, like Dani, to jail is going to deter U.S. taxpayers
from cheating on their taxes.  And the deterrence argument
rings hollow when you consider that the government offered the
U.S. taxpayers, who used offshore accounts to cheat on their
taxes, not one, not two, not three, but four opportunities to
participate in voluntary disclosure programs.  And tens of
thousands of U.S. taxpayers took advantage of those
opportunities.  And the government offered Swiss banks an
opportunity to obtain amnesty despite the fact that for years
and years and years they had benefitted from the substantial
fees that were generated by U.S. clients.

Now, your Honor, taxpayers, to be clear, were eligible
to participate in voluntary disclosure programs regardless of
how long they had been cheating on their taxes, the size of the
accounts, the amount of taxes that were evaded or the
complexity, whether they held the account in their own name or
they had a Liechtenstein foundation as a buffer.  And banks
were eligible to participate in the Swiss bank program and
avoid any risk of prosecution.  The only criteria was that they
could not be under investigation in August of 2013, when the
program was announced.

There were 14 banks that were under investigation at
that time.  They were category 1 banks; they were ineligible.
Every other bank in Switzerland had the opportunity to

O42WwalS

participate in the program, get a nonprosecution agreement in
exchange for disclosing certain information regarding their
offshore activities and paying a penalty -- again, unrelated to
how many U.S. clients they had, the size of their U.S.
accounts, the amount of taxes evaded or the sophistication of
the schemes.  None of that mattered.  All they had to do was
come forward.

        I am not criticizing -- and I want to be clear on
this.  I'm not criticizing the Department of Justice and the
IRS for having offered the Swiss bank program to the banks or
the voluntary disclosure programs to the U.S. taxpayers.  Those
were policy decisions they were well within their right to
make.  But having made the policy choice to immunize over
56,000 taxpayers and 84 Swiss banks, I think that says
something about general deterrence.  And I think it's
far-fetched to think that prosecuting Dani Walchli is going to
somehow send a message to the U.S. taxpayers that they now have
to comply with their tax obligations.

        As we pointed out to your Honor, in two cases in the
Eastern District of Virginia, in 2015 -- so about nine years
ago -- the Department of Justice told a district judge
sentencing two Swiss bankers that -- and I'm going to read from
the sentencing memos that were submitted -- broad participation
in the IRS voluntary disclosure programs indicates that the
message of general deterrence has been widely received by U.S.

O42WwalS

1  citizens seeking to return to or otherwise enter into

2  compliance with the U.S. tax system.

3      That's the Department of Justice, in 2015, telling the

4  judge in Virginia that essentially general deterrence has been

5  achieved.

6      Now, there's no effort to explain what happened in the

7  intervening nine years that causes general deterrence to now be

8  of the essence and to require sending Dani to jail to deter

9  U.S. taxpayers.

10     The government's deterrence argument, to be fair, is

11 not limited to deterring U.S. taxpayers.  The government also

12 talks about deterring other individuals, what are generally

13 referred to as enablers.  But in the 14 years since this case,

14 since the offense conduct in this case, there's been an

15 enormous shift in the international banking industry, and I

16 think it's important to recognize, as we sit here in 2024, that

17 the world is very different than it was in 2013, when the

18 government offered the Swiss bank program, or even in 2009,

19 when Dani first got involved in the Singapore solution.

20     The U.S. and Swiss governments have sought to bring

21 taxpayers and banks into compliance, and the United States

22 Congress has passed, and the Treasury department has

23 implemented, the Foreign Account Tax Compliance Act, generally

24 referred to as FATCA.  And FATCA is an important piece for the

25 international enforcement mechanism that mitigates the risk of

O42WwalS

1    undisclosed offshore accounts.

2            So your Honor, with respect to deterrence, we

3    respectfully submit that sending Dani Walchli to jail is not

4    going to serve the interest of general deterrence.

5            The next factor I want to turn to is the need to avoid

6    unwarranted sentencing disparities among defendants with

7    similar records who have been found guilty of similar

8    conduct -- similar conduct.

9            In our submissions, we addressed parity from several

10    different perspectives.  First, we noted the judicial

11    sentencing information data that was incorporated into the PSR

12    and data published by the sentencing commission.  What both of

13    those sources demonstrate is that the majority of defendants

14    convicted of tax offenses received substantial variances below

15    the sentencing guidelines, and many of those defendants

16    received noncustodial sentences.  In fact, adjacent data

17    provides that 36 percent of defendants, with Dani's guideline

18    range, convicted of tax offenses with Dani's guideline range

19    and criminal history category, received noncustodial sentences.

20    36 percent of the 105 defendants, noncooperating defendants,

21    got noncustodial sentences.

22            We also looked at sort of the cohort of U.S. taxpayers

23    who used undisclosed accounts to cheat on their taxes, and both

24    in this district and around the country, the majority of the

25    relatively few U.S. taxpayers who have been prosecuted for

O42WwalS

```
1    offenses relating to offshore accounts received noncustodial

2    sentences, and virtually all of those defendants received

3    substantial variances.

4           Finally, in our submission, we address the 18

5    so-called enablers who were convicted in the United States for

6    conduct relating to facilitating U.S. taxpayers' tax evasion.

7    Unlike Dani, for decades, these defendants chose to make their

8    living facilitating tax evasion by U.S. customers and U.S.

9    taxpayers.  We respectfully submit that all of them were more

10   culpable than Dani in terms of how long they had acted to

11   enable the U.S. taxpayers, the number of clients that they

12   serviced, the size of the accounts that they serviced and the

13   amount of taxes that their clients evaded.  And only two of the

14   18 were sentenced to any period of incarceration.

15          Now, of the three defendants who, like Dani, are not

16   getting credit for cooperation, only Urs Frei, of Wegelin,

17   received any prison time.  Unlike Dani, Mr. Frei and his two

18   codefendants did not voluntarily come to the United States to

19   face the charges.  They waited out the government, stayed in

20   Switzerland for nearly a decade before they negotiated

21   misdemeanor pleas.

22          Now, we believe that Dani is less culpable of all

23   three of the Wegelin defendants, but he's certainly less

24   culpable than Mr. Frei, and we ask your Honor to consider that

25   while Mr. Frei has spent years managing undeclared accounts for
```

O42WwalS

U.S. taxpayers, he ultimately serviced up to 70 clients with approximately $250 million in assets. Notwithstanding that conduct, he was sentenced to two months in prison and a $10,000 fine. In light of the sentences imposed on Mr. Frei and his codefendants, sending Dani to jail would create an unwarranted sentencing disparity, your Honor.

Now, in response to the parity argument, the government presents a chart of 67 cases that, based on the docket numbers, appear to go back to 2009. I want to address the government's chart because I think it's not reflective of how courts should be considering or do consider parity. The government's chart goes back 15 years, but we looked at the last 10 years.

In the past 10 years, over 5,000 defendants were sentenced for criminal tax offenses across the United States. The government's chart refers to 67 of those. Now, most of the defendants on the chart are U.S. taxpayers who evaded their own tax obligations or whose conduct was otherwise not comparable to Dani's. For example, one case involved the owners of Tony Luke's Cheesesteaks in south Philadelphia, who failed to report more than $8 million of cash receipts and paid their employees under the table. Another involved a tax protester from Oregon who cheated on his taxes for 20 years.

The government makes no effort, and I can't discern any explanation of how the defendants in that chart, how their

O42WwalS

1    conduct is somehow comparable to Dani's, such that those

2    sentences -- which, by the way, include a number of significant

3    downward variances -- but how those sentences are at all

4    necessary to eliminate a sentencing disparity among like

5    defendants who are convicted of like conduct.

6        Finally, your Honor, we have set forth in our papers

7    another aspect of sentencing parity, and that relates to the

8    sentences that are available to your Honor.

9        In its submission, the government says Dani should not

10   get any credit for voluntarily coming to the United States to

11   face the charges because that's what any U.S. citizen would be

12   required to do and he should be treated the same as those

13   people; that because a U.S. person charged with those crimes

14   would have to stay in the United States and answer the charges,

15   Dani should not get credit for coming from Switzerland to face

16   the charges.  Your Honor, this ignores the one essential fact

17   of what will happen if your Honor imposes a sentence of

18   incarceration.

19       If your Honor imposes a sentence of incarceration,

20   Dani will be treated significantly worse than a comparable

21   offender who receives an identical sentence but is a U.S.

22   citizen.  So U.S. citizens get far better treatment by the

23   Bureau of Prisons than a Swiss national who comes to the United

24   States to face charges.  That's an important consideration, we

25   respectfully submit, your Honor.  U.S. citizens convicted of

O42WwalS

tax crimes almost always go to federal prison camps, and the
conditions at those camps are significantly less onerous than
other prison facilities, including the low prison facilities
that Dani would be eligible to serve his sentence at.

Under BOP policies, Dani is ineligible for a prison
camp, which means that any period that Dani spends of
incarceration will be significantly harsher than an identical
sentence that's imposed on a U.S. citizen convicted of a tax
offense.

In addition to being more difficult, any sentence your
Honor imposes will result in Dani spending more time in custody
than a U.S. citizen who receives an identical sentence.  Upon
his conviction, Dani will be deemed a deportable alien, which
means that, unlike a U.S. citizen convicted of a tax offense,
he will be ineligible to serve the last 10 to 20 percent of his
sentence in community confinement and home confinement.  And at
the conclusion of his sentence, Dani will be transferred to ICE
custody, where he will be held pending deportation.

Now, we've discussed this issue with the government,
and they have proposed that Dani enter into an order of
judicial removal, which will shorten the amount of time that
Dani will have to spend in ICE custody.  And we appreciate the
government's efforts in this respect, but the problem is it's
actually a catch-22, because if Dani has an order of judicial
removal entered before he goes to the Bureau of Prisons, he

O42WwalS

1   will be ineligible for FIRST STEP Act credit.

2           I want to try to quantify this point for your Honor.

3           Our understanding is that if there is an order of

4   judicial removal and your Honor were to impose the six-month

5   sentence that the probation department recommends, Dani will

6   serve the full six months in a low-security facility and will

7   then be transferred to ICE custody to be deported.  By

8   contrast, a U.S. citizen who receives the same six-month

9   sentence will be eligible for 50 days of FIRST STEP Act credits

10  and could be released from his prison camp -- not a low

11  facility, a prison camp -- in a little over three months if he

12  receives the earliest possible release to a halfway house.

13          Now, we tried to resolve this issue by asking if ICE

14  would commit to allow Dani to self-deport, which we understand

15  would enable him to receive FIRST STEP Act credits and avoid

16  ICE detention and might even enable him to be designated to a

17  camp.  Unfortunately, ICE was unwilling to make that commitment

18  or, quite frankly, show any flexibility at all on the issue.

19  The only way we can see to avoid this conundrum is for the

20  Court to enter an order similar to the one that Judge Rakoff

21  entered in Frei, where he ordered that the defendant be

22  permitted to self-deport, ordered ICE not to lodge a detainer

23  and expressed the intent that the order would enable the

24  defendant to serve his sentence at a prison camp.

25          Unfortunately, your Honor, my understanding is that

O42WwalS

```
 1   even if your Honor were to enter such an order, there is no

 2   assurance that ICE and the Bureau of Prisons would follow your

 3   Honor's recommendations.  So there's no way to guarantee that

 4   this issue of parity in the sentence that is actually served is

 5   achieved.

 6           THE COURT:  I'm sorry.  Can I just ask a question.

 7           MR. TEMKIN:  Yes.

 8           THE COURT:  The Frei order by Judge Rakoff that you

 9   just described, was it an order or a recommendation?

10           MR. TEMKIN:  It was an order, and I can hand it up to

11   your Honor.

12           THE COURT:  Please do.

13           MR. TEMKIN:  May I just show the government?

14           THE COURT:  You may.

15           Thank you, counsel.

16           You can proceed.

17           MR. TEMKIN:  Your Honor, I'm going to close now by,

18   again, thanking your Honor for the time and attention that

19   you've devoted to the case and for permitting me to go on

20   longer than I had thought I would this morning.

21           I want to repeat.  We did not ask for a noncustodial

22   sentence lightly, but for all the reasons that we discuss in

23   our papers and that I've discussed today, we respectfully

24   submit that the facts of this case, considered in light of the

25   statutory factors, justify such a sentence, and we urge your
```

O42WwalS

| 1 | Honor to balance punishment with mercy and to allow Dani to
| 2 | return home to Switzerland with his family.

Thank you, your Honor.

| 4 | THE COURT:  Thank you, counsel.

Let me turn to the defendant.  Would you like to make
a statement to the Court?

THE DEFENDANT:  Yes.  Yes, your Honor.

THE COURT:  Thank you.

THE DEFENDANT:  Shall I make it from here or --

THE COURT:  Wherever you feel most comfortable.

THE DEFENDANT:  Your Honor, thank you for giving me
the opportunity to speak to you today and for reading my
letter.  And please also excuse that I have a paper in front of
me.  I wouldn't do that normally, but this is a very difficult
and emotional time for me, and I just want to ensure that I
don't forget anything I want to speak today.

I want to say here and now the most important thing.
I deeply regret what I have done, and I want to apologize to
you, your Honor, to the government and to the American people.
I know it was wrong to have participated in helping American
taxpayers to continue to conceal their accounts at PrivatBank
IHAG.  I have no one to blame for my actions than myself.  And
I sincerely apologize for my role in the Singapore solution.

It has been a long and very difficult time for me to
get here today.  For me it has been ongoing for nearly 14 years

O42WwalS

now.  My actions not only caused me to feel ashamed but have

also caused sorrow and pain to my family.  I, therefore, also

want to apologize to my family -- sorry -- and tell you that

your caring love has helped me so much.

         To my wife Antoinette and our daughters Virginia and

Raffaela, my mother Margrit and her husband Jean-Pierre, my

brother Peter and my close friend Sean Kirby, thank you so much

for supporting me and being here today.

         I also want to thank John Kirby and Sherry Kirby, who

wanted to be here today, but for medical reasons,

unfortunately, they couldn't come.

         I will never be able to thank you enough for your love

and your support over the past several years.

         Virginia and Raffaela, I am so very sorry to have

brought so much suffering into your lives.  I will never be

able to forgive me for this.

         Your Honor, the only hope I have is that I'm given a

second chance, that I can close this chapter and so my family

and I move past this.

         Thank you very, very much, your Honor, for listening

to my words.

         Thank you.

         THE COURT:  Thank you.

         Counsel for the United States, does the government

wish to be heard with respect to sentencing?

O42WwalS

1              MS. DAVIS:  Yes, your Honor.

2              THE COURT:  Thank you.

3              Please proceed.

4              MS. DAVIS:  Your Honor, what the defense has urged for

5    this defendant, who engaged in some of the most brazen conduct

6    that we've seen in the Swiss banking world, is an utter lack of

7    accountability: no jail time, apparently no fine; rather, just

8    that he be able to go back to Switzerland to live his

9    comfortable life, without any cost to him other than the cost

10   of having to go through this prosecution.

11             I'd like to add some additional context to the facts

12   that were highlighted by Mr. Temkin.

13             First, it's very important to note that the

14   development of the Singapore solution and its subsequent

15   implementation happened at a time where very, very publicly the

16   United States was bringing law enforcement actions against

17   Swiss banks, the first Swiss bank being UBS.  The investigation

18   of UBS became public in mid-2008, and in February of 2009, UBS

19   entered into a deferred prosecution agreement with the United

20   States.  Along with that was what's called a John Doe summons,

21   which was directed to UBS to try to get them to disclose the

22   names of U.S. accountholders who were hiding income and assets

23   at UBS.

24             Ultimately, this procedure and the law enforcement

25   activities resulted in some names being produced to the United

O42WwalS

States.  But not all names.  Ultimately, Swiss banking secrecy
prevailed and prevails to this day in terms of the government's
ability to obtain the names of specific accountholders.  I
heard just this week from a Swiss attorney that they couldn't
disclose to us particular information that we had requested
because of Swiss bank secrecy.

Your Honor, I don't usually interject my own personal
experiences in this, but I was a manager of the Swiss bank
program on behalf of the Department of Justice tax division.  I
sat through conduct disclosure meetings for over 80 Swiss banks
who opted to participate in the Swiss bank program, and I can
tell you that the Singapore solution stood out among the
conduct that was disclosed to the United States by those Swiss
banks for its absolute brazenness in developing a brand-new
fraud scheme to help clients who were refusing to participate
in the options that were available to them, the OVDP, continued
to hide their assets and continue in that way to earn fees for
the enablers, the bankers and the fiduciary services firm.

It was brazen.  It involved not one, not two but
multiple countries, the establishment of dozens of entities in
places like BVI.  It required the agreement of Mr. Walchli as
the head of Helvetic and its participation, which, contrary to
the statement of Mr. Temkin, there was no hijacking of
Helvetic.  Mr. Gubser approached Mr. Walchli, who was the head
of Helvetic, down to choosing its logo, and Mr. Walchli

O42WwalS

interposed no objections to that, agreed to it, and that is how
Helvetic got intimately involved as a key player in this.

It was Helvetic in whose name the evaded taxes were
coming back to IHAG. It was Helvetic in whose name the
accounts were held. It was Helvetic who was overseeing the KYC
that was required by Singapore. It was Mr. Walchli, who was
the director of Helvetic, and was the person tasked by his boss
to lead the charge into Asia for IHAG. Unfortunately, that
charge was led on the back of the United States taxpayers.

And it's clear that Mr. Walchli had every intention of
trying to service undeclared taxpayers even after the UBS
deferred prosecution agreement became public. We have to look
no further than exhibit 2 to the government's submission, which
are board meaning minutes for AFP Holding, which was the Hong
Kong entity that had been purchased by IHAG Holding's Asia
subsidiary that was being used as part of this, because the
money was jumping through Hong Kong and they needed entities
and they needed bank accounts, and that was AFP Holding's role.

Mr. Walchli was a member of that board, and we see the
minutes from May 2009, where the client structures were being
discussed based on charts that were provided by Mr. Walchli.
And it lays out five different options that might be used by
taxpayers to continue, using Mr. Walchli's own words, having
their black money remain black.

It's quite clear that Mr. Walchli -- you can see on

O42WwalS

the last page, at the bottom -- was the author of those

minutes.  He understood everything about how these schemes were

supposed to work.  He's also offering up other options, like

insurance wrappers, and I can refer the Court to the deferred

prosecution agreement with Swiss Life insurance company that

was a purveyor of those insurance wrapper options that many

Swiss banks offered to their clients.  Those were the kinds of

solutions that Mr. Walchli was trying to develop, that Mr.

Walchli was entertaining as a board member of AFP Holding.

So far from being what appears, if you take

Mr. Temkin's words, an attempt to portray Mr. Walchli as this

poor, innocent person who was swept into this unfortunate

scheme, Mr. Walchli was an essential part of the development

and implementation of this brazen tax fraud scheme.  But if you

follow Mr. Temkin's recommendation, Mr. Walchli will suffer no

accountability here in the United States criminal justice

system.

Certainly the tools that are available to the Court

are somewhat blunt.  It's basically jail time, money.  You

know, sometimes there are other options.  But here, we submit

that the appropriate sentence is a within-guidelines sentence

that has, by virtue of the guidelines computations, already

accounted for his acceptance of responsibility and already

accounted for the fact that he is a first-time offender.  That

would help bring home the message to other offshore enablers

O42WwalS

1    that the United States is not fair game for their schemes.

2              I tell you, your Honor, notwithstanding Mr. Temkin's

3    rosy picture of the state of offshore compliance, those

4    enablers are still out there.  They are still helping United

5    States taxpayers evade their taxes, and the schemes are getting

6    more and more complex as the Department of Justice's efforts

7    have gotten deeper and deeper into their world.

8              With respect to the other Swiss enablers, there was --

9    and that model has somewhat changed -- for the longest time a

10   pretty odious business model in Switzerland, whereby much of

11   their economy was driven by servicing clients who were doing

12   nefarious things, like evading taxes, money laundering, hiding

13   income and assets from their respective governments, and the

14   Swiss bankers that Mr. Temkin referred to were employees of

15   those banks that engaged in that odious conduct.

16             The IRS has attempted in many different ways to try to

17   reach what are very, very difficult accounts to uncover.  One

18   of the primary ways is, as Mr. Temkin acknowledges, the

19   offshore voluntary disclosure program.  The fact that there

20   were tens of thousands of accountholders who came in -- and I

21   believe the amount collected through that is upwards now of $10

22   billion -- is a testament to the depth of the problem.  And

23   each one of those U.S. taxpayers was enabled by a person

24   entrenched in the Swiss banking industry.

25             Now, we acknowledge that Mr. Walchli was not a Swiss

O42WwalS

banker.  He worked for the holding company, but I don't see
that that's a meaningful distinction when you look at what he
actually did and how deeply he was involved here.  He was a key
player in this, notwithstanding Mr. Temkin's assertions that
everybody else was more culpable than he.

          We have no reason to be able to verify, other than Mr.
Walchli's words, that he tried in 2010 to put a stop to the
Singapore solution, unsuccessfully, quite apparently.  In 2011,
he did convince the bank to kick the clients out, but there
were no efforts made by Mr. Walchli or any of the other
participants to ensure that those clients became tax compliant.
Rather, what they were doing -- and I note that in 2011, four
Credit Suisse bankers were indicted -- they were getting rid of
the hot potato of those undeclared clients and, as it turns
out, assisting them overall in going to Singapore bank
accounts, in new entity names, continuing the scheme for a
number of years.

          In short, your Honor, no jail time for Mr. Walchli
would send no message whatsoever of deterrence to others
situated like him.  The fact that they've highlighted the
suffering that he has apparently undergone in the last 14
years -- and we've heard it from Mr. Walchli today, and I feel
deeply sorry for his family -- he had every opportunity to come
in, at least by 2014, when we understand that Mr. Temkin was
hired to represent him.  But rather, he did not do that.  He

O42WwalS

played a wait-and-see game, and he waited until he had lost his

motion to dismiss to plead guilty.  That's his right to do, and

we do not quarrel with that, but he should not be rewarded

somehow for the suffering that he purported to go through in

the intervening years, when the length of time was of his own

making and of his own choice.

Your Honor, it's always a difficult thing to

contemplate the sentence of someone who otherwise appears to

have led a good, decent and honorable life.  But he did not

engage in good, decent or honorable conduct when it came to the

Singapore solution.  We still don't know why he did it.  We've

proffered to you a theory in the government's submission.

Perhaps it was nothing more than wanting the approval of his

boss.  Perhaps it was wanting to maintain his position at IHAG

Holding and not incur the wrath of the people he worked with.

But whatever it was, he had a choice.  He made it, and it

resulted in not only lost tax revenue to the United States, but

it resulted in multiple regulatory actions by the countries who

were impacted, including Germany, Singapore and Switzerland,

where FINMA made inquiries of the bank when they heard about

the Singapore solution.

Mr. Walchli has been a very fortunate man in

comparison to so many and so many who have come before this

Court.

We attempted to work with his lawyers regarding a

O42WwalS

```
 1   consent judicial removal order, which was rejected.  Your
 2   Honor, we believe that the only fair sentence, given all of the
 3   factors under 3553(a), is a term of imprisonment.  We submit
 4   that the appropriate term falls within the sentencing
 5   guidelines.
 6           If there are no questions, your Honor, we rest on our
 7   papers.
 8           THE COURT:  Good.  Thank you, counsel.
 9           MR. TEMKIN:  Your Honor, may I just have one moment --
10           THE COURT:  Yes.
11           MR. TEMKIN:  -- to talk with Mr. Albert and
12   Mr. Bussen?
13           THE COURT:  Yes, you may.
14           Let me do this.  I was going to propose that we take a
15   very short recess.  We've been here for a little while, and I
16   want to give everybody a chance to stretch their legs, so I'll
17   take a short, five-minute break.  Please confer during that
18   period, and I'll hear any further argument that the defense
19   wants to offer.
20           I'll see you here shortly.
21           MR. TEMKIN:  Thank you.
22           (Recess)
23           THE COURT:  Thank you.
24           Be seated.
25           Good.
```

O42WwalS

1          Thank you.

2          Counsel for defendant, anything else from you?

3          MR. TEMKIN:  Your Honor, very, very briefly.

4          First, with respect to Ms. Davis's last point about

5     the thesis that they posited for why Dani would have engaged in

6     the conduct, Dani had an enormously successful career at IHAG,

7     at Holding.  There was no financial gain, and it's speculation

8     to think that somehow these clients were essential to the

9     success of Helvetic.

10          The point that I was making with respect to Gubser's

11     co-opting of Helvetic is there's no question that Dani was

12     developing a legitimate asset manager for purposes wholly

13     unrelated to concealment, account concealment, and we know that

14     because Helvetic survived many years after those accounts were

15     closed.  So those accounts were in no way central to Helvetic,

16     and there's no reason to believe that they somehow furthered or

17     enhanced Dani's career.

18          Second, Ms. Davis was obviously very, very active in

19     the Swiss bank program, and the design of the Swiss bank

20     program was in many ways ingenious in how it pitted different

21     constituencies against one another.  I, too, was pretty active

22     in the Swiss bank program, your Honor, and I find it hard to

23     believe that this was the most brazen conduct that the 84 banks

24     that were immunized by virtue of the Swiss bank program engaged

25     in.

O42WwalS

|   |   |
|---|---|
| 1 | Finally, with respect to the comment about FINMA, |
| 2 | FINMA is the bank regulator in Switzerland, and I understand |
| 3 | that they actually investigated all banks that participated in |
| 4 | the Swiss bank program, the conduct that was disclosed.  So I |
| 5 | don't think that there's anything special about the fact that |
| 6 | FINMA looked at the Singapore solution. |
| 7 | Your Honor, I really do appreciate the time and |
| 8 | attention that your Honor has given to this matter, and unless |
| 9 | your Honor has any questions, I'll sit down and rely on the |
| 10 | papers. |
| 11 | THE COURT:  Thank you. |
| 12 | Counsel, is there any reason why sentence should not |
| 13 | be imposed at this time? |
| 14 | MS. DAVIS:  No, your Honor. |
| 15 | MR. TEMKIN:  No, your Honor. |
| 16 | THE COURT:  Thank you. |
| 17 | I'll now describe the sentence that I intend to |
| 18 | impose, but counsel will have a final opportunity to make legal |
| 19 | objections before the sentence is finally imposed. |
| 20 | As I've stated, the guidelines range applicable to |
| 21 | this case is 18 to 24 months of imprisonment.  I've considered |
| 22 | the guidelines range.  Under the Supreme Court's decision in |
| 23 | *Booker* and its progeny, the guidelines range is only one factor |
| 24 | that I must consider in deciding the appropriate sentence.  I'm |
| 25 | also required to consider the other factors set forth in 18 |

O42WwalS

U.S.C. Section 3553(a).  These include:

First, the nature and circumstances of the offense and the history and characteristics of the defendant;

Second, the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, (c) to protect the public from further crimes of the defendant, and (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

Third, the kinds of sentences available;

Fourth, the guidelines range;

Fifth, any pertinent policy statement;

Sixth, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

Seventh, the need to provide restitution to any victims of the offense.

Ultimately, I'm required to impose a sentence that is sufficient but no greater than necessary to comply with the purposes of sentencing that I mentioned a moment ago.

I've given substantial thought and attention to the appropriate sentence in this case, considering all of the 3553(a) factors and the purposes of sentencing, as reflected in

1    the statute.  Based on a review of all of those factors, which

2    I'm going to discuss in much more detail in a moment, I intend

3    to impose a nonguidelines sentence of time served.  I do not

4    expect to impose a term of supervised release.  I expect to

5    impose a fine.  I do not expect to issue an order of

6    restitution.  I'm going to impose the mandatory fee of $100.

7    I'm going to discuss each of those issues with more specificity

8    after I've reviewed my reasoning, which I'm going to go into in

9    more depth now, starting with the nature of the offense.

10          Let me just start by saying the nature of

11    Mr. Walchli's crimes was very serious.  Tax fraud is a very

12    serious crime.  Many of us have heard the famous quote by

13    Justice Holmes, who wrote that "taxes are the price we pay for

14    a civilized society."  So for those of us who facilitate not

15    paying taxes, look around.  It's the price we pay for a

16    civilized society.  The people who evade that duty and people

17    like the defendant who facilitate its evasion are committing a

18    very serious crime, one that undermines a civic society.  The

19    government's work in this arena is very important.  It is

20    prosecuting serious crimes and working to stop corrosive

21    practices that undermine our civic society.

22          Now, I'm not going to try to outline all of the

23    details of the so-called Singapore solution that PB IHAG

24    developed to help some of their American clients to hide their

25    money.  It's all thoroughly explained in the presentence report

O42WwalS

1    and the various submissions by the parties.  I, like the

2    government, view it as being sophisticated, dastardly in its

3    effort to hide these clients' assets from the government.  I

4    will not recite all of its details, but I'll just say a few

5    words, in part, in order to put the defendant's participation

6    in the scheme into context.

7            As we've heard, the defendant was employed by IHAG

8    Holding, a holding company.  He started working there in 2004

9    and became a member of its executive board in 2006.  It was in

10   early 2009, in response to stepped-up enforcement in the United

11   States, that PB IHAG, a Swiss bank that was an affiliate of

12   IHAG Holding, the company for which the defendant formerly

13   worked, adopted a policy that would require Americans with

14   deposits there to disclose their accounts to the IRS or would

15   require them to leave the bank.  But the bank had three

16   significant American clients who did not want to do that.

17   Those accounts had about $60 million in them, so the company's

18   top lawyer, acting at the direction of the bank's executive

19   management and without the defendant's knowledge or

20   involvement, approached a codefendant, Mr. Schnellmann, about

21   developing the Singapore solution.  That lawyer, top lawyer,

22   worked with Mr. Schnellmann, Mr. Lampert and others at Allied

23   Finance to develop the solution which essentially involved

24   laundering money through a Singapore-based money manager, which

25   would then deposit the funds in PB IHAG in its own name -- a

O42WwalS

complex scheme involving moving money through multiple boxes internationally and obscuring the identities of the depositors. It was a sophisticated, complex scheme.

The scheme was developed and structured with the guidance of senior management at the bank, who counsel for defendant described as higher-ups, who are not before me here, and others who are being prosecuted but who have largely evaded capture. Those people developed the scheme without the defendant's involvement. Mr. Walchli got involved because several years earlier he'd been tasked with exploring ways for IHAG Holding to enter the Asian market. In doing so, he developed an asset management business, which we've heard about today, called Helvetic.

I highlight that his codefendants had another Singaporean entity in mind when they developed the scheme, and again, ironically, it was the top lawyer and risk manager at the bank who approached the defendant about using Helvetic in the scheme. Before he agreed to do so, the defendant sought the approval of higher-ups in the company's management. He also disclosed it to the company's board, and the company's board approved the conduct.

Mr. Walchli then participated in the project from about, until about 2011, or at least Helvetic did. During that period, the three U.S. families engaged in a series of complex transactions to round trip their funds to PB IHAG to avoid

O42WwalS

1    paying U.S. taxes.

2            Now, I understand that Mr. Walchli proffers that he

3    grew uncomfortable with the structure in 2010 and asked his

4    superiors to stop using the solution.  I'm told that they

5    declined to do so when he first asked.  I've heard today and in

6    the sentencing submissions that the bank's employees scorned

7    the defendant for his attempt to stop their use of the

8    solution.  Eventually, in 2011, I understand it's undisputed

9    that the defendant asked to cut Helvetic out of the Singapore

10   solution, and it was at the defendant's initiative.

11           Two of the three U.S. families for whom the Singapore

12   solution was developed ultimately participated in the IRS's

13   offshore voluntary disclosure program.  Through that program,

14   those two families disclosed their illegal offshore banking

15   activities.  They paid restitution.  They paid penalties, all

16   in exchange for amnesty and anonymity.  Because they

17   participated in the program, the principal beneficiaries of the

18   program are not being prosecuted.  One person who used the

19   solution, Mr. Chinn, was prosecuted.  He pleaded guilty,

20   forfeited a number of offshore assets and was sentenced to

21   probation with, I think, 18 months of house arrest.

22           So, this is a very serious crime.  I do not undermine

23   it.  The development and use of the Singapore solution was

24   sophisticated.  It was wrong.  It defrauded the government.

25   The defendant knowingly engaged in that complex fraud.

O42WwalS

1        At the same time, I believe that the defendant was one

2   of the least culpable people involved in the scheme.  He did

3   not develop the scheme.  It was developed by others.  He was a

4   later addition to the scheme.  He was recruited to it because

5   the business that he had developed for legitimate reasons was

6   viewed as being capable of playing a role in the scheme.  He

7   was not personally involved in the client relationships that

8   the scheme was designed to preserve.  Again, the defendant was

9   approached to participate in the scheme by the company's top

10  lawyer and compliance officer, and he sought and obtained

11  clearance from "higher-ups" and the board before he moved

12  forward.  So I recognize that he had a meaningful role, but I

13  do not believe that he was as culpable as a number of his

14  codefendants or perhaps others who have not been charged, and

15  was not nearly as culpable as the taxpayers who have been

16  granted amnesty by the government and, as a result, have not

17  faced the threat of prosecution or the collateral consequences

18  of it.

19        So, this is a serious offense, but I think it's

20  important to consider not just the overall seriousness of the

21  Singapore solution; I think it's important to target the nature

22  of the defendant's participation in it and the circumstances

23  that led to his engagement in it and the circumstances related

24  to his withdrawal from it.

25        The defendant was born in May 1967 in Zurich,

O42WwalS

Switzerland.  He's 56 years old today.  He was raised by both

of his parents there in what was described as an upper

middle-class life style.  The government describes his life as

comfortable.  His family was close-knit.  He's been married to

his wife, who is here today, since 1999.  The couple have two

adult children, who are both here.  His entire family remains

very supportive of him, as is reflected in the numerous letters

that I've received from all of them.

          I've read all of the letters submitted in support of

the defendant in connection with this sentencing, and I take

from them that in many other aspects of the defendant's life,

he has been a generous, committed, hardworking person and one

that in particular in connection with his dedication to charity

and his assistance for the victims of the bus accident in India

is arguably exemplary.  His commission of this offense appears

to be aberrational.  And again, in my view, it's significant

that he participated in it only after having requested and

received the endorsement of higher-ups at his company and its

board of directors and that he did so after being solicited to

participate in it by the chief risk officer, the person charged

with compliance at the bank.

          The defendant is blessed with generally good health.

He has no history of mental health issues or substance abuse

issues.  The defendant graduated from university in Switzerland

and has an MBA from the University of Rochester.  He enlisted

O42WwalS

in the Swiss army.  He was there for a period of six years,
over the course of which he achieved the title of lieutenant.
He has a long history of legitimate work in banking and finance
and I'll call it management.  He started off at ZKB before
moving to IHAG Holding in 2004.  He worked there for 18 years,
first as vice president for strategy and business development,
and then he moved to a position on the company's executive
board.  He's principally involved in business development and
investment strategy.  His work, as I understand it, did not
generally involve client relations with customers of PB IHAG,
the bank at the center of this scheme.

        The defendant has no prior convictions for criminal
conduct.

        Now, I've considered what is a just punishment in this
case.

        I'm also required to consider the deterrent effect
both on Mr. Walchli personally and the need to deter others
from committing this type of offense, which we refer to as
general deterrence.

        I think that the need for personal deterrence here is
very low.  I think that for a number of reasons:

        First, the defendant committed this offense over a
decade ago.  We have no information that he was involved in
criminal conduct since he took the steps to withdraw the
Helvetic entity from the scheme.  The indictment in this case

O42WwalS

wasn't unsealed until about eight years after one of the

families participated in the OVDP program, presumably

disclosing this scheme, so there was not a rush to stop him.

Second, the defendant only engaged in this crime after

being requested by his employer, after receiving the express OK

from higher-ups; he did not financially benefit from the

offense.

Third, Mr. Walchli does not have a financial need to

commit further crime.

Fourth, I think that the defendant's approach to this

indictment supports the view that he has accepted

responsibility for the offense both through his willingness to

appear in the United States to face it and his subsequent

conduct and engagement since his indictment.

Now, I put little weight in the government's argument

that I should not value his willingness to come to the United

States to face the charges because he wanted to protect his

ability to travel abroad. I think that argument undervalues

the challenges of exposing oneself to prison, and the conduct

by Mr. Walchli's codefendants illustrates what I think is the

fallacy of the argument. They've decided to stay in

Switzerland rather than face that risk. So I, therefore, take

that Mr. Walchli's willingness to come to the United States

demonstrates a commitment to accepting responsibility for his

negative behavior, and I think that that is worthy of note.

O42WwalS

```
1    And I think it supports my view that the need for personal
2    deterrence is low.  His acceptance of responsibility weighs in
3    favor of a lesser sentence.
4         Now, I've weighed the need for general deterrence in
5    this case.
6         I think that this is a factor that requires serious
7    consideration.  I agree with the government that facilitators
8    of this kind of tax fraud against the United States should be
9    deterred from that type of conduct.  Still, this is just one of
10   many factors that I must weigh in assessing the 3553(a)
11   factors, and I don't believe that it requires a greater
12   sentence in the context of the assessment of all of those other
13   factors.
14        I note, among other things, the serious collateral
15   consequences of the offense.  I accept the shame and psychic
16   toll of prosecution.  I also note the length of time between
17   the date of the conduct and today's sentencing.
18        I've considered the defendant's ability to use any
19   period of incarceration for education or vocational training,
20   medical care or other correctional treatment.
21        Given the defendant's education, job history and
22   health and his financial conditions, I think that this factor
23   weighs heavily against an incarceratory sentence.
24        I've considered the kinds of sentences available.
25        I do not believe that a term of imprisonment is
```

O42WwalS

1    necessary in this case.

2         I've given serious consideration to the guidelines and

3    the policy statements.

4         I believe that a nonguidelines sentence here is

5    appropriate based on my assessment of all of the 3553(a)

6    factors and the purposes of sentencing.  In the circumstances

7    of this case, my decision is based on an assessment of all of

8    those factors, but I'd like to highlight just a couple of the

9    principal reasons for my downward variance here:

10        First, I believe that the likelihood of personal

11   recidivism is extremely low;

12        Second, I think, as I'm about to comment upon, that a

13   downward variance is appropriate in order to avoid unwarranted

14   sentencing disparities; and

15        Third, I believe that a downward variance is

16   appropriate given the defendant's responsible acceptance of

17   liability or responsibility in this case and his, I accept,

18   heartfelt remorse for his decision to engage in this conduct.

19        I've considered the need to avoid unwarranted sentence

20   disparities.

21        Having considered all of the sentencing factors, I

22   believe that the sentence is appropriate for him.  This factor

23   does weigh significantly in my decision.  As I've described,

24   two of the U.S. taxpayers involved in the scheme received

25   amnesty for good, programmatic reasons.  The consequence of

O42WwalS

1    that is that they have not suffered consequences other than the

2    need to repay the tax losses with penalties and interest.

3          The other U.S. taxpayer involved received a

4    nonincarceratory sentence.  The defendant, I believe, is among

5    the least culpable of the defendants that the government has

6    charged as a result of this conduct in this case.  None of the

7    others have yet faced jail time.  I think it would be

8    disproportionate to impose a substantial incarceratory sentence

9    on the defendant, given that those who, in my view, are

10   substantially more culpable than he have not yet been jailed.

11         I should pause here to say the fact that I'm

12   sentencing the defendant here in this way is very much a result

13   of my assessment of the totality of the circumstances.  Mr.

14   Walchli is, in my view, very much the least culpable of the

15   codefendants.  I do not expect that my assessment of all of

16   these factors would weigh in the same way with respect to the

17   codefendants who have not accepted responsibility and instead

18   have chosen to elude justice and may have been more

19   substantially implicated by their involvement in this scheme.

20   So this is a decision that applies to this defendant, given my

21   assessment of all of the factors with respect to him alone.

22         I've considered the need to provide restitution to any

23   victims of the offense.

24         This is really not a factor in this case because, as I

25   understand it, the U.S. taxpayers who participated in the

O42WwalS

```
 1   scheme have already satisfied the government's tax loss.

 2             With that, let me ask the defendant to please rise for

 3   the imposition of sentence.

 4             It is the judgment of this Court that you be sentenced

 5   to time served.

 6             Following the guidance of Section 5D1.1(c), I'm not

 7   going to impose a term of supervised release.

 8             I've considered all of the factors set forth in

 9   Section 5E1.2(d) and conclude that Mr. Walchli should pay a

10   fine in the amount of $50,000.  I believe that this is

11   necessary in order to ensure just punishment.  The defendant

12   has the financial means to satisfy a fine in this amount.

13   Given the nature of his offense and the financial capacity, a

14   fine in this amount, I believe, is appropriate.

15             The defendant must pay a total special assessment of

16   $100, which shall be due immediately.

17             Counsel for the United States, I understand that the

18   government is not seeking forfeiture or restitution in this

19   matter.  Is that correct?

20             MS. DAVIS:  That's correct, your Honor.

21             THE COURT:  Thank you.

22             Counsel, any view regarding the time that I should

23   establish by which the defendant must satisfy the fine?

24             Counsel for defendant.

25             MR. TEMKIN:  Your Honor, I think if we could have a
```

O42WwalS

1    week, we should be able to do it much faster, but I just don't

2    know in terms of wire transfers and the like.

3                THE COURT:  That's fine.

4                The fine is payable no later than April 12, which I

5    believe is next Friday.

6                Counsel, does either counsel know of any legal reason

7    why this sentence shall not be imposed as stated?

8                Counsel for the United States.

9                MS. DAVIS:  Your Honor, the answer to that is no, but

10   I can't let one of your comments go without being addressed

11   because, frankly, it's a huge slap in the face personally and

12   to the Department of Justice that we were, quote, in no rush to

13   put a stop to this.

14               This case took thousands of hours to develop and

15   prosecute.  It took many months --

16               THE COURT:  I'm sorry, counsel.  Let me just pause

17   you.

18               I'll give you the opportunity to criticize the Court

19   right after I finish the sentencing.

20               MS. DAVIS:  Thank you, your Honor.

21               THE COURT:  Is this something that goes to the

22   sentencing?

23               MS. DAVIS:  Not directly, your Honor.

24               THE COURT:  Thank you.

25               MS. DAVIS:  Thank you.

O42WwalS

| | |
|---|---|
| 1 | THE COURT:  Do you wish for me to comment on this?  If |
| 2 | you want to finish your remarks, please feel free. |
| 3 | Go ahead, understanding that I will respond. |
| 4 | MS. DAVIS:  Your Honor -- |
| 5 | THE COURT:  What do you want to say to the Court? |
| 6 | MS. DAVIS:  Your Honor, it's meant with the most |
| 7 | respect, but this was not for lack of effort on the part of the |
| 8 | government. |
| 9 | THE COURT:  Did I say that, counsel? |
| 10 | MS. DAVIS:  That was what I heard, and perhaps I |
| 11 | misheard. |
| 12 | THE COURT:  Thank you. |
| 13 | What's the takeaway that you're presenting to the |
| 14 | Court, counsel for the United States?  What are you asking for? |
| 15 | MS. DAVIS:  I just want the record to be clear that |
| 16 | the government did not sit on its hands with this case, your |
| 17 | Honor. |
| 18 | THE COURT:  Thank you. |
| 19 | I'll comment on that. |
| 20 | Anything else, counsel for the United States, that's |
| 21 | pertinent to this sentencing? |
| 22 | MS. DAVIS:  No, your Honor. |
| 23 | THE COURT:  Thank you. |
| 24 | Is that pertinent to the sentencing?  Is this a legal |
| 25 | reason why the sentence should not be imposed as stated? |

O42WwalS

1           MS. DAVIS:  No, your Honor.

2           THE COURT:  Thank you.

3           Is there anything else that the government wishes to

4  present to the Court in connection with the sentencing?

5           MS. DAVIS:  No, your Honor.

6           THE COURT:  Thank you.

7           We'll talk about this issue after the sentencing is

8  completed.

9           Counsel for the defendant, is there any legal reason

10  why the sentence shall not be imposed as stated?

11          MR. TEMKIN:  No, your Honor.

12          THE COURT:  Thank you.

13          The sentence as stated is imposed.  I find the

14  sentence to be sufficient but not greater than necessary to

15  comply with the purposes of sentencing set forth in 18 U.S.C.

16  Section 3553(a)(2).

17          Thank you very much.  You can be seated.

18          You have the right to appeal your conviction and

19  sentence, Mr. Walchli, except to whatever extent you may have

20  validly waived that right as a part of your plea agreement.

21  The notice of appeal must be filed within 14 days of the

22  judgment of conviction.  If you're not able to pay the cost of

23  an appeal, you may apply for leave to appeal *in forma pauperis*.

24  If you request, the clerk of court will prepare and file a

25  notice of appeal on your behalf.

O42WwalS

1              Good.

2              Any other applications at this time?

3              Counsel, first, for the United States.

4              MS. DAVIS:  No, your Honor.

5              THE COURT:  Thank you.

6              Counsel for defendant.

7              MR. TEMKIN:  Your Honor, we will present to your Honor

8    as soon as possible a request that your Honor exonerate the

9    bail.  So we will hopefully get that down to your Honor or

10   submit it via ECF later today, since Mr. Walchli is in the

11   country now, and I don't know if he needs to appear to address

12   the cash bail issue.

13             THE COURT:  Thank you.

14             MR. TEMKIN:  Thank you.

15             THE COURT:  Fine.  Good.

16             Counsel for the government, let's discuss.  What would

17   you like to raise with THE Court?

18             MS. DAVIS:  Nothing further, your Honor.

19             THE COURT:  Thank you.

20             To the extent that you took from my comment that I

21   take issue with the government's efforts here, that is

22   incorrect.  I hope that you appreciate that at the very

23   beginning of my comments, counsel, I specifically pointed to

24   the seriousness of this offense and I specifically applauded

25   the government's efforts to prosecute such crimes.  So I

O42WwalS

```
1   apologize if you and the Department of Justice, as you just
2   stated, the Department of Justice takes issue with my comments.
3   I apologize if that is the case.
4            Is it the case that the Department of Justice takes
5   issue?
6            MS. DAVIS:  Your Honor, I can only speak for myself.
7            THE COURT:  Thank you.
8            But before you spoke for the Justice Department.  Is
9   that right?
10           MS. DAVIS:  I am a representative of the Department of
11  Justice, yes, your Honor.
12           THE COURT:  Thank you.
13           Good.
14           This proceeding is adjourned.  Counsel for the
15  government we'll proceed going forward.
16           Anything else before I step down?
17           Counsel for the government.
18           MS. DAVIS:  No, your Honor.
19           THE COURT:  Thank you.
20           Counsel for defendant.
21           MR. TEMKIN:  No, your Honor.
22           THE COURT:  Very good.
23           Thank you.
24           This proceeding is adjourned.
25           (Adjourned)
```